UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

HIDDEN EMPIRE HOLDINGS, LLC,       )
et al.,                            )
                                   )
          Plaintiffs,              )
                                   )
               vs.                 )   2:22-CV-6515-MWF
                                   )
DARRICK ANGELONE, et al.,          )
                                   )
          Defendants.              )
_____

REPORTER'S TRANSCRIPT OF HEARING

Los Angeles, California

Thursday, September 29, 2022

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

APPEARANCES OF COUNSEL:

For the Plaintiffs:

        SANDERS ROBERTS LLP
        By:  Lawrence Hinkle, Attorney at Law
             Stephanie Nojima, Attorney at Law
        1055 West 7th Street, Suite 3200
        Los Angeles, California 90017

For the Defendants:

        LAW OFFICES OF J T FOX APC
        By:  J T Fox, Attorney at Law
        556 South Fair Oaks Avenue, Suite 444
        Pasadena, California 91105

THE CLERK:  Now calling item number 2, case number CV-22-6515, Hidden Empire Holdings, LLC, et al. vs. Darrick Angelone, et al.

Counsel, please state your appearances.

MR. HINKLE: Good morning, Your Honor.  Lawrence Hinkle appearing on behalf of the plaintiffs.

MS. NOJIMA: Good morning, Your Honor.  Stephanie Nojima on behalf of the plaintiffs.

THE COURT:  Good morning, Counsel.

MR. FOX: Good morning, Your Honor.  J T Fox on behalf of the defendants.

LAW CLERK:  Certified law clerk for defendants.

THE COURT:  And how does Mr. Angelone pronounce his name?

MR. ANGELONE:  Darrick Angelone.

THE COURT:  Mr. Angelone, please let your lawyers speak for you in court.  This is going to go much more simply for you if you do that.  If I want to hear from you, I will ask you directly.

All right.  And starting off on that foot, let me say good morning, Mr. Angelone, which is why I was asking the question.

MR. ANGELONE:  Good morning.

THE COURT:  Let me summarize, having looked at this, how I see things.  And of course, the purpose of this hearing

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

is to give the parties a chance to tell me why I'm wrong.

It does seem that there is a legitimate dispute between the Taylors and Mr. Angelone; and in particular, about whether he is entitled to something arising from the video game, whether it's in the nature of quantum meruit for the work he put in, or whether it was an implied contract or an expressed contract, or whether he, in fact, is being pushed to the edge because of the $125,000. All of those things seem to be disputed. Mr. Angelone could very well be in the right, it's something for the Superior Court to figure out.

However, those pressures, and perhaps the justice of that cause is no excuse for taking the law into one's own hands and exercising self help. I might owe somebody money, but it doesn't give them the right to take my car away from me because I loaned it to them with the keys. It doesn't give them the right to go inside my house and start taking out my furniture. It's just that is not the way things work.

And on what is being presented here, it does appear that that is the digital equivalent of what is going on here. It would appear that Hidden Empire has certain rights and certain property.

I get it that Mr. Angelone would be very irritated, or to the extent that it's a financial disaster, just terrified or desperate if having through the acquiescence,

and perhaps, as suggested by the defense, the carelessness or

lack of curiosity or lack of ability of the Taylors, that he

felt that these things were essentially just given over to

him for his care.

But nonetheless, that is not the same as saying that

they were -- they belonged to Mr. Angelone or to his

companies.

The evidence in front of me demonstrates that at all

times these were assets that belonged to Hidden Empire.

So with that brief synopsis of what I think seems to

be going on here based on what the evidence has shown, let me

hear from the defense.

I did read Mr. Angelone's declaration.  It was much

more in the nature of an unauthorized sur-reply than anything

else, but nonetheless, I did read it, and I did consider it.

Even if the allegation is true about the nature of

the Icelandic company and what is being shown, the fact

remains is that there is nobody else who would have done

this, I mean, other than Mr. Angelone.  And it's just

completely implausible to think that some unknown person for

some unknown reasons, whose existence would be unknown to the

owners of Hidden Empire, would have acted in that way of

reregistering these things.

So Mr. Fox, let me hear from you.

MR. FOX: Thank you, Your Honor.  Your Honor, can I

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

take the lectern?

THE COURT:  You may.

MR. FOX: Thank you, Your Honor.

Your Honor, thank you very much for giving us an opportunity this morning to speak.

Your Honor, we've only had a chance to read through about a quarter of the tentative ruling, and so I will try my best; and also, I do appreciate your comments.  I think they were very helpful.

I wanted to start by saying that I think an issue over the credibility of the plaintiffs is seriously at stake here.  And it just speaks entire volumes that they can allege that they did not authorize or know anything about this Fear game, if you will.  And then of course, Mr. Angelone presents substantial evidence, text message communication, e-mails, et cetera, where the game is discussed.  And you can tell from the communications between the parties that the game was authorized.

It's also, like Your Honor pointed out, this is a very unfortunate situation, because a lot of these documents -- or a lot of the relationship wasn't formally documented, which is really unfortunate.  And that is why we are here today.  And that is why we are probably in court a lot of the time, because parties hand shake deals, or they are friends, and things are fine, and things aren't

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

formalized, and eventually there is a problem, and now we are in court. Which is unfortunate at the same time, because it seems like the parties were very good friends for some period of time.

And Mr. Angelone's relationship goes back to 2012 with the plaintiffs. And so he's had a long relationship with these people; not just friends, but business colleagues, et cetera.

I think it's very disingenuous for the plaintiffs to call Mr. Angelone an independent contractor through and through from the beginning to the end of this relationship. We showed to the Court that there were multiple operating agreements that were sent to Mr. Angelone for approval. He was placed on a bank account.

I understand that these are probably more or less issues for the State Court, and I respect that, Your Honor, but I think it just goes to credibility.

The one thing I can tell from all of the relationship is that Mr. Angelone was baited from 2018 through the present. And I do understand his discontent, and I do understand what transpired in April of 2022, or at least what began. There were substantial fees that were owed on his services in respect to web service, et cetera.

And because of the lack of payment, it came to a point of frustration. And so that is when Mr. Angelone's

company had shut off plaintiffs' web access, if you will, or e-mail access for only, I think it was six or seven days maximum.  Payment was made, and all of those things are restored.

And the reason why I'm going in this direction is because there is one exhibit that is so important, and it's really important that the Court knows that access was fully restored.  Plaintiffs' business was interrupted for six days. And ironically, Mr. Angelone's business, AOne, did nothing different than what a GoDaddy would do, or a Google.  So if you fail to pay for your services, at some point they are going to turn off the service until you make your account good.

So that is what happened here.  And it was only a six-day period.  And so there is one exhibit in particular that I think is really important for the Court to take note. It was -- it's Exhibit Number 32, which was attached to Mr. Angelone's declaration -- I'm sorry -- to Quincy Newell's declaration, I apologize.  And it's an e-mail from Google -- I'm sorry -- between Google and Roxanne Taylor.

And you can see in this e-mail that Hidden Empire Film is receiving e-mail, and they are responding to e-mail, using their e-mail account.

So this position by plaintiff that they have been totally shut out of their accounts, their social media, their

e-mail, it's just not true.  This is proof positive that they are using their e-mail account, Your Honor.

So what Mr. Angelone was trying to express in his declaration is that these things were restored to the plaintiffs right away after they received payment for those particular services.

And he had provided them with certain information in which they could then gain access or slash ownership to those accounts.  And so  -- and so I know it's probably a question that is better asked or answered by Mr. Angelone, because he's the technology expert here.

I tried to get involved to help mediate the dispute in early, middle of August of 2022.  And I'm not a technology expert.  I don't understand three quarters of the technology verbiage that I've received to date in this case.

But what I do know is that the accounts were restored to plaintiffs after that six-, seven-day period. And they have continued to use -- the plaintiffs have continued to use their e-mail accounts, their social media accounts, and so forth.

Your Honor, I think what is also very important, and it's something that I think the Court should consider in respect to weighing the credibility of the parties, is that plaintiffs claim irreparable harm to their business. Business is disrupted.  We know there was a disruption for

six or seven days; however, that was caused by them.  They didn't pay AOne for months, months and months for those service fees.  And then once they paid, it was brought current.

But what is even more alarming is that now it is September 2022, and AOne has been continuing to administer those services and pay the domain fees, the e-mail account fees, if you will, during this entire time.

In fact, just this last month, he paid more fees.  This is not somebody that is trying to disrupt their business; he's actually helping them maintain their accounts.

And so -- and I think that is one thing that is kind of lost here, is that he's actually been proactive.  Even though we have this dispute, he's actually been proactive.

And he's offered to transfer the administration access to the plaintiffs; however, there is another step that the plaintiffs have to take.  And again, I'm not a technology expert, I don't really understand how it works.  It is certainly something that Mr. Angelone could explain to the Court.

But I would just hope that the Court would take into serious consideration that Mr. Angelone is actually being proactive, and he's doing nothing to try to intentionally damage their business, et cetera.

Your Honor, I think --

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

THE COURT:  I'll let you go on, but I do have a question for you, and that is:  If the preliminary injunction were to be along the lines that I indicate, where essentially the -- it's just dealing with Hidden Empire, and I'm not giving the Taylors everything they are asking for, what would be the damage to Mr. Angelone?  You know, if in fact -- what -- how would Mr. Angelone be damaged if, in fact, the -- he was ordered to do those things, or refrain from doing those things that I set forth on page 2?  If he's not claiming ownership on some of these things, or if the use of these things was being exercised by the plaintiff pending the resolution of the relationship in the Superior Court, where is Mr. Angelone damaged by that?

MR. FOX: Your Honor, thank you.  And I think that is a great question, and I appreciate the opportunity to answer that.

There would be some damage to Mr. Angelone.  And in his declaration in opposition, if Your Honor recalls, there was -- there were many accounts that he has no issue returning to the plaintiffs, or I don't want to say returning.  He's never had an objection.  It's this second process, the second stage that is required by the plaintiffs to initiate the transfer.  They have to provide certain administration information to Mr. Angelone's company for him to then transfer these accounts to the plaintiffs.  So that

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

is one issue.

Your Honor, in respect to how he could be damaged, in respect to -- well, one, is that he created the Fear game based on the conduct of plaintiffs.  He's now incurred hundreds of thousands of dollars developing a game that is actually still in development while we speak today, and he's continuing to spend thousands of dollars developing the game.

So he would be significantly damaged if the Court were to order that he's not to promote, advertise, market or sell the video game, or maybe there is a way to amend that ruling that doesn't damage Mr. Angelone.  It would be substantial damages to Mr. Angelone, Your Honor.

THE COURT:  Well, although damages that would be subject to being quantified; and therefore, would be money damages.  Albeit there might be an issue of whether Hidden Empire would be in a position to pay those damages.

Is the -- what is the dispute right now in the Superior Court, and what does it encompass?  Is there, in fact, a lawsuit?  There has been these kind of references to it, but I don't recall on this what exactly is -- is there a lawsuit right now in Superior Court based on the relationship of the parties?  And if so, what is its status, and what will be resolved in that case?

MR. FOX: Thank you, Your Honor.

Your Honor, just quickly before I answer that, if I

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

may?  In respect to the game, as we set forth in our papers, we believe that we have an implied license to develop, market, sell that game.

So if Mr. Angelone is stopped from continuing to develop that game right now, the game is going to be lost forever.  I think that is -- and that is more from a technology standpoint.

Our lawsuit was filed.  It was filed September 16th, 2022.  We've purposefully held off on serving the lawsuit.  I was hopeful that the parties may agree to meet.  I proposed the parties attending a private mediation.  I think it's a very complicated matter.  We haven't received a response to that yet.  I know that plaintiffs' counsel, and with all due respect -- and respectfully, he did ask us for a settlement proposal, which is fine, and I think that is in the papers.  But it's so complicated, Your Honor.  I think it's something where a third-party would be very helpful in trying to sort through all of this and coming up with some sort of remedy that would be beneficial to all parties.

In respect to -- can I just ask --

THE COURT:  You may.

(Pause in proceedings.)

MR. FOX: Your Honor, there is still the $35,000 that AOne has not been paid for for services from May -- I think May 2022 through present, plus the costs that he incurred for

paying the renewal fees for domains and Google account fees, et cetera.

Also, my client was nice enough, because I actually spoke to him last night, and I said, Mr. Angelone, I'm worried that tomorrow morning I will not be able to articulate well anything revolving technology in respect to this hearing.

So he was nice enough to prepare some spreadsheets for me, which would help me answer some of the Court's questions.

And part of the reason was is because his position is that there is certain things that plaintiffs are asking for that he has absolutely no control or ownership of, and I think that was also specified in his declaration.

And, you know, as an example, we incorporated into our opposing papers an actual trademark registration certificate for Hidden Empire Film Group, which Mr. Angelone does not own, AOne does not own, it's owned by a gentleman named Mark Phifer Chalant.

And Mr. Angelone has no interest in that.  And that is something that he could not feasibly transfer control or ownership of that.

So I actually have the list of items which he claims he has absolutely no control, no ownership.  So what I'm concerned is if the Court makes this blanket ruling that he

has to turn over everything that the plaintiff has asked for, he can't do it.

THE COURT: Well, ultimately someone cannot be held in contempt for failing to do something which he or she has no ability to do, anymore than someone could be sent to debtor's prison when there is an inability to pay a debt.

The question here is how much of these things -- which of these things fall into that category? Trying to be fair to Mr. Angelone, it seems that some might, and they would be excluded from the order. Some of the things based on, for instance, what happened in Iceland, I find his assertion quite dubious. And I believe that he and AOne in fact do have the ability, but there would be a hearing before he would be held in contempt, and he would have the right to present whatever evidence, including his own testimony, in support of his inability to obey that.

But of course then he has the right here now to argue that is the case. I'm just saying, based on the evidence which is in front of me as to those -- as to those things, it just seems to me that the assertions that are being made are dubious. Because who else is there who would have done that? And that is even giving the benefit of the doubt that the statements that were made in the declaration this morning about the Reykjavik address simply reflecting the use of the privacy company are, in fact, correct, because

who else would, in fact, be -- who else would have done those things other than Mr. Angelone?  It's like saying there is some unknown enemy out there of the Taylors who is very sophisticated about their affairs and about what they are doing digitally.  And it just seems unlikely that there is two such people here, along with many other things in the evidence.

So there is that, but you certainly have the right to argue, and I'll listen as to those things, which are -- which I'm inclined to order, which are on page 2 of the tentative.  You have the right to argue that those -- that that shouldn't be part of any preliminary injunction, including -- the problem with Fear is that I'm not exactly sure if the movie coming out -- I guess I just don't know what value the game has independent of the movie.  If it's a great video game that people would be excited about, then that is one thing.  If it's essentially its value is in connection with the movie, then I'm not exactly sure why halting things right now would be as dire as what you just suggested.

But that's -- that is what my reaction is to what I'm hearing.  It's just I -- I just don't understand the basis for saying that if there was a temporary lull while either this Court or the Superior Court tries to sort these things out, or a mediator, for that matter, why in regard to

the game that would be such a difficult situation for

Mr. Angelone.

MR. FOX: Your Honor, I can answer that question, but I did not answer one question that you had a few minutes ago, and I apologize.

You wanted to know if a lawsuit was filed in State Court and what the claims were.  I did mention that the lawsuit was filed and then I went into this --

THE COURT:  Hasn't been served.

MR. FOX: I'm sorry.  So the answer is, yes, filed September 16th, 2022.  We filed a First Amended Complaint.  I believe that was September 19th, 2022.  That is still pending with the Court.  I have a file stamp copy of the original complaint.  The complaint has 11 causes of action.  Probably the significant claim is fraudulent inducement.  There is breach of oral agreement.  There is declaratory relief. There is violation of Business and Professions Code 17200. There is an unjust enrichment claim and some other miscellaneous claims.

But that is the extent of the First Amended Complaint, Your Honor.

And in -- in respect to the Fear game, maybe that is something my client could answer, Your Honor, or --

THE COURT:  Well, let him tell you because it's -- I don't want him to -- I don't want to have this thing where

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

someone is making all these statements that aren't under oath and aren't cross-examined, but I understand why you need to consult with him --

MR. FOX: Understood.

THE COURT:  -- in order to answer the question.

MR. FOX: So, Your Honor, he was nice enough to give me some notes, which hopefully will help the Court.

In respect to the Fear game, he would obviously be unable to complete it or release it.

THE COURT:  Well, it wouldn't be my intention to prevent him from finishing it if it's -- if he feels it's in his interests potentially to throw good money after bad or throw good time and effort after bad, but perhaps if it was completed, it would be something to negotiate with Hidden Empire about.  It would be -- might be valuable on this.

So I don't really have a problem with him finishing it as long as he didn't then release it.  I think until such time as the issue of the implied license, which is not an implausible argument for him to make, is resolved, then either by this Court or the Superior Court, it would seem to be in everyone's interest, including the Taylors, to have him continue to work on it.

I'm not sure why -- I'm not sure that they are even asking for that not to happen.  If they are, then I'll hear from Mr. Hinkle, and he'll explain it to me.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

But that is -- I guess that is my tentative view, is that the point was is to -- this is dealing with it public. If, in fact, as the evidence in front of me right now suggests that it's their movie, and it's -- they don't want the game being released to be at odds with the movie, to denigrate the movie, perhaps cast things in a different light, perhaps to steal the movie's thunder, all of those seem reasonable things for the owners of the movie to be concerned about.

But again, and if there was a license and Mr. Angelone was tricked into putting in a huge amount of effort and now no one wants to pay, then that is something that should be -- then should be resolved.

MR. FOX: And, Your Honor, he would be fine, if the Court would be amenable, to at least allowing him to complete the game in the interim until further order of the Court or the State Court.

THE COURT: I'll hear from Mr. Hinkle as to whether there is an objection to that.

MR. FOX: Okay. And, Your Honor, I'm not sure if -- you know, in respect to the items that Mr. Angelone cannot transfer, I just -- I don't want to get him into a situation where he's in trouble and we are back in front of the Court again. We certainly do not want to waste your time, we don't want to waste plaintiffs' counsel's time. I take court

orders very serious.

So I know that, like we've mentioned, that Mr. Angelone does not have control or ownership over certain things. So I don't know, would it be -- would the Court be open to Mr. Angelone at least providing a declaration as to the -- I know he did to some degree, to specify exactly to what he absolutely cannot transfer because he does not own, et cetera? I think that would maybe be very helpful for the Court and for the plaintiffs.

THE COURT: Well, let me hear -- I'll give you a chance to respond, but let me hear from the plaintiffs.

MR. FOX: Okay. Thank you, Your Honor.

MR. HINKLE: Good morning again, Your Honor.

First, I would like to thank the Court and staff for the substantial work that went into preparing the order or the tentative ruling and working on this matter.

With respect to pretty much the majority of what Counsel just told the Court, we don't think that it impacts the rulings that Your Honor made with respect to literally everything that is in the order itself.

I wanted to focus -- and so we submit on the tentative, Your Honor, with respect to all of those things.

I did want to just state for the Court that even as of this morning, our clients still do not have access to their e-mails. I don't know what they are talking about.

And there have been substantial efforts on our part --

THE COURT:  What about the reference to the Google exhibit showing that the Hidden Empire was able to use its e-mail based on -- because of the Google reference, Exhibit 32?

MR. HINKLE:  I'm not sure about that, Your Honor.  I don't believe that is so.  I have to take a look at that and speak to Mr. Newell specifically about that.  He is here. He's the person whose declaration it was attached to.

I know that we have been routinely going about trying to get access to e-mails for the last several weeks through a number of different ways; not the least of which is trying to get cooperation from the plaintiffs in that regard.

I find that comment, though, a little inconsistent with the statement from Mr. Angelone in his declaration that he's locked out of the account, as well.

So I don't know how we can access the account, Your Honor, and he can't access -- he can't access the account and we can.  I'm not sure about that, Your Honor, quite frankly.

But there have been an enormous amount of efforts to try to get access on a regular basis, almost a daily basis, to see what is going on, to no avail.  Not just by my client, Your Honor, but through the hiring of experts to try to help us get that access.

There is no question that that is an issue.  If it

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

weren't an issue, Your Honor, we wouldn't be here with respect to that issue.  I can attest to that.

With respect to the other thing that Your Honor -- with respect to what Mr. Fox said about the Fear game, the facts are that my clients never approved that game to be made.

I think the evidence shows that Mr. Angelone brought up the fact that he had developed the game.  He sought their interest in the game.  And between that and today, all there has ever been is a discussion about whether we would do something with the game or be interested in the game.  That is it.

The most important thing, I think, though, as it pertains to this hearing, is there has never been a written license for Mr. Angelone -- I'm sorry -- Angelone to -- sorry about that -- to actually use the game in any way, shape or form.

So to the extent that Mr. Angelone decided on his own, as was evident from Mr. Fox's declaration, to spend $125,000 on developing the game, and also Mr. Angelone's admission that he's not seeking for that money from us.  So there is no issue with respect to who's, you know, responsible for paying for that.  There really isn't any relevance to anything else that is going on here, in our opinion, other than the fact that there is no license.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

And, yes, there can be discussions.  If Mr. Angelone wants to create something else on his own, I don't think we can stop him, just like we can't stop anyone else from trying to develop something in the comfort of their own home.  It's beyond -- it's when it gets outside of their own home when it becomes an issue.  And I think that is the scope of the order that we are looking for.

What I did want to address, Your Honor, is the portion of the tentative which states, in conclusion, that it, "will only apply to domains and accounts that use the name 'Hidden Empire' as those are Plaintiffs' flagship accounts."

What is not included in the order then, Your Honor, are the Hidden Empire films, Hidden Empire initiatives, and the Hidden Empire -- and the names of Hidden Empire representatives, as an example.

Your Honor, they are all tied together. Mr. Angelone does not dispute that he doesn't have access to those domains that pertain to the films that Hidden Empire created and distributed.  We are talking about like the film "Traffik" or "Meet the Blacks".  Those are domains that exist right now.  Those are domains where there is active, or should be active social media accounts.  Those are domains that are still valuable to my client.  And those are domains by which we need to regain access to those accounts.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

It's not disputed, Your Honor, that those are our films.  It's not disputed that Mr. Angelone was put into a position of trust to manage those accounts.  We have submitted evidence showing invoices from Mr. Angelone stating that he was managing those accounts for us.  We've submitted undisputed evidence that we have paid Mr. Angelone for those.

And so, Your Honor, there is no difference, really, in terms of the underlying analysis as to why those accounts that pertain to Hidden Empire Films, Hidden Empire initiatives, and even the names of Hidden Empire founders should not be turned over.

THE COURT:  Excuse me, Mr. Hinkle.

What is your response to the argument that the one Hidden Empire entity was shown to be tied to someone who was -- or I should say an unknown person to Mr. Angelone, he might very well be well-known to the Taylors, but the Mark, whatever.

What is your response on that?

MR. HINKLE: Your Honor, I believe that concept pertains to a trademark that Mr. --

THE COURT:  That's right, the trademark.

MR. HINKLE: Not what we are dealing with here, and that is an entirely separate issue.  Which, by the way, Your Honor, has been resolved.  That is no longer an active trademark, as we understand it, and it's just not relevant to

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

this subject.

THE COURT:  Thank you.

MR. HINKLE: And so, Your Honor, I would ask the Court to reconsider its position with respect to all the other assets, all of which are very important to the ongoing businesses that Hidden Empire has.

And whether it's the conversion claim, Your Honor, those are still accounts that we had a right to possession of at the time of conversion.  They are also accounts, Your Honor, that in his own papers, he's not disputing that they are our accounts and they relate to our films.  He's not disputing that he can't turn those over.

So, Your Honor, I do ask the Court to reconsider that issue and broaden the scope of the order, really to follow page 2, which says at the second bullet point there is where the Court says, "Provide plaintiffs with access to all accounts and/or domains identified by plaintiffs."

And that would encompass what I just referred to, Your Honor.

Thank you.

THE COURT:  Thank you.

Mr. Fox?

MR. FOX: Thank you, Your Honor.

MR. HINKLE: Your Honor, I apologize.  I don't mean to interrupt the flow, but I do have the answer to the

question --

THE COURT:  Yes.

MR. HINKLE -- that is very specific regarding the Google account.

The exhibit at issue was Exhibit 35; not 32.

And the e-mail that is being referred to was a separate e-mail account that was created by Mr. Newell, and it's a hiddenempirefilm@gmail.com account.  It is not the accounts that we are talking about here.

THE COURT:  All right.  Thank you, Mr. Hinkle.

MR. HINKLE: Thank you.

THE COURT:  Mr. Fox?

MR. FOX: Your Honor, thank you.

So briefly, again, I'm trying to understand the differences in technology and the verbiage here.

But I know -- I think it's important to note, and Mr. Angelone's -- I'm sorry -- Ms. Roxanne Taylor's exhibit attached to her Declaration Number 3, she actually sends Mr. Angelone an e-mail dated December 11th, 2014, where she acknowledges that their domain had expired, and she didn't know that someone else had actually bought the domain.  We just wanted the Court to take note of that.

The -- sorry, Your Honor.  I think it's important for the Court to take note that Mr. Angelone was an executive of Hyper Engine.  He was also, at least in his mind, was an

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

owner of this company, and that he took the initiative to help market many of the projects on behalf of the plaintiffs, and which the game being one of them.

And I still would hope that the Court would at least allow Mr. Angelone to complete production of the video game until further order of the Court.  And hopefully the litigations will resolve themselves, or the parties will reach an agreement in the future, again, that is beneficial to all parties.

And it seems like that type of order would not be prejudicial to the plaintiffs, because the film hasn't been released yet, and won't be released until sometime next year, if even that.

Mr. Angelone provided me with a list of items that he just has no control or ownership of, and there is just nothing that he could do to transfer those things.  And I don't know if the Court would like me to read --

THE COURT:  Why don't you just read the list.

MR. FOX: Okay.  So the domains that he has no control or ownership over are hiddenempire.com, climb.org, HEFG.com, hiddenempiremediagroup.com, hiddenempiremedia.com, hiddenempirereleasing.com, hiddenempireproductions.com, hiddenempire.productions, hiddenempire.media, hiddenempiremedia.group, hiddenempire.studio, hiddenempire.org, hiddenentertainment.com,

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

hiddenempirestudio.com, and fearthemovie.com.

And, Your Honor, defendants have no control of the following platforms, web platforms:  Roxanne Avent, Deon Taylor, akuma.video, the.hustle.movie, The Intruder Movie, DT Film To Hoop, "Fatale" Movie.

And then one other important point -- well, two points, is that @climb.organization has already been transferred to the plaintiff.  And then -- and I went back this morning and I reread Mr. Angelone's declaration, in respect to Be Woke.Vote, and also blackhistoryintwominutes.com, those are domains that aren't even owned by the plaintiffs.  And so they have no proprietary right and/or intellectual property right to those specific domains and/or names, Your Honor.

And Mr. Angelone provided his basis for that claim in his declaration.

THE COURT:  All right.  Thank you, Counsel.

I don't see the need for a bond here because the main risk to Mr. Angelone, it seems, is in regard to the game.  And at some point his rights to it or not to it are separate from what is really going on here.

If there comes a time where he's finished it and he feels he can make money off of it and that he's unreasonably being kept from doing that, then he can approach the Court and seek to do it, or try to reach an understanding with the

Taylors for that matter.

But in the absence of that, it doesn't seem really that there is much risk of this, so there won't be a bond.

I take the matter under submission, and will get an order out in the next couple of days, along with a formal preliminary injunction, which will of course be binding on the defendants.

All right.  Thank you, Counsel.  Thank you, Mr. Angelone.

*****      *****      *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

---------------------------

Amy C. Diaz, RPR, CRR                  September 30, 2022

S/  Amy Diaz

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER