JEFFREY S. KRAMER, State Bar No. 094049
SANDRA CALIN, State Bar No. 100444
KRAMER, DEBOER & KEANE
A Limited Liability Partnership
Including Professional Corporations
21860 Burbank Boulevard, Suite 370
Woodland Hills, California 91367
Tel: (818) 657-0255 - Fax: (818) 657-0256
jkramer@kdeklaw.com;
scalin@kdeklaw.com
Attorneys for Defendants, DARRICK ANGELONE, AONE CREATIVE, LLC and ON CHAIN INNOVATIONS, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

HIDDEN EMPIRE HOLDINGS, LLC; a Delaware limited lability company; HYPER ENGINE, LLC; a California limited liability company; DEON TAYLOR, an individual,

Plaintiffs,

v.

DARRICK ANGELONE, an individual; AONE CREATIVE, LLC formerly known as AONE ENTERTAINMENT LLC, a Florida limited liability company; ON CHAIN INNOVATIONS, LLC, a Florida limited liability company,

Defendants.

Case No. 2:22-cv-06515-MWF-AGR
Action Filed: September 12, 2022

Assigned to Honorable
Judge Michael W. Fitzgerald

**SUPPLEMENTAL DECLARATION OF SANDRA CALIN IN OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE WHY SANCTIONS SHOULD NOT BE IMPOSED AGAINST DEFENDANTS**

DATE: March 18, 2024
TIME: 10:00am
DEPT: 5A

I, Sandra Calin, declare as follows:

1. I am an attorney at law duly licensed to practice before all courts of the State of California and am a partner with the law firm of Kramer, deBoer & Keane, LLP, attorneys of record for Defendants DARRICK ANGELONE, AONE CREATIVE, LLC and ON CHAIN INNOVATIONS, LLC ("Defendants") in the above-captioned case.

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
21860 BURBANK BOULEVARD, SUITE 370
WOODLAND HILLS, CA 91367
TELEPHONE (818) 657-0255

2.     I have personal knowledge of the following facts and, if called upon as a witness, could competently testify thereto, except as to those matters which are explicitly set forth as based upon my information and belief and, as to such matters, I am informed and believe that they are true and correct.

3.     On February 26, 2024, I caused to be filed and served the Defendants' Opposition to the Motion to Show Cause Why Sanctions Should Not be Imposed.  At that time, I submitted to the Court by way of my Declaration a draft report by Defendants' expert, Rick Watts, since the final report was not yet available.

4.     Attached hereto as Exhibit "3" is the final report by Rick Watts, prepared in response to the Declarations by Plaintiffs' experts, Erin Burke and Alex Izen.

5.     Declarant respectfully requests that this final report be considered by the Court in deciding the instant motion.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of February, 2024, at Woodland Hills, California.

_____
SANDRA CALIN, Declarant

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
21860 BURBANK BOULEVARD, SUITE 370
WOODLAND HILLS, CA 91367
TELEPHONE (818) 657-0255

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

HIDDEN EMPIRE HOLDINGS, LLC; a Delaware
limited lability company; HYPER ENGINE, LLC; a
California limited liability company; DEON TAYLOR,
an individual,

       Plaintiffs/Counter-Claim
       Defendants,


v.                                                          Case No. 2:22-cv-06515-MWF-AGR

DARRICK ANGELONE, an individual; AONE
CREATIVE, LLC formerly known as AONE
ENTERTAINMENT LLC, a Florida limited liability
company; ON CHAIN INNOVATIONS, LLC, a Florida
limited liability company,

       Defendants/Counter-
       Claimants,


v.

ROXANNE TAYLOR, an individual

       Third Party Defendant.


**<u>REBUTTAL REPORT AND EXPERT OPINION OF RICK WATTS</u>**

In accordance with Fed. R. Civ. P. 26(a)(2), the following is my written report describing the subject
matter areas, background, and opinions about which I expect to testify in the present litigation if called
upon to do so.

## Table of Contents

I.  INTRODUCTION ................................................................................................................. 5

II.  QUALIFICATIONS ........................................................................................................... 5

III.  SCOPE OF ENGAGEMENT ........................................................................................... 6

IV.  MATERIALS CONSIDERED .......................................................................................... 7

V.  Reservation of Rights ......................................................................................................... 7

VI.  SUMMARY OF OPINIONS ............................................................................................ 8

VII.  DEFINITIONS ................................................................................................................. 10

VIII.  Rebuttal opinions and analysis of erin Burke's report .................................................... 12

A.  Ms. Burke's opinion that Mr. Angelone perpetrated malfeasance inappropriately renders a legal opinion. ......................................................................................................................... 12

B.  Ms. Burke's opinions that Mr. Angelone deleted the Google Workspace account and denied access to HEFG team members lack a factual basis and are not supported by an independently verifiable analysis. .......................................................................................................... 12

i.  Ms. Burke's opinion that Mr. Angelone deleted the Google Workspace is not supported by information in the Google audit log, Mr. Angelone did not login with sufficient privileges to perform such an act. ................................................................................................................. 12

ii.  Ms. Burke adds additional analysis for new environment other than the original HEFG Google Workspace, the environments are completely unrelated, there is no indication of Mr. Angelone having access or login to this environment, and no supporting documents are provided. ............... 15

iii.  Contrary to Ms. Burke's analysis, other HEFG members did have access, there are many reasons Google will prevent a login besides password resets, and there was insufficient data provided in the report to reach a verifiable conclusion. .................................................................. 17

C.  Ms. Burke's opinion that Mr. Angelone had knowledge and access to the Icelandic domains relies upon coincidental information, and makes assumptions not supported by the underlying technology. 22

i.  The Namecheap return included domain account information and the login history for the account, including IP addresses. ......................................................................................... 22

ii.  IP address cannot reliably determine geolocation or identify a particular end-point device such as a computer or cell phone. ................................................................................................ 23

iii.  The login history for the Namecheap account correlates to the same IP address that was used to login to Mr. Angelone's account on Google Workspace, creating a coincidental inference, but not verifiable forensic information. ............................................................................................ 24

D.  Ms. Burke's opinion that Mr. Angelone failed to successfully transfer HEFG's social media accounts ignores best efforts by Mr. Angelone, ignores complexities of the nature of social media accounts, lacks a factual basis and is not supported by an independently verifiable analysis. ............. 25

i.      Mr. Angelone exhibited a good faith effort to transfer social media accounts, the majority were successful and very few were hampered by technical difficulties not of his making................26

ii.     For X/Twitter, Ms. Burke's opinion relies upon incorrect information, the X/Twitter account had been deleted prior to the attempt at transfer and was beyond Mr. Angelone's ability to transfer......................................................................................................................................... 26

iii.    For Instagram, Mr. Angelone provided valid credentials to transfer access but Ms. Burke and HEFG were unable to accept the transfer due to lost information from HEFG during creation of the *New* Google Workspace................................................................................................................. 28

E.    Rebuttal Conclusions: ....................................................................................................... 31

IX.    Rebuttal opinions and analysis of alex izen's report ........................................................... 33

A.    Mr. Izen's opinion that Mr. Angelone is associated with the Hollywood Street King website and blog and that this association alone proves malicious activity by Mr. Angelone lacks a factual basis and is not supported by an independently verifiable analysis. ...................................................... 33

i.      Mr. Izen's expert report is full of references to sensational content, with famous names and Hollywood insider drama, but contains no facts regarding Mr. Angelone's specific actions or involvement, there are no verifiable facts upon which to draw conclusions.....................................33

ii.     Mr. Izen's opinion that Jacky Jasper and Mr. Angelone are separate individuals is accurate to the best of my research. ................................................................................................................. 33

iii.    Mr. Izen's opinion that publishing articles in a Hollywood online tabloid, and Mr. Angelone's technical and operation role for that tabloid amounts to malicious, extortion-like tactics is without merit and an intentional misrepresentation of the facts per the documents produced. .................34

iv.    Mr. Izen does not acknowledge that Hollywood Street King web blog is part of a $3Bn Hollywood gossip industry and that revenue and payments are driving the push for more information. ..................................................................................................................................... 36

v.     Mr. Izen's opinion that the content published on the Hollywood Street King website is confidential HEFG information fails to show any ownership, privacy control, or chain of custody for the materials cited and does not demonstrate any relevance to Mr. Angelone.................................37

vi.    Mr. Izen's opinion that the content published on the Hollywood Street King website was taken from HEFG email "servers" shows a complete lack of understanding regarding Google Workspace security, and his conclusion lacks substantive facts and forensic evidence.......................................38

vii.   Mr. Izen's cover and recitation of sensational content on Hollywood Street King website and blog fails to show any factual relationship or relevance to the defendant Mr. Angelone. ...............40

viii.  Mr. Izen's selective use of court documents as "public records" to infer Mr. Angelone has assumed the identity of Jacky Jasper is misleading and a complete analysis of the facts indicates otherwise. ...................................................................................................................................... 41

B.    Mr. Izen's opinion that there was intentional interference with the HEFG social media properties, and further that Mr. Angelone was directly involved lacks a factual basis and is not supported by an independently verifiable analysis. ...................................................................................................... 42

i. Mr. Izen notes that there was an AOne logo post from HEFG assets, but no opinion is rendered or concluded as to the meaning of the post or the relevance to Mr. Angelone. .............................. 43

ii. Mr. Iven's opinion that Mr. Angelone had any involvement in the Twitter account acting like "bot" activity has no supporting facts or evidence and ignores the most likely explanation that it was in fact a bot "acting like a bot". .................................................................................................. 43

iii. Mr. Izen's opinion that Darrick Angelone was responsible for relabeling and then deactivating the HEFG twitter account does not provide any technical facts to support his position and is contrary to the observed facts available. ........................................................................................ 45

C. Rebuttal Conclusions.................................................................................................................... 48

X. AFFIRMATION ..................................................................................................................................... 49

## I.    INTRODUCTION

1.    I, Rick Watts, am a consultant with Quandary Peak Research, an independent consulting firm in Los Angeles, California specializing in software dispute consulting, e-discovery, and computer forensics.

2.    I have been retained by the law firm of Kramer De Boer & Keane to act as an independent technical expert in this matter involving claims asserted by Hidden Empire Holdings, LLC et al (HEFG) against Darrick Angelone et al.

3.    I have received and reviewed the January 31, 2024 Supplementary Report of Hidden Empire Holdings' technical experts, Ms. Erin Burke, and Mr. Alex Izen. This report is in rebuttal to Ms. Burke's and Mr. Izen's reports.

## II.    QUALIFICATIONS

4.    I hold a BA degree from Louisiana State University and a Juris Doctorate from Wake Forest University School of Law. I am an active member of the Maryland State Bar. I have more than 32 years' experience in the information technology industry as an engineer, architect, and senior leader and I am a Florida state licensed private investigator.

5.    I have been designated as a consulting or testifying expert, both for vendors and customers, in software disputes involving late, inadequate, or incomplete delivery.

6.    My prior experience includes the design and implementation of cloud solutions on Google, Azure and Amazon, web and mobile applications, commercial enterprise software such as Customer Relationship Management (CRM/SRM), Enterprise Resource Planning (ERP) and Human Resources Information Systems (HRIS), cybersecurity and risk management, application support and operations.

7.    During my more than 30 years as an IT professional, I have been involved in all aspects of the software development lifecycle, including requirements definition, business process reengineering, functional and technical design and development, performance and functional testing, data conversion, reporting, and integration with legacy and third-party systems.

8.    I maintain certifications conferred by the most well-regarded organizations in several IT disciplines including Project Management Professional (PMP®), conferred by the Project Management Institute (PMI); Professional Software Engineering Master (PSEM), conferred by

the Institute for Electrical and Electronics Engineers Computer Society (IEEE-CS); Professional Cloud Architect conferred by Google; Certified Data Privacy Solutions Engineer conferred by the Information Systems Audit and Control Association (ISACA).

9.  I have been a State of Florida licensed private investigator since 2010.

10. Based on my education, training, and experience, my areas of expertise include cloud computing, software design and implementation, enterprise and systems architecture, enterprise products and solutions, solution delivery and operations, investigations.

11. My qualifications and prior testimony are listed in my CV, included in this report as Attachment B.

12. I am being compensated at the rate of $475 per hour for the work I have performed on this engagement. My compensation is in no way contingent on the outcome of this matter.

## III.  SCOPE OF ENGAGEMENT

13. I have been retained by the law firm of Kramer De Boer & Keane to act as an independent technical expert in this matter involving claims asserted by Hidden Empire Holdings, LLC et al (HEFG) against Darrick Angelone et al.

14. I have been requested to undertake the following tasks in connection with this matter:

    14.1.  Review and rebut the analysis and opinions of HEFG's technical experts, Ms. Erin Burke, and Mr. Alex Izen.

    14.2.  Perform an independent examination of the documentary record in this matter in connection with the case, within the scope of the expert report.

    14.3.  Perform an examination of the documents disclosed, and the technical facts and industry standards in connection with the subject matter of the expert report.

    14.4.  Reach findings and opinions regarding the positions set forth in the expert reports of Ms. Burke and Mr. Izen.

15. In connection with my anticipated trial testimony in this action, I may use exhibits produced in this litigation that relate to the matters discussed in this report.  In addition, I may create or assist in the creation of certain demonstrative exhibits for the purposes of my anticipated trial testimony.

## IV.    MATERIALS CONSIDERED

16.    The formation of the opinions detailed within this report is based on several factors. These include my extensive experience spanning 32 years in the field of information technology, all the references that have been cited throughout this report, and the summary list of materials presented in Exhibit A, attached to this report.

17.    For ease of reference and to maintain consistency the documents provided by Ms. Burke and Mr. Izen supporting their opinions are referenced with the names of the files as provided to me, and an Exhibit reference is attached so the document can be found in the court record.

18.    I was provided unfettered access to all documents produced by both parties in the case.

19.    The documents I relied upon to perform my analysis and form my opinions are explicitly referenced in footnotes throughout this report.

20.    In preparing this report, I consulted applicable authoritative industry standards and best practices for cloud operations and software engineering.

## V.    RESERVATION OF RIGHTS

21.    I reserve the right to amend or supplement the opinions set forth in this report prior to any expert disclosure deadlines in this matter, in response to opinions expressed by other experts, or in light of any additional evidence, testimony, discovery, court rulings, or other pertinent information provided to me.

22.    If called upon to testify or provide additional opinions regarding this matter, I reserve the right to rely upon any additional information or materials that may be provided to me or that are relied upon by any experts or fact witnesses.

23.    If called upon to testify, I may present various documents as exhibits, which have been produced in this case and are pertinent to the subjects addressed in this report. Furthermore, I reserve the prerogative to utilize animations, demonstrative evidence, magnified versions of exhibits, and other relevant information to effectively communicate my professional opinions and their underlying reasoning, as and when necessary.

## VI.    SUMMARY OF OPINIONS

24.    Ms. Burke's opinion that Mr. Angelone perpetrated malfeasance inappropriately renders a legal opinion.

25.    Ms. Burke's opinions that Mr. Angelone deleted the Google Workspace account and denied access to HEFG team members lack a factual basis and are not supported by an independently verifiable analysis.

25.1.    Ms. Burke's opinion that Mr. Angelone deleted the Google Workspace is not supported by information in the Google audit log, Mr. Angelone did not login with sufficient privileges to perform such an act.

25.2.    Ms. Burke adds additional analysis for new environment other than the original HEFG Google Workspace, the environments are completely unrelated, there is no indication of Mr. Angelone having access or login to this environment, and no supporting documents are provided.

25.3.    Contrary to Ms. Burke's analysis, other HEFG members did have access, there are many reasons Google will prevent a login besides password resets, and there was insufficient data provided in the report to reach a verifiable conclusion.

26.    Ms. Burke's opinion that Mr. Angelone had knowledge and access to the Icelandic domains relies upon coincidental information, and makes assumptions not supported by the underlying technology.

26.1.    The Namecheap return included domain account information and the login history for the account, including IP addresses.

26.2.    IP address cannot reliably determine geolocation or identify a particular end-point device such as a computer or cell phone.

26.3.    The login history for the Namecheap account correlates to the same IP address that was used to login to Mr. Angelone's account on Google Workspace, creating a coincidental inference, but not verifiable forensic information.

27.    Ms. Burke's opinion that Mr. Angelone failed to successfully transfer HEFG's social media accounts ignores best efforts by Mr. Angelone, ignores complexities of the nature of social

media accounts, lacks a factual basis and is not supported by an independently verifiable analysis.

27.1.   Mr. Angelone exhibited a good faith effort to transfer social media accounts, the majority were successful and very few were hampered by technical difficulties not of his making.

27.2.   For X/Twitter, Ms. Burke's opinion relies upon incorrect information, the X/Twitter account had been deleted prior to the attempt at transfer and was beyond Mr. Angelone's ability to transfer.

27.3.   For Instagram, Mr. Angelone provided valid credentials to transfer access but Ms. Burke and HEFG were unable to accept the transfer due to lost information from HEFG during creation of the *New* Google Workspace.

28.   Mr. Izen's opinion that Mr. Angelone is associated with the Hollywood Street King website and blog and that this association alone proves malicious activity by Mr. Angelone lacks a factual basis and is not supported by an independently verifiable analysis.

28.1.   Mr. Izen's expert report is full of references to sensational content, with famous names and Hollywood insider drama, but contains no facts regarding Mr. Angelone's specific actions or involvement, there are no verifiable facts upon which to draw conclusions.

28.2.   Mr. Izen's opinion that Jacky Jasper and Mr. Angelone are separate individuals is accurate to the best of my research.

28.3.   Mr. Izen's opinion that publishing articles in a Hollywood online tabloid, and Mr. Angelone's technical and operation role for that tabloid amounts to malicious, extortion-like tactics is without merit and an intentional misrepresentation of the facts per the documents produced.

28.4.   Mr. Izen does not acknowledge that Hollywood Street King web blog is part of a $3Bn Hollywood gossip industry and that revenue and payments are driving the push for more information.

28.5.   Mr. Izen's opinion that the content published on the Hollywood Street King website is confidential HEFG information fails to show any ownership, privacy control, or chain of

custody for the materials cited and does not demonstrate any relevance to Mr. Angelone.

28.6.   Mr. Izen's opinion that the content published on the Hollywood Street King website was taken from HEFG email "servers" shows a complete lack of understanding regarding Google Workspace security, and his conclusion lacks substantive facts and forensic evidence.

28.7.   Mr. Izen's cover and recitation of sensational content on Hollywood Street King website and blog fails to show any factual relationship or relevance to the defendant Mr. Angelone.

28.8.   Mr. Izen's selective use of court documents as "public records" to infer Mr. Angelone has assumed the identity of Jacky Jasper is misleading and a complete analysis of the facts indicates otherwise.

29.   Mr. Izen's opinion that there was intentional interference with the HEFG social media properties, and further that Mr. Angelone was directly involved lacks a factual basis and is not supported by an independently verifiable analysis.

29.1.   Mr. Izen notes that there was an AOne logo post from HEFG assets, but no opinion is rendered or concluded as to the meaning of the post or the relevance to Mr. Angelone.

29.2.   Mr. Iven's opinion that Mr. Angelone had any involvement in the Twitter account acting like "bot" activity has no supporting facts or evidence and ignores the most likely explanation that it was in fact a bot "acting like a bot".

29.3.   Mr. Izen's opinion that Darrick Angelone was responsible for relabeling and then deactivating the HEFG twitter account does not provide any technical facts to support his position and is contrary to the observed facts available.

## VII.   DEFINITIONS

30.   I wish to incorporate by reference the definitions set out by Erin Burke in her report p. 4-5 describing ICANN/WHOIS, Google Workspace, and Social Media.[1]

---

[1] Burke Report, p.4-5

31.     For clarity, the following are additional definitions which I will apply throughout this statement.

31.1.   **The Internet Archive (aka Wayback Machine)** – The Internet Archive (www.web.org)[2], is a non-profit library of millions of free books, movies, software, music and most relevant to this review, websites. The Internet Archive crawls the internet and captures web pages at points in time and saves those images. The Internet Archive has been archiving the web for 20 years and to date has captured more than 866 billion web pages.[3] Included in these historical captures are pages from social media such as X/Twitter and Instagram. The Internet Archive is a valuable open-source tool for investigators and experts to see the historical perspective of the internet.

31.2.   **Security Compliance** – Security compliance is the act of complying with a regimen or regulatory requirement to achieve privacy and security. A key aspect of compliance is the ability to prove the compliance by using reports generated by the system or an independent 3rd party, and attested to (verified) by an independent authority.[4] The Google Workspace for example, has 3rd party attestations that prove specific levels of access controls and data protections, that is who can see what content and what content is accessible inside and outside of the Workspace. Google gives the administrator of a Workspace the ability to run audit reports, the audit reports document any activity that indicate exceptional or questionable activity that would compromise the compliance.

31.3.   **Google Drive** – Google Drive is a file storage system that is hosted in the cloud and is accessible from anywhere in the world via a web browser.[5] Similar to the folders and files a person can store on their own computer, except the files are remotely stored in Google's systems and are protected by Google security. It is possible to directly share personal files on Google Drive with another person, regardless of that person's association, via a website link or shortcut that points to the stored content.[6]

---

[2] https://web.archive.org/ is the website for accessing the Internet Archive
[3] https://blog.archive.org/2016/10/23/defining-web-pages-web-sites-and-web-captures/
[4]  Google Support - Google Workspace Security whitepaper - compliance 2024.pdf
https://workspace.google.com/learn-more/security/security-whitepaper/page-5.html
[5] Google Support - what is Google Drive.pdf
[6] Google Support - What are Google Drive Shared Drives 2024.pdf

31.4.   **Google Gmail** – Google Gmail is Googles own, branded email system. Gmail is a cloud service, which means there are no servers or hardware required by the user to use the service. The email in the Google Gmail system is remotely hosted in Google's systems and is protected by Google Security.

31.5.   **Encryption** – Encryption is the process of converting information or data into secret code to prevent unauthorized access. Google uses encryption to scramble the data so that only a person with authorized access can open and see it.[7]

## VIII.   REBUTTAL OPINIONS AND ANALYSIS OF ERIN BURKE'S REPORT

### A.   Ms. Burke's opinion that Mr. Angelone perpetrated malfeasance inappropriately renders a legal opinion.

32.   In the Executive Summary of her report on page 4, and again in the detailed findings #3 of [8]that summary on page 6, Ms. Burke opines that the facts in this case revealed "apparent malfeasance" by Mr. Angelone. [9]

33.   The implication of this finding is that the facts and opinions in the subsequent sections of her report would disclose particular facts, analysis, and a rationale to support the opinion.

34.   It is my understanding that the determination of malfeasance is a matter of law and outside the purview of a technical expert's opinion, thus I will not opine on this opinion, but will discuss the facts and assertions that support Ms. Burke's opinion.

### B.   Ms. Burke's opinions that Mr. Angelone deleted the Google Workspace account and denied access to HEFG team members lack a factual basis and are not supported by an independently verifiable analysis.

### i.   Ms. Burke's opinion that Mr. Angelone deleted the Google Workspace is not supported by information in the Google audit log, Mr. Angelone did not login with sufficient privileges to perform such an act.

35.   Ms. Burke walks through the process that occurred between September 7 and October 7, 2022 when R.A. Taylor attempted to take the Google Workspace from Mr. Angelone via a forced transfer of ownership. During this process Google removed Mr. Angelone as the admin

---

[7] Google Support - What is encryption 2024.pdf https://cloud.google.com/learn/what-is-encryption

[9] Burke Report p. 6

for the Google Workplace.[10] The Google Support Team was installed as the temporary admin for the account, in effect the Google Workspace was without an admin for a month.[11] During that time, Mr. Angelone was prevented from any administrative work on the Google Workspace environment from September 7 until after October 7 when Google reinstated Mr. Angelone's admin privileges.[12]

36.     Ms. Burke then describes how on October 10, R.A. Taylor received a link to start a free trial for a Workspace account – and the domain is "hiddenempirefilmgroup.com". And at that point R.A. Taylor finds the Workspace is empty. It is Ms. Burke's opinion that the Workspace was deleted by Mr. Angelone.

37.     To understand the facts and analysis necessary to support such an opinion it is important to first understand the subject – namely Google Workspace (formerly Google GSuite). Google Workspace is a cloud application called Software as a Service (SaaS) which means that Google hosts and maintains all the technology that makes the software work, whereas the customer/user is responsible for the setup and operation (the actual "using") of the software. There are no "servers" or systems, it is much like an app on your iPhone, everything behind the scenes is provided for you. In practical terms, Google makes email services available like Gmail, and the user must set up accounts, login and use the application through application screens.

38.     The delineation of responsibilities is important, Google calls this the "Shared Responsibility Model"[13] and highlights Google's responsibility to provide security, privacy, and compliance of the software application[14]. To accomplish these three responsibilities, Google has put protections in place like encrypting the data and contents, requiring user account authentication to access that content, and audit reports that describe activity in the software. We will come back to these first two protections in a later opinion from Mr. Izen concerning access of Google Workspace content, but for this opinion we are focusing on the third item, "compliance of the software application" via audit reports.

---

[10] Burke Report p. 8, referencing Google return, Exhibit 111-53
[11] 2022_1005_D_FTI_GoogleWorkspaceAdminRevoked_EXTERNAL_ RE_ Google workspace.pdf
[12] Burke Report p. 9, referencing Google return, Exhibit 111-53
[13] Google Cloud Shared Responsibility in support of security, privacy and compliance, https://cloud.google.com/architecture/framework/security/shared-responsibility-shared-fate
[14] How Google protects your organization's security and privacy, https://support.google.com/a/answer/60762?hl=en

39.     Google logs the activity and events that go on within a Workspace to provide assurance of its role in security compliance. These logs are essentially a long list of timestamped events with details of each event, the type of activity, and the user account responsible. There are logs of user activity, and admin activity. There is a panel that the admin can use to view these logs, but the logs cannot be deleted as a matter of compliance assurance.[15]

40.     A further point of information, the role of "admin" (which is short for administrator) in Google Workspace is a privilege, much like an enhancement to an existing user account.[16] When Mr. Angelone was the admin prior to September 7, 2022, he would login using his darrick[@]hiddenempirefilmgroup.com user account. There is not a separate account for the admin, any user can have this privilege assigned to them. Everyone is a user; some users are admins. Therefore, Google logs of users would include an admin and name the user account like any other user.

41.     Google provided these Workspace audit logs as part of a response and Ms. Burke reviewed them in her opinion.[17]

42.     The audit log provided by Google in its response is a collection of text files that captures all user activity from May 11, 2022 until Oct 7, 2022. The log stops after October 7, presumably because the Workspace no longer existed. I have not found any other documentation that indicates when the Workspace was removed.

43.     For an admin to delete a Google Workspace they must first login to the environment, that login would be captured in the Google Audit Log. If an admin then deleted the Workspace, then that activity would be captured in the admin audit log.

44.     In my review of the Google Audit Log there were six logins from three users in the last three days, October 5 – 7, 2022. The users were Velma Sykes (HEFG Head of operations), Darrick

---

[15] Google Support User Log Events - https://support.google.com/a/answer/4580120?sjid=5985929901690007532-NA

[16] Google Support how to make any user an admin https://support.google.com/a/answer/172176?hl=en in point of fact instead of trying to force a transfer, it would have been possible prior to September 7 to simply have Mr. Angelone assign admin privileges to another member of the HEFG team

[17] The audit log for the HEFG Workspace named hiddenempirefilmgroup.com was requested from Google in a subpoena on 11/18/22, per Exhibit 111-51 and Google responded by providing the audit information as response on 1/25/23 per Exhibit 111-53.

Angelone, and Sean Ethan Miller (HEFG Office Manager). The only person to login on October 7, and the last person to login, was Sean Miller.[18]

| user_name | ip_address | login_type | event_name | event_timestamp | LA Time |
|---|---|---|---|---|---|
| velma@hiddenempirefilmgroup.com | 74.62.58.130 | google_password | login_verification | 10/6/22 2:28 | 10/5/22 18:28 |
| velma@hiddenempirefilmgroup.com | 74.62.58.130 | google_password | login_success | 10/6/22 2:28 | 10/5/22 18:28 |
| velma@hiddenempirefilmgroup.com | 74.62.58.130 | google_password | login_verification | 10/6/22 2:28 | 10/5/22 18:28 |
| darrick@hiddenempirefilmgroup.com | 192.145.119.93 | google_password | login_success | 10/6/22 17:21 | 10/6/22 9:21 |
| darrick@hiddenempirefilmgroup.com | 2603:8000:df00:988f:ec89:7dd9:541:58a7 | google_password | login_success | 10/6/22 20:58 | 10/6/22 12:58 |
| sean@hiddenempirefilmgroup.com | 47.181.171.127 | google_password | login_success | 10/7/22 21:50 | 10/7/22 13:50 |

*Figure 1: login events from Google audit log May 6 and 7*

45. Recall that Google Support did not return admin privileges to Mr. Angelone until October 7, 2022. There is no login activity from Mr. Angelone after his admin privileges were restored.

46. I have reviewed all the files provided by Google and there is not an admin log that indicates the Workspace was deleted. Sean Miller was the last person to login to the Workspace, Mr. Angelone did not login after having privileges restored, and there is no record of the Workspace being deleted in the audit logs. Therefore, I cannot agree with Ms. Burke's opinion, and based upon the facts presented to me there must be another explanation.

ii. **Ms. Burke adds additional analysis for new environment other than the original HEFG Google Workspace, the environments are completely unrelated, there is no indication of Mr. Angelone having access or login to this environment, and no supporting documents are provided.**

47. The final paragraphs of Ms. Burkes opinion are spent tying IP addresses to user accounts for an "Aha!" moment within a completely different Workspace environment than the original HEFG Workspace. Figure 1 on page 10 of the report, recreated below does not make sense and no documents or logs were provided in support of this screen shot.[19]

---

[18] Login audit logs.json - Files contained in the Google Subpoena Docs.zip response file per Exhibit 111-53 Google response and productions, including user log events from May 11 – Oct 7, 2022
[19] Figure 1 in Burke Report p. 10



Figure 2 Image from Burke Report p. 10

48.     Recall that Ms. Burke in her narrative on pg. 9 of her report noted that R.A. Taylor created a
        *New* HEFG Workspace (emphasis is mine).[20] This makes sense because you cannot create a
        Workspace for a name if the name is already in use by another Workspace. That is, a new user
        cannot login to Google Workspace and create an account for hiddenempirefilmgroup.com if
        that account already existed under another user, which it did under Darrick Angelone until
        October 7.

49.     What is confusing about this screen capture is that it indicates it is from October 10, 2022, the
        very day R.A. Taylor created a brand-new Workspace account. There is nothing on the screen
        capture that indicates what account this information represents, and I was not provided an
        audit log to verify the information. The sorting on the screen ("Showing 1451 – 1464 of 1464

---

[20] Burke Report p. 9

results) indicates we are looking at the very first thirteen user events covering the entire day of October 10, 2022.[21] A new Workspace account has no users other than the person who created the account. This is verified by Ms. Burke in her own analysis on page 7 of her report.[22] On Day 1 of a new Workspace, there are no other users. Each user account must be created by the admin, which for this new HEFG account would be R.A. Taylor.

50.   Ms. Burke would have us believe that the very first act by R.A. Taylor upon creating a new Workspace is to grant administrative privileges to Mr. Angelone? And that then Mr. Angelone would disable R.A. Taylor's account? Then the first login I should see on this audit log would be that of Mr. Angelone.

51.   I have reviewed the audit logs from the *Original* HEFG Workspace, provided by Google and showing no activity after October 7. I have reviewed the Google support logs and analysis by Ms. Burke that a *New* HEFG Workspace was created on October 10. I was not provided an audit log from Google for this *New* HEFG Workspace, but I can see what is purported to be a screen shot of the admin logs with the very first events all belong to R.A. Taylor and no login by Mr. Angelone or any other user.

52.   It is my conclusion from the facts presented to me that Mr. Angelone is unlikely to have been given access to the new environment by R.A. Taylor, and that there are no login events in the audit log indicating Mr. Angelone was ever in the environment on October 10.

### iii.   Contrary to Ms. Burke's analysis, other HEFG members did have access, there are many reasons Google will prevent a login besides password resets, and there was insufficient data provided in the report to reach a verifiable conclusion.

53.   Ms. Burke uses analysis of the user audit log produced by Google and referenced earlier.[23] In her analysis Ms. Burke begins with the assertion that Mr. Angelone was "resetting R.A Taylor's password through August and September" in a seemingly endless series of events.[24] However, according to the Google support logs and Ms. Burke's own report, Mr. Angelone had his

---

[21] This is determined by 1464 – 1451 = 13, and the sort order by date is indicated by a "down" arrow next to the column header "Date", the dates start at the top on October 11, and go down to the first event at 19:32

[22] Burke Report p. 7 -"The original creator of a Google Workspace account becomes the account's first user, and the account's "super administrator".

[23] Files contained in the Google Subpoena Docs.zip response file per Exhibit 111-53 Google response and productions, including user log events from May 11 – Oct 7, 2022

[24] Burke Report p. 11

admin privileges revoked on September 6 because R.A. Taylor was attempting to force a transfer.[25] During the time period September 6 until October 7, Mr. Angelone did not have admin privileges and was thus unable to reset a user's password.

54.     In the previous section I discussed the audit logs within Google, which captures administrative events and would include amongst many other things, the event when a user's password is changed whether by an admin or the user themselves.[26] The log would record the event with a date, time, name of user account, and an event named "password_edit" signifying the password had been changed. Ms. Burke did not produce or demonstrate any administrative account resets or password resets and I did not observe any password change records in the audit log provided by Google.

55.     In addition to audit logs to provide Compliance, I mentioned Security and Privacy are part of Google's responsibilities for cloud software like Workspace. Google takes security seriously and is constantly running computer algorithms and assessing activity to identify suspicious behavior. A key area for this type of security surveillance by Google is in the login events where Google looks at so many more things than just a password when a user first login.

56.     Ms. Burke only allows for two scenarios that would cause a failed login, a mistyped password or "changed by the administrator".[27] She attributes the login failures to Mr. Angelone and then attempts to correlate the logins of Mr. Angelone to the failures of R.A. Taylor. However, the Google security mentioned previously provides many more scenarios for why a user would not be allowed to login, including:[28]

56.1.     Leaked Password: Google will disable a password when it has become aware that someone else knows its password

---

[25] Burke Report p. 8 quoting support ticket from Google "Changed primary admin from darrick@hiddenempirefilmgroup.com to 40829326@hiddenempirefilmgroup.com 2. Demoted darrick@hiddenempirefilmgroup.com"

[26] Google Support Document Login Audit Activities- https://developers.google.com/admin-sdk/reports/v1/appendix/activity/login

[27] Burke Report p. 11 "When a user's attempted login is unsuccessful due to either a mistyped password or, as will be discussed below, an unknown password change by the administrator, it will be recorded as a "login_failure""

[28] Google Support Document Login Audit Activities- - https://developers.google.com/admin-sdk/reports/v1/appendix/activity/login

56.2.   Suspicious Login: Google will block a login if it is suspicious, e.g. a different location or type of device different than usual pattern

56.3.   User Suspended: account disabled due to sending spam, suspicious activity

56.4.   Login Challenge: Google challenged the user to verify identity, failure prevents login

56.5.   Login Verification: Google requires additional information to complete the login, failure prevents login

56.6.   Sensitive Action Blocked:  Unusual characteristics like unfamiliar IP address during login

57.   There are more reasons for login failure and password failure than Ms. Burke discusses in her opinion. All these types of events would be captured in an audit log just like a password change. Google was subpoenaed for all logs for this account. When I reviewed the audit log's contained in the response there were no events of this type, just like there were no password change events.

58.   Rushing to the conclusion that Mr. Angelone is the reason for the failed logins, Ms. Burke focuses on correlating login failure by R.A. Taylor and successful login in close time proximity by Mr. Angelone.  I have reviewed the same data as Ms. Burke, and the events that she feels are related.

59.   Ms. Burke noted that the problems arose on August 9, and that HEFG had "switched to a new domain" following August 16. This only leaves a 7-day time window where password resets were being actively attempted.[29]

60.   In my review of the same audit log data, I immediately observe that R.A. Taylor only has 2 logins for the month of May, 7 in June, and 4 in July; hardly what one would call prolific. I also see that R.A. Taylor had login difficulty beginning August 9, after only one other login attempt that month. Rather than focus only on the failures of R.A. Taylor, I reviewed all of the data for the month of August.

61.   The following chart is a plot of logins by Mr. Angelone and R.A. Taylor during August, with the number of successful logins per day in the green band, and the number of login failures in the red band. Ms. Burke only presented the events near each other on the calendar, leaving out

---

[29] Burke Report p. 15

all the other events. When viewed more holistically, it appears that Mr. Angelone has almost daily logins, meaning nearly any day R.A. Taylor has a password failure would coincide with a day Mr. Angelone had a login, creating more coincidence than coordinated activity.

Moreover, there are many days where R.A. Taylor had successful logins while Mr. Angelone had successful logins, and many days R.A. Taylor had failed logins even though Mr. Angelone did not login. Contrary to Ms. Burke's interpretation, I do not see a pattern to this data.

| Count of Logins | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Row Label | 9-Aug | 10-Aug | 11-Aug | 12-Aug | 13-Aug | 15-Aug | 16-Aug | 17-Aug | 18-Aug | 20-Aug | 21-Aug | 22-Aug | 24-Aug | 25-Aug | 28-Aug | 30-Aug | 31-Aug |
| ⊟ darrick@hiddenempirefilmgroup.com | | | | | | | | | | | | | | | | | |
| login_challenge | | | | | | | | | | | | | | | | | |
| login_failure | | | | | | | | | | | | | | | | | |
| login_success | 1 | 4 | 2 | 1 | 1 | 1 | 2 | 1 | | 6 | 2 | | 1 | | | 5 | 3 |
| login_verification | | 1 | | | 1 | | 1 | | | | 2 | | | | | 2 | 1 |
| ⊟ roxanne@hiddenempirefilmgroup.com | | | | | | | | | | | | | | | | | |
| login_failure | 1 | 5 | | 1 | | 2 | | | | | | 2 | | 3 | 2 | 1 | |
| login_success | 1 | 3 | 4 | | | | 2 | 2 | 1 | | | | | | | | |
| login_verification | | 1 | 1 | | | | 3 | 2 | | | | | | | | | |

*Figure 3 All Login activity for Darrick and Roxanne in August[30]*

62.     Further review of the data beyond R.A. Taylor provides even less support for Ms. Burke's analysis. Focusing on users with activity in August, and narrowing down to the period August 9 – August 17, I have produced the chart in figure 3 from the audit data with number of successful logins per day in the green band, and the number of login failures in the red band. Logins in the white band means user was challenged for identity verification before successful login. The data indicates there is a lot of activity with many login successes and several login failures. Notably, users Quincy, Sean and Velma had successful logins during this period, and Velma continued to have login success for the rest of August.

---

[30] Login audit logs.json - Google response and productions Exhibit 111-53

The Google Audit logs are in a structured text file called a JSON file format, to create the visual chart I loaded this JSON file into a Microsoft Excel spreadsheet. Excel can read a JSON file (no conversion is necessary) and creates a spreadsheet with columns of data. Once the data was loaded into the Excel spreadsheet the chart was developed by creating a simple pivot table. Pivot tables are a built-in function of Excel that takes columns of information and sorts, aggregates and displays the data. This chart is an aggregation of username and login type, summarizing number of occurrences per day. No manual entry or typing was required to create this chart, all data is directly from the Google response file "login audit logs.json"

**Count of Logins**

| Row Labels | 8-Aug | 9-Aug | 10-Aug | 11-Aug | 12-Aug | 13-Aug | 15-Aug | 16-Aug | 17-Aug | 18-Aug | 19-Aug |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ⊟ darrick@hiddenempirefilmgroup.com | | | | | | | | | | | |
| login_challenge | | | | | | | | | | | |
| login_failure | | | | | | | | | | | |
| login_success | | 1 | 4 | 2 | 1 | 1 | 1 | 2 | 1 | | |
| login_verification | | | 1 | | | 1 | | 1 | | | |
| ⊟ erinmurray@hiddenempirefilmgroup.com | | | | | | | | | | | |
| login_failure | | 2 | | 2 | | | | | | | |
| login_success | | | | | | | | | | | |
| login_verification | | | 2 | | 2 | | | | | | |
| ⊟ quincy@hiddenempirefilmgroup.com | | | | | | | | | | | |
| login_failure | | | | | 1 | | | | | | |
| login_success | 1 | | | | 3 | | | 1 | | | 1 |
| login_verification | | | | | 3 | | | 2 | | | 1 |
| ⊟ roxanne@hiddenempirefilmgroup.com | | | | | | | | | | | |
| login_failure | | 1 | 5 | | 1 | | 2 | | | | |
| login_success | | 1 | 3 | 4 | | | | 2 | 2 | 1 | |
| login_verification | | | 1 | 1 | | | | 3 | 2 | | |
| ⊟ rtaylor_asst@hiddenempirefilmgroup.com | | | | | | | | | | | |
| login_challenge | | | | | | | | | | | |
| login_failure | | 1 | | 1 | 4 | | | 1 | | | |
| login_success | | | | 1 | 1 | | | | 4 | | |
| login_verification | | | | 2 | 2 | | | | 4 | | |
| ⊟ sean@hiddenempirefilmgroup.com | | | | | | | | | | | |
| login_failure | | 2 | 2 | | | | 1 | | | | |
| login_success | | | | 3 | 2 | | | 2 | 2 | | |
| login_verification | | 5 | | 3 | | | | 3 | 1 | | |
| ⊟ velma@hiddenempirefilmgroup.com | | | | | | | | | | | |
| login_challenge | | | 1 | | | | | | | | |
| login_failure | | 1 | 9 | 1 | | 1 | | | | | |
| login_success | 1 | 2 | | | | | | | 2 | | |
| login_verification | 1 | 1 | 9 | | | | | | 2 | | |

*Figure 4 A more complete picture of login activity in the August period [31]*

63.      Extending the chart out to the month of September when <u>Mr. Angelone did not have any admin privileges</u> is illustrated in Figure 4 using the same success and failure color banding. Note that R.A. Taylor continues to have login failures, as does her assistant, even though it is impossible for Mr. Angelone to have any influence over the accounts. The Sean and Velma users on the other hand continue with login and access.

---

[31] Login audit logs.json - Google response and productions Exhibit 111-53
*ibid*

| Count of Logins Row Labels | 1-Sep | 6-Sep | 7-Sep | 8-Sep | 9-Sep | 12-Sep | 13-Sep | 14-Sep | 15-Sep | 16-Sep | 17-Sep | 19-Sep | 20-Sep | 21-Sep | 22-Sep | 23-Sep | 24-Sep | 28-Sep | 29-Sep | 30-Sep |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **darrick@hiddenempirefilmgroup.com** | | | | | | | | | | | | | | | | | | | | |
| login_challenge | | | | | | | | | | | | | | | | | | | | 1 |
| login_failure | | | | | | | | | | | | | | | | | | | | |
| login_success | 1 | 6 | 1 | | | | 1 | 2 | | 1 | | 2 | | | | | 1 | 1 | 2 | 3 |
| login_verification | | 3 | | | | | | | | | 1 | | | | | | | | | |
| **erinmurray@hiddenempirefilmgroup.com** | | | | | | | | | | | | | | | | | | | | |
| login_failure | | | | | | | | | | | | | | | | | | | | |
| login_success | | | | | | | | | | | | | | | | | | | | |
| login_verification | | | | | | | | | | | | | | | | | | | | |
| **quincy@hiddenempirefilmgroup.com** | | | | | | | | | | | | | | | | | | | | |
| login_failure | | | | | | | | | | | | | | | | | | | | |
| login_success | | | | | | | | | | | | | | | | | | | | |
| login_verification | | | | | | | | | | | | | | | | | | | | |
| **roxanne@hiddenempirefilmgroup.com** | | | | | | | | | | | | | | | | | | | | |
| login_failure | 3 | 3 | | 2 | 1 | | 4 | | | | 1 | | 1 | | 2 | | | | | |
| login_success | | | | | | | | | | | | | | | | | | | | |
| login_verification | | | | | | | | | | | | | | | | | | | | |
| **rtaylor_asst@hiddenempirefilmgroup.com** | | | | | | | | | | | | | | | | | | | | |
| login_challenge | | | | | | | | | | | | | | | | | | | | |
| login_failure | | | | | | | 1 | 2 | | | | | | | 2 | | | | | |
| login_success | 1 | | | | | | | | | | | | | | | | 1 | | | |
| login_verification | 1 | | | | | | | | | | | | | | | | | | | |
| **sean@hiddenempirefilmgroup.com** | | | | | | | | | | | | | | | | | | | | |
| login_failure | | | | | | | | | | | | | | | | | | | | |
| login_success | | | | | | | | | | | | | 1 | 2 | | 1 | | | | |
| login_verification | | | | | | | | | | | | 1 | 1 | | | 1 | | | | |
| **velma@hiddenempirefilmgroup.com** | | | | | | | | | | | | | | | | | | | | |
| login_challenge | | | | | | | | | | | | | | | | | | | | |
| login_failure | | | | | | | | | | | | | | | | | | | | |
| login_success | | 1 | 1 | 1 | | | | | 1 | 1 | | | 2 | 1 | 1 | | | 1 | 1 | |
| login_verification | | 1 | 1 | 1 | | | | | 1 | 1 | | | 2 | 1 | 1 | | | 1 | 1 | |

*Figure 5Login activity in September when Mr. Angelone had no administrative access[32]*

64.   I have reviewed the audit login data provided by Google and do not see any pattern that would indicate Mr. Angelone is intentionally preventing HEFG team members from successful login. Mr. Angelone has a near daily login, while other members of HEFG are having successful logins at the same time. Ms. Burke has not produced any user or administrative logs that would indicate the user's passwords are being changed, nor any administrative activity by Mr. Angelone. I cannot agree that there are indications of intent by Mr. Angelone based solely on this data.

## C.   Ms. Burke's opinion that Mr. Angelone had knowledge and access to the Icelandic domains relies upon coincidental information, and makes assumptions not supported by the underlying technology.

## i.   The Namecheap return included domain account information and the login history for the account, including IP addresses.

65.   Ms. Burke reviews the information returned from Namecheap and concludes that Mr. Angelone did have control over the so-called Icelandic domains based upon a name association and an IP address correlation.

---

[32] Login audit logs.json - Google response and productions Exhibit 111-53

66.     My review of the Namecheap return shows that the domains in question were all managed in the same account under user jackyjasper on Namecheap. The domains were set to auto renew, meaning they would renew each year automatically on the anniversary.

67.     I did my own research using the WHOIS database, likewise, confirming that the domains had recently been renewed and there had not been any recent transfers on the domains. The domains had been in the account since 2021.[33]

68.     In addition to domain registration and account information, Namecheap provided login history for the jackyjasper user account, including IP addresses.

## ii.     IP address cannot reliably determine geolocation or identify a particular end-point device such as a computer or cell phone.

69.     IP address information is dynamic, meaning it can change often, sometimes in as little as 24 hours, and different customers in an ISP's geographic area could have the same IP address assigned to them over time, making IP addresses a poor indicator of physical location.[34] IP addresses are allocated in large blocs of numbers to the Internet Service Providers (ISPs) such as Frontier and Charter Communications.[35] Thus reducing accuracy of IP address geolocation to the granularity of the ISP's region. Put plainly, there are more people seeking access to the internet than there are IP addresses available to an ISP, especially in high density populations like Los Angeles. To accommodate that, and to provide privacy to customers, ISPs regularly reassign IP addresses to different locations within the ISP's regions, in Charter's case the LA metropolitan area. IP addresses cannot be relied upon to consistently identify a geolocation such as an address.

70.     Importantly, ISPs assign the IP address for access to the internet, not to identify a specific device. It is possible for commercial operations to buy a static IP address, however, most residences and many businesses subscribe to an ISP service such as Charter or Frontier, where the default is a dynamic IP. It follows then that IP addresses cannot be used to consistently identify an endpoint device like a smart phone or a laptop any more than a particular

---

[33] WHOIS history for Icelandic domains.pdf -  using Domain Tools Side by Side comparison

[34] DynamIPs: Analyzing address assignment practices in IPv4 and IPv6- Ramakrishna Padmanabhan, John P. Rula, Philipp Richter, StephenD. Strowes, and Alberto Dainotti. 2020. In The 16th International Conference on emerging Networking EXperiments and Technologies (CoNEXT '20), December 1–4, 2020, Barcelona, Spain. ACM, New York, NY, USA, 16 pages. https://doi.org/10.1145/3386367.3431314

[35] IANA Resource Guide - https://www.iana.org/help/inr-request-procedure

geolocation. That is because the WiFi used by the device assigns the IP address. For example, if a laptop were to access Namecheap from a Starbucks, it would have an IP address assigned by the ISP that provides WiFi to Starbucks. Later, another device at that same Starbucks could be assigned the same IP address. The original laptop that accessed Namecheap, when it was later used at a residence or another business, would then get a completely different IP address.

### iii.    The login history for the Namecheap account correlates to the same IP address that was used to login to Mr. Angelone's account on Google Workspace, creating a coincidental inference, but not verifiable forensic information.

71.    Ms. Burke goes further, and correlates the IP addresses of the computer upon login to the jackyjasper account on Namecheap and the IP addresses of the computer upon login to the darrick[@]hiddenempirefilmgroup.com account on Google Workspace.[36] The Workspace IP information was included in the Google return.[37] Two of the IP addresses are identical to IP addresses used to login to the Workspace account.

---

[36] Namecheap and Google Workspace correlation of IP address.pdf
[37] Login audit logs.json - Google response and productions Exhibit 111-53



**Login History**

| Date | Success | Username | IP Address |
|---|---|---|---|
| 9/22/2022 2:05:30 AM | True | jackyjasper | 76.167.147.254 |
| 9/22/2022 12:02:24 AM | True | jackyjasper | 76.167.147.254 |
| 9/21/2022 9:07:50 PM | True | jackyjasper | 76.167.147.254 |
| 9/16/2022 2:30:56 PM | True | jackyjasper | 50.117.77.90 |
| 9/16/2022 11:40:34 AM | True | jackyjasper | 50.117.77.90 |
| 8/18/2022 2:36:24 PM | True | jackyjasper | 23.230.46.39 |
| 8/17/2022 7:54:25 PM | True | jackyjasper | 76.93.225.102 |
| 8/17/2022 5:12:02 PM | True | jackyjasper | 76.93.225.102 |
| 8/17/2022 5:11:39 PM | True | jackyjasper | 76.93.225.102 |

**GOOGLE WORKSPACE AUDIT LOG**

| user_name | ip_address | login_type | event_name | event_timestamp |
|---|---|---|---|---|
| darrick@hiddenempirefilmgroup.com | 76.167.147.254 | google_password | login_success | 8/17/22 0:29 |
| darrick@hiddenempirefilmgroup.com | 76.167.147.254 | google_password | login_success | 8/16/22 23:12 |
| darrick@hiddenempirefilmgroup.com | 76.167.147.254 | google_password | login_success | 8/16/22 16:53 |
| darrick@hiddenempirefilmgroup.com | 76.167.147.254 | google_password | login_verification | 8/16/22 16:53 |
| darrick@hiddenempirefilmgroup.com | 76.93.225.102 | google_password | login_success | 8/13/22 14:37 |
| darrick@hiddenempirefilmgroup.com | 76.93.225.102 | google_password | login_verification | 8/13/22 14:37 |
| darrick@hiddenempirefilmgroup.com | 76.93.225.102 | google_password | login_success | 8/5/22 18:13 |
| darrick@hiddenempirefilmgroup.com | 76.93.225.102 | google_password | login_success | 8/2/22 16:38 |

72.  The subpoena return from Charter communications did not identify these two specific IP addresses provided in the Namecheap return and did not provide any user or account information to identify who may have been using the IP addresses on the dates captured in the Namespace event log. We do not know if this IP address is within a residence, business, or commercial operation (like Starbucks). Therefore, we do not have a definitive identification of the user for these IP addresses, there is no forensic data to verify.

73.  The correlation does not directly indicate Mr. Angelone had access to the Namecheap account, this could be a shared computer in an office environment, or different computers on the same WiFi network in an office or commercial operation. The dates between the access span days or weeks and there are only these limited instances over a long period of time. The correlated data Ms. Burke opines upon is coincidental, but not conclusive without further data points.

**D.  Ms. Burke's opinion that Mr. Angelone failed to successfully transfer HEFG's social media accounts ignores best efforts by Mr. Angelone, ignores complexities of the nature of social media accounts, lacks a factual basis and is not supported by an independently verifiable analysis.**

### i.   Mr. Angelone exhibited a good faith effort to transfer social media accounts, the majority were successful and very few were hampered by technical difficulties not of his making.

74.   Ms. Burke begins section 3 of her report highlighting the difficulty Mr. Angelone had transferring two of the social media accounts, the primary X/Twitter and Instagram accounts.[38] My reviews of the email correspondence between Mr. Angelone and Ms. Burke throughout October indicates that Mr. Angelone was in fact attempting in good faith to transfer the social media accounts as required by the injunction.[39] Of particular note is the October 5th summary Email from Mr. Angelone that list 31 social media accounts that were identified, had access credentials turned over, or were updated with a disposition of "not owned/not controlled".[40]

75.   There were two accounts that were not transferred immediately, the Instagram account due to technical difficulties with HEFG confirming access, and the X/Twitter account which Mr. Angelone indicated had been suspended.[41]

76.   X/Twitter, Instagram and its sister company Facebook are like nearly every other mainstream cloud application in that they monitor unusual login activity and will seek to verify a user's identity if the login pattern is different. I have opined on this security measure earlier with Google and how it secures the Workspace cloud application. Different login patterns could mean from a different geolocation, a different IP address, or a computer or mobile device that has never been used to login to the account before. The verification process is also part of the lost password recovery process.

### ii.   For X/Twitter, Ms. Burke's opinion relies upon incorrect information, the X/Twitter account had been deleted prior to the attempt at transfer and was beyond Mr. Angelone's ability to transfer.

77.   The X/Twitter account transfer was problematic for Mr. Angelone and the HEFG team. The credentials provided to Ms. Burke did not work. Furthermore, Mr. Angelone could not provide a valid email for account verification. Unlike the Instagram account issue that follows in the

---

[38] Burke Report p. 17
[39] Email exhibits as part of Ms. Burke's report including exhibits marked as Exhibit 111-26 through Exhibit 111-29
[40] 2022_1005_D_FTI_Initial_EXTERNAL RE Social media follow up.pdf, Exhibit 111-26
[41] 2022_1005_D_FTI_Initial_EXTERNAL RE Social media follow up.pdf, Exhibit 111-26 "@HIDDENEMPIREFG WAS SUSPENDEDFOR COPYRIGHT ISSUES."

next section where valid credentials were provided and an email was sent, here the email address for the account was claimed to be completely unknown by Mr. Angelone. This activity and communications transpired between October 5 – 11, 2022.[42]

78. Per Mr. Izen's report, the X/Twitter account for @hiddenempirefg was completely deactivated and deleted on or around September 30 of 2022.[43] There is no actual log or documentation of the deactivation, only the noted absence of the site when searching for it, as Mr. Izen documents in his report.

79. the social media transfer to Ms. Burke during October 5 – 11, Mr. Angelone has provided what he believes are his credentials, and noted the account appears to be suspended. Later in that same dialogue with Ms. Burke, Mr. Angelone notes that the twitter account now says "it does not exists".[44]

80. Ms. Burke must realize from her cohort Mr. Izen, and from the observations from Mr. Angelone, that the X/Twitter account no longer exists, and yet is surprised when the login credentials do not work. When an X/Twitter account is deactivated or deleted, so also are the account profiles and credentials. One should not expect the credentials to work.[45]

81. Instead, in her report, Ms. Burke brings up the X/Twitter return received in April of 2023.[46] In that return X/Twitter shows the creation of a new @hiddenempirefg twitter account as of January 12, 2023. This is a brand-new account that did not exist before January 2023, as noted in the data file provided by X/Twitter, and illustrated in figure below (I have circled the date the account was created in red):

---

[42] 2022_1005_D_FTI_Initial_EXTERNAL RE Social media follow up.pdf, Exhibit 111-26; 2022_1011_Suspension_Re_ _EXTERNAL_ RE_ Twitter suspension.msg.pdf, Exhibit 111-27
[43] Izen Report p. 49 (this report does not have page numbers), Section 3
[44] 2022_1011_Suspension_Re_ _EXTERNAL_ RE_ Twitter suspension.msg.pdf, Exhibit 111-27
[45] Izen Report p. 50 "On or around September 30, 2022, Hidden Empire Twitter channel (@hiddenempirefg) was deactivated and/or appeared as nonexistent"
[46] 20230921 Twitter Subpoena Response 031141740424.pdf

```
-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512

[
  {
    "account" : {
      "accountId" : "1613335181120933888",
      "createdAt" : "2023-01-12T00:41:10.121Z",
      "email" : "jacky.jasper@gmail.com",
      "createdVia" : "oauth:3033300",
      "username" : "hiddenempirefg",
      "accountDisplayName" : "hiddenempirefg"
    }
  }
]
```

*Figure 6 X/Twitter return indicating the date a NEW account was created*

82.   Ms. Burke completely fails to realize the X/Twitter information is not for the original @hiddenempirefg account that was deactivated the previous September, but instead is for this new account created in January of 2023. The new 2023 account has no bearing on the original @hiddenempirefg account transfer that was attempted to transfer in October of 2022. The original X/Twitter account @hiddenempirefg had been deactivated and was beyond Mr. Angelone's ability to transfer.

83.   As for Ms. Burke's conclusion that the IP address identifies Mr. Angelone, I have covered that topic extensively in prior section VIII. C. iii of this same report. The IP address does not at all identify Mr. Angelone. The correlated IP address data Ms. Burke opines upon is coincidental, but not conclusive without further data points.

### iii.   For Instagram, Mr. Angelone provided valid credentials to transfer access but Ms. Burke and HEFG were unable to accept the transfer due to lost information from HEFG during creation of the *New* Google Workspace.

84.   Mr. Angelone transferred the login credentials for the Instagram account to Ms. Burke on September 30, as acknowledged by Ms. Burke in her report.[47] The problem arose when Ms. Burke and team attempted to access Instagram using the valid credentials. Instagram recognized a different login pattern and required further account verification.[48] We know the

---

[47] Burke Report p. 20 – "Angelone provided a successful username and password credential set to access this account."
[48] 2022_1011_GraniteBay_Instagram_D_FTI_Re_ _EXTERNAL_ Re_ hiddenempirefilmgroup IG emailrecovery.pdf, Exhibit 111-28

credentials Mr. Angelone provided were valid, because of the additional account verification, had the credentials not been valid Instagram would have returned a "failed login, invalid credentials" message.

85.     In her report Ms. Burke incorrectly explains the behavior as Two Factor Authentication (shortened to the acronym 2FA or MFA). However, Instagram is very clear when and how to setup 2FA and that once setup, after a user inputs valid login credentials then Instagram will require a code to be entered from a text message, a special mobile app designed for authentication, or the WhatsApp mobile app.[49] Based upon the screen shots and messages returned by Instagram, and captured in the Emails cited earlier, 2FA was not setup for the Instagram account because these three methods for a code were not requested by Instagram.

86.     Instead, what is happening is because the account did not have 2FA setup, the user verification resorted to what is called the "recovery email". The recovery email is the email address added for the account profile, typically when the account was initially registered with Instagram and there is only one email.[50] If a phone number is added to the account profile, Instagram can also send a text but that does not appear to be the case in this situation. We can see that this is happening because the screen shot of the phone attempting to login to Instagram says "Enter the 6-digit code we sent to"... followed by an email address. [51]



87.     The email address on the phone message captured in the screenshot above is obscured for security and privacy reasons, this is called a "mask". Otherwise, a bad actor could use this process to first find an Email address then pursue access to the Email account. This masking method of obscuring with asterisk is an industry practice that allows open communication about an email address without compromising it. The assumption is that only the account holder knows the complete email address. According to the email on October 11, Ms. Burke

---

[49] Securing Instagram with two-factor authentication.pdf  https://help.instagram.com/566810106808145
[50] Update Instagram profile information with your Email.pdf  https://help.instagram.com/583107688369069/
[51] 2022_1011_GraniteBay_Instagram_D_FTI_Re_ _EXTERNAL_ Re_ hiddenempirefilmgroup IG emailrecovery.pdf p. 4 , Exhibit 111-28

understood this principle and proceeded to ask Mr. Angelone about the Email account, what may be behind the asterisk, but she was asking the wrong individual.[52]

88.    There is another component to this industry practice, and it is that there is not a one-for-one match between characters in the Email and number of asterisks in the message. That is intentional and supports security and privacy by making the email address less obvious to guess. In short, while we see 4 asterisks in the name and 5 asterisks in the domain (the words after the "@"), there can be any number of numbers and letters behind the asterisk. Ms. Burke assumes the email address is literal and looks for an email address that fits.[53] Mr. Angelone notes during the exchange, that it was the Email setup originally and he believes that fits "social[@]hiddenempirefilmgroup.com".[54]

89.    In the Email exchange, Ms. Burke believes Mr. Angelone has access to the recovery email code because he has a screen shot of a "New login to Instagram" on his office[@]aone.la email account.[55] The alert to Mr. Angelone about a new login to Instagram is not relevant because of the date of the notice. The figure to the right is a copy of that screenshot, and I have circled in red the date of the alert, it is October 6, one day prior to the Google Workspace being deleted. The *Original* Google Workspace managed email for



HEFG and Mr. Angelone had access, the *New* Google Workspace created by R.A. Taylor on October 10 did not include Mr. Angelone to my knowledge. The email exchange with Ms. Burke attempting to recover Instagram from an Email occurs on October 10 – 13, during and after the new email system was created by R.A. Taylor.[56] At this point, Mr. Angelone does not have any access to an HEFG email account and cannot assist further. Unfortunately, Ms. Burke

---

[52] 2022_1011_GraniteBay_Instagram_D_FTI_Re_ _EXTERNAL_ Re_ hiddenempirefilmgroup IG emailrecovery.pdf p. 6, Exhibit 111-28
[53] 2022_1011_GraniteBay_Instagram_D_FTI_
[54] 2022_1011_GraniteBay_Instagram_D_FTI_
[55] 2022_1011_GraniteBay_Instagram_D_FTI_
[56] 2022_1011_GraniteBay_Instagram_D_FTI_

neglects to realize the situation with a new Workspace account and continues to press Mr. Angelone for resolution as if he has access.[57]

90.    Ms. Burke, in her report, incorrectly assumes Mr. Angelone had access on October 13, when he sent the Email of the Instagram alert, and does not realize that Mr. Angelone's alert was from October 6, <u>prior to the Workspace account that allowed his access being deleted</u>.[58]

91.    Ms. Burke was wrong. The only person that could receive that verification Email, was the person R.A. Taylor had setup in the new Google Workspace for the email account.

## E.    Rebuttal Conclusions:

92.    Ms. Burke's opinion that Mr. Angelone perpetrated malfeasance inappropriately renders a legal opinion.

93.    Ms. Burke's opinions that Mr. Angelone deleted the Google Workspace account and denied access to HEFG team members lack a factual basis and are not supported by an independently verifiable analysis.

93.1.    Ms. Burke's opinion that Mr. Angelone deleted the Google Workspace is not supported by information in the Google audit log, Mr. Angelone did not login with sufficient privileges to perform such an act.

93.2.    Ms. Burke adds additional analysis for new environment other than the original HEFG Google Workspace, the environments are completely unrelated, there is no indication of Mr. Angelone having access or login to this environment, and no supporting documents are provided.

93.3.    Contrary to Ms. Burke's analysis, other HEFG members did have access, there are many reasons Google will prevent a login besides password resets, and there was insufficient data provided in the report to reach a verifiable conclusion.

---

[57] 2022_1013_Recap_IG_instagram hiddenempirefilmgroup.pdf p. 1, Exhibit 111-29
[58] Burke Report p. 20 – "Angelone claimed in a conversation with FTI on October 13, 2022, memorialized via email21, that he received alert emails to his office@aone[.]la email account for logins to this Instagram account. Though his accessible email was connected to this account, albeit not used as the recovery account, he claimed he was unable to access or change the verification email address receiving the verification codes in order to permit access.

94.    Ms. Burke's opinion that Mr. Angelone had knowledge and access to the Icelandic domains relies upon coincidental information, and makes assumptions not supported by the underlying technology.

94.1.    The Namecheap return included domain account information and the login history for the account, including IP addresses.

94.2.    IP address cannot reliably determine geolocation or identify a particular end-point device such as a computer or cell phone.

94.3.    The login history for the Namecheap account correlates to the same IP address that was used to login to Mr. Angelone's account on Google Workspace, creating a coincidental inference, but not verifiable forensic information.

95.    Ms. Burke's opinion that Mr. Angelone failed to successfully transfer HEFG's social media accounts ignores best efforts by Mr. Angelone, ignores complexities of the nature of social media accounts, lacks a factual basis and is not supported by an independently verifiable analysis.

95.1.    Mr. Angelone exhibited a good faith effort to transfer social media accounts, the majority were successful and very few were hampered by technical difficulties not of his making.

95.2.    For X/Twitter, Ms. Burke's opinion relies upon incorrect information, the X/Twitter account had been deleted prior to the attempt at transfer and was beyond Mr. Angelone's ability to transfer.

95.3.    For Instagram, Mr. Angelone provided valid credentials to transfer access but Ms. Burke and HEFG were unable to accept the transfer due to lost information from HEFG during creation of the *New* Google Workspace.

## IX.   REBUTTAL OPINIONS AND ANALYSIS OF ALEX IZEN'S REPORT

### A.   Mr. Izen's opinion that Mr. Angelone is associated with the Hollywood Street King website and blog and that this association alone proves malicious activity by Mr. Angelone lacks a factual basis and is not supported by an independently verifiable analysis.

#### i.   Mr. Izen's expert report is full of references to sensational content, with famous names and Hollywood insider drama, but contains no facts regarding Mr. Angelone's specific actions or involvement, there are no verifiable facts upon which to draw conclusions.

96.   Throughout the review of Mr. Izen's expert report I observed that most all the fact references supporting Mr. Izen's opinion are website links and references back to the Hollywood Street King website and blogs, or to the Hollywood Street King social media content on YouTube.[59]

97.   I have reviewed the content referenced and find that Mr. Izen is promoting sensational and dramatic content, without any forensic analysis as to the origin, ownership, or chain of custody of the content. Mr. Izen's basic approach seems to be, Hollywood Street King is bad, Mr. Angelone is associated with Hollywood Street King, therefore Mr. Angelone is bad.

98.   I understand that it is permissible for an expert to draw an inference in the opinion, but that inference must be grounded in fact and the product of reliable principles and methods that are reliably applied to the facts of the case. Mr. Izen does not produce his methodology nor the underlying facts supporting his opinion and the inferences they contain.

99.   Having the court review these videos and postings is a waste of its time and that of the experts.

#### ii.   Mr. Izen's opinion that Jacky Jasper and Mr. Angelone are separate individuals is accurate to the best of my research.

100.   Mr. Izen opens his report by identifying Sean Merrick as the real person behind the media persona of Jacky Jasper, and that Mr. Angelone partnered with Jacky Jasper in the support and operations of the website Hollywood Street King.[60]

---

[59] Izen Report, Exhibit A – O pp. 54 – 84 **(there are no page numbers on the Izen report, so the actual PDF page number for the expert report named 2024-01-22 Plnttf Exp Witness Disclosure - reports 031141644360.pdf will be used)**

[60] Izen Report p. 41

101. I have researched the background of Sean Merrick, including the personas Greg Comeau, and Jacky Jasper including social media references. I am prepared to opine on that topic if requested, but it is outside of the scope of my responsibilities for this report. This matter only involves the HEFG digital environments and the actions of Mr. Angelone. The behavior of a Hollywood online tabloid is not in scope for this matter.

102. Jacky Jasper was featured on an NBC Television Dateline report "The Perfect Catch" that aired June 15th 2012.[61] In that television report Dennis Murphy, the NBC investigative reporter, interviews Jacky Jasper regarding articles published on the Hollywood Street King website that exposes the subject of the NBC investigation, rapper Timothy Blair. [62]

103. I concur with Mr. Izen's analysis that Mr. Merrick aka "Jacky Jasper" and Mr. Angelone are separate individuals.

### iii. Mr. Izen's opinion that publishing articles in a Hollywood online tabloid, and Mr. Angelone's technical and operation role for that tabloid amounts to malicious, extortion-like tactics is without merit and an intentional misrepresentation of the facts per the documents produced.

104. Mr. Izen spends a scant paragraph associating Mr. Angelone with the Hollywood Street King online tabloid and Jacky Jasper, the online persona of Sean Merrick.[63] Mr. Izen does not explain the relevance of this information or provide more than media references to support the association.

105. Mr. Izen appears to be using the association to form an opinion in the next paragraph of his report. Mr. Izen summarizes a story published in the New York Times in 2016 about how Hollywood Street King first broke the story that Charlie Sheen was HIV positive.[64] In Mr. Izen's retelling of the New York Times article, Mr. Izen says "Jacky Jasper" played a prominent role, by **improperly** gaining access to confidential information and publishing it."[65] (emphasis added)

---

[61] NBC Dateline The Perfect Catch Dennis Murphy interview Jacky Jasper additional resources.pdf
[62] 2012 Dateline NBC The Perfect Catch interview Dennis Murphy and Jacky Jasper clip.mp4
[63] Izen Report p. 41
[64] Izen Report p. 41 "The Path to Charlie Sheen's H.I.V. Disclosure"
https://www.nytimes.com/2016/01/06/arts/television/the-pathto-charlie-sheens-hiv-disclosure.html
[65] Izen Report p. 41

106.    Mr. Izen brazenly mischaracterizes the words and the tone used in the New York Times article. Reviewing the article directly, what Mr. Izen says was "improper access", is described by Mr. Sheen himself during the interview as "someone who had taken pictures of his medicines with a cellphone".[66] In the article Jacky Jasper identifies the source as the friend of someone Mr. Sheen was dating and to whom Mr. Sheen was paying money to keep the story under wraps. Clearly there was no "improper access" by Jacky Jasper and no association or implication to Mr. Angelone.

107.    Mr. Izen continues the Charlie Sheen article to describe how the attorney for Hollywood Street King, cited in the NYT article as one Ronald Richards, was approached by another attorney interested in "a complete blackout on objectional subject matter".[67] The two attorneys arranged for the content to be taken down in exchange for payments. To be clear, the attorney for Hollywood Street King was approached. Here Jacky Jasper references Mr. Angelone as responsible for the "technical and business operations" of the website.[68] It is here that Mr. Izen draws his first conclusion and opines that this "demonstrates his [Darrick Angelone] familiarity with leveraging the outlet for malicious, extortion-like tactics of prominent individuals".[69]

108.    I must admit, it is not clear to me the relevance of Mr. Izen's observations.  This matter only involves the HEFG digital environments and the actions of Mr. Angelone. The behavior of a Hollywood online tabloid is not in scope for this matter.

109.    After reviewing the references, the articles and Mr. Izen's opinion I can only conclude that there are no facts presented that tie Mr. Angelone to malicious and extortion-like tactics and that Mr. Izen intentionally misrepresented the content of the New York Times article to impugn Mr. Angelone's character and setup Mr. Izen's later analysis in this report regarding the purported confidential information from HEFG.

---

[66] 2016_01_15 New York Times Article re Charlie Sheen 031141740402, Exhibit 111-34, paragraph 3
[67] 2016_01_15 New York Times Article re Charlie Sheen 031141740402, Exhibit 111-34, paragraph 4
[68] Izen Report p.41
[69] Izen Report p. 41

### iv.   Mr. Izen does not acknowledge that Hollywood Street King web blog is part of a $3Bn Hollywood gossip industry and that revenue and payments are driving the push for more information.

110.   Mr. Izen, in the opening section of his report has characterized the Hollywood Insider gossip business in the most uncharitable light. Many would not disagree on a personal level. However, I find that this subject needs to be addressed because it is important to understand the underlying dynamics of this industry to evaluate the documents and positions Mr. Izen publishes later in his report as an expert witness.

111.   There is an often-cited article from the New York Times, from 2011, that estimates the Hollywood insider gossip revenue stream at that time was $3Bn annually.[70] This article is noteworthy because it cites the allure of large cash payments to employees for disclosing celebrity information. The article goes on to describe tabloid outlets like TMZ paying $25,000 dollars to get medical information, inside information or event gossip. All this to fuel an insatiable appetite in the public for more gossip. The online news outlet The Week updated the article in 2015 with a collection of numbers exposing how much tabloids are willing to pay for information, from $4,600 for a hospital record, to $10,000 for celebrity mishaps.[71] Fast forward to 2023 when Medium, an internet website that promotes itself as an "online publishing platform", detailed the results of a global survey indicating GenZ are up to 12 times more obsessed with celebrity gossip.[72]  All this to establish what many of us probably already surmised, Hollywood tabloid news is big business and even more so with young adults.

112.   The next critical step is understanding how gossip blogs and tabloid websites generate revenue since they are not directly selling the content. There are both technical and

---

[70] NYT 2011 Article The Gossip Machine.pdf https://www.nytimes.com/2011/05/22/us/22gossip.html

[71] 2015 The Week Gossip Payments .pdf https://theweek.com/articles/484520/3-billion-celebrity-gossip-industry-by-numbers

[72] Medium 2023 Gen Z proves celebrity gossip is in its peak era.pdf survey https://medium.com/@beyondson/gen-z-proves-celebrity-gossip-is-in-its-peak-era-whats-next-16b1062a70d4

"GenZ" is a short form reference to the Generation Z cohort of children born in the United States in the late 1990's and Early 2000's, as defined by Merriam-Webster and Oxford Dictionary, https://www.merriam-webster.com/dictionary/Generation%20Z

and researched by the international Pew Research Center. https://www.pewresearch.org/short-reads/2019/01/17/where-millennials-end-and-generation-z-begins/

marketing components that I will summarize.[73] The key sources of revenue come from ad
clicks ("click here, buy now") which may be on the website, or on links to other websites such
as YouTube, and affiliate marketing (promoting a brand in your content that people then go
and buy). To generate this revenue the website must have traffic, people who visit the site
and click on the content. Generating traffic requires marketing the content to find people
who are interested in the subject and will come to your site. The marketing may be real
advertising, or shout outs on other websites and blogs, or the more modern approach of
placing social media references on various platforms like X/Twitter and Instagram.

113.   In summary, the recipe is to build a website, put content on the website, market the content
to get people to visit your site, then offer them marketing campaigns to buy product or click
links to other websites. This is an oversimplified explanation of what Mr. Angelone does as a
creator, for the Taylor's and HEFG digital properties as well as for Sean Merrick and the
Hollywood Street King gossip blog. Understanding the key elements of a successful website
will be revisited in the analysis of Mr. Izen's opinions.

### v.   Mr. Izen's opinion that the content published on the Hollywood Street King website is confidential HEFG information fails to show any ownership, privacy control, or chain of custody for the materials cited and does not demonstrate any relevance to Mr. Angelone.

114.   In Topic 1, Section 2 of his report, Mr. Izen describes a series of postings on the Hollywood
Street King website and on Hollywood Street King's channel on YouTube that included public
court records as well as digital content, including videos of Deon Taylor.[74] In the report Mr.
Izen includes citations and links to the digital content on the Hollywood Street King website as
well as text captured in Mr. Izen's reports Exhibit B and C.

115.   Mr. Izen characterizes the information as confidential but does not explain how he came to
that conclusion. There is a general reference to "email servers" and the "personal and private
emails and zoom content".[75] Portions but not all of the HEFG email and files were maintained

---

[73] Lasso - How to Start a Gossip Blog 2024.pdf There is not a scholarly article on this subject, Universities have
researched it, and many self-help and business articles show how to set it up. This article is probably the simplest
to reference from A to Z for a gossip blog. https://getlasso.co/how-to-start-a-blog/gossip/
[74] Izen Report p. 43
[75] Izen Report p. 43

in the HEFG Google Workspace, operated and maintained by Mr. Angelone. Mr. Izen makes
an implied accusation that Mr. Angelone improperly accessed the HEFG digital content.

116.   I will address the accusation of "improper access" in my next conclusion, in this portion I will
address the characterization of the digital content as "confidential".

117.   Mr. Izen's Section 2 of his report is a single page long and contains no other citations or
references that would verify the claim that the digital content in question was held in
confidence by HEFG. Mr. Izen has not provided the actual digital files that were the source of
the content for forensic inspection. Mr. Izen has not provided any chain of custody or HEFG
business practices documentation that explains how the digital content was kept confidential.

118.   After my review of the information and citations from Mr. Izen, including a review of the
videos, I can find no facts presented for my review that verify the digital content in question
was stored on the HEFG Google Workspace or that HEFG exercised possession or control of
the digital content to keep it confidential.

## vi.   Mr. Izen's opinion that the content published on the Hollywood Street King website was taken from HEFG email "servers" shows a complete lack of understanding regarding Google Workspace security, and his conclusion lacks substantive facts and forensic evidence.

119.   Mr. Izen's report, in a single paragraph covered by Topic 1 of Section 2, comes to the abrupt
conclusion that Mr. Angelone improperly accessed the HEFG digital content from the HEFG
Google Workspace.[76] Mr. Izen infers that the digital content published on the Hollywood
Street King website was improperly taken from the HEFG "email servers".

120.   There are no facts cited in Mr. Izen's report that verify where the HEFG digital content was
stored, and if that digital content was stored securely. There is no documented evidence that
any of this content was stored in the HEFG Workspace.

121.   Google Workspace contains useful tools for keeping and sharing content, including Google's
Email called Gmail and a file storage tool called Google Drive.[77] Using these tools it is possible

---

[76] Izen Report p. 43 "Most notably, this footage was improperly taken from Hidden Empire email servers –
including personal and private emails and zoom content – after Mr. Angelone's access was legally prohibited."
[77] See Definitions *supra*

for an HEFG user to share their own content to anybody by simply sending a website link. If
the user is not careful, anybody in possession of that website link can access the content.[78]

122.   Mr. Izen also illustrates a clear lack of understanding for the Google Workspace environment
and how the technology operates:

    122.1.   There are no "servers", email or otherwise, in the Google Workspace cloud
environment, the environment is secure and protected from access by Google. The
Google Workspace environment is in "the cloud" which means that all of HEFG
content is not on local computers accessible by a person, all of the content is stored in
a remotely hosted, and highly secure environment (we call that "the cloud").[79]

    122.2.   The user's content (emails, files, videos) is stored encrypted, meaning only the owner
or an authorized person can see the contents.[80] Authorized person in this example
means when a user sends a website link to the content and gives the recipient of that
link permission to see the content.[81]

    122.3.   The Workspace admin role does not have access to other user's content in Google
Workspace.[82] This is an attribute of the Google security and privacy protections
offered to uses. Mr. Angelone could not see any user's content merely because he is
the admin.

    122.4.   There are only 5 ways a Workspace admin can gain access to a user's content and each
requires permission from the user, or causes an audit log entry.

    122.5.   It is possible for a user to share their personal content with anybody by simply texting,
emailing, or posting a website link that points to the content.[83]

123.   It is possible, if the content was stored in the HEFG Google Workspace, that the content was
shared carelessly between members of HEFG or with outside parties. There were no
documents or facts presented that would refute such a possibility and verify that the content
was managed and maintained securely.

---

[78] Google Support - How to share content from Google Drive 2024.pdf
[79] Google Support - Google Workspace Security whitepaper - compliance 2024.pdf
[80] Google Support - How Google Drive protects your privacy 2024.pdf
[81] Google Support - Sending Google drive attachments in Gmail 2024.pdf
[82] Google Support - An admin can never see a users files 2024.pdf
[83] Google Support - How to share content from Google Drive 2024.pdf

124.   Plaintiffs and expert did not produce facts showing where the confidential content was stored by HEFG personnel, who amongst the HEFG personnel had access, whether the confidential content was stored solely within the Google Workspace environment, or whether any content had been shared outside of HEFG personnel with emails, links to files.

125.   Mr. Izen has not provided any facts that would support an analysis and conclusion that the digital content on Hollywood Street King was inappropriately accessed.

### vii.   Mr. Izen's cover and recitation of sensational content on Hollywood Street King website and blog fails to show any factual relationship or relevance to the defendant Mr. Angelone.

126.   Mr. Izen shares a long list of social media and website content in an effort to illustrate what he terms "a campaign against Deon and Hidden Empire".[84] Mr. Izen uses this long recitation of website material to opine that the Hollywood Street King and Jacky Jasper are "seemingly operating strictly in the interests of Angelone".[85] There are not facts, just the inference, and Mr. Izen concludes this opinion that all of the content is meant to promote negative attention towards Deon Taylor and Hidden Empire.

127.   I agree that the content is certainly not favorable to the Taylors and HEFG. Mr. Izen does not proclaim the information to be untrue, only to be negative. If the information was untrue there would likely be a separate legal matter against Hollywood Street King in that regard, and if so, then that matter is outside the scope of this report.

128.   Instead, Mr. Izen rest his opinion with the perspective that the content and postings on Hollywood Steet Kings is all about the Taylors and HEFG.

129.   After reviewing all of the postings and content references Mr. Izen provides, I have come to an alternative conclusion. My conclusion is that this is not about the Taylors, who are at best "D-listers" in the Hollywood power circles.[86] Instead after reviewing the various content and references, I see name dropping of power stars and A-Listers such as Will Smith, Kevin Hart, R. Kelly, The Rock, King Bach and many more.

---

[84] Izen Report p. 44
[85] Izen Report p. 45
[86] The Hollywood scale, from A-list to D-list was invented by James Ullmer to express bankability of a Hollywood star. 2009_05_22 LA Times The Ulmer Scale a true test of Hollywood star bankability.pdf

130.    Recall my previous description of the recipe for a successful Hollywood gossip website. In that recipe we must put content on the site that people search for and want to see, and then the website must market the content to attract people to the site in the hopes of generating revenue. Also recall that I earlier explained the Hollywood tabloid industry is large and competitive. My analysis of Mr. Izen's content is that the Hollywood Street King website was securing and publishing content with big name stars, and marketing that content on social media, to drive traffic to their site and consequently revenue. Deon or R.A. Taylor are not going to drive traffic to a website, but the names of actual Hollywood stars listed in the previous paragraph will absolutely do that. It is my conclusion that the Taylors and HEFG are getting trampled in the process of a website publishing juicy gossip involving A-Listers.

### viii.    Mr. Izen's selective use of court documents as "public records" to infer Mr. Angelone has assumed the identity of Jacky Jasper is misleading and a complete analysis of the facts indicates otherwise.

131.    Mr. Izen completes his series of opinions associating Mr. Angelone to the Hollywood Street King and Jacky Jasper by reciting court documents with Mr. Angelone as a party in the pleading and uses that "public record" to indicate Mr. Angelone has assumed the pseudonym "Jacky Jasper".

132.    Mr. Izen implies that Mr. Angelone is named as a sole party in the proceedings and as a matter of record is also named "Jacky Jasper". The actual court documents show that is not the case:

132.1.    The first case is Tosh A Berman v. Greg Comeau et al.[87]  In this case there are several plaintiffs named, including Darrick Angelone, Greg Comeau, Does 1-10, Dairy of Hollywood Street King <sic>, and Jacky Jasper. Being named as one of several defendants in an action does not establish a public record that Mr. Angelone is Jacky Jasper, or Greg Comeau, or any other party to the matter.

132.2.    The second case is Angelone v. Midway Rent a Car, etc., et al.[88] In this case Mr. Izen notes that Mr. Angelone, while under deposition, declares "there is no person with the

---

[87] Tosh A Berman v. Greg Comeau et al State Civil Lawsuit Superior Court of California, County of Los Angeles, Case No. BC509496, Expert Exhibit 111
[88] The second case is Angelone v. Midway Rent a Car, etc., et al., Los Angeles Superior Court No. BC485275. Expert Exhibit 111

name "Jacky Jasper". That is an accurate and true statement by Mr. Angelone. Sean Merrick, as Mr. Izen explained in his opening paragraph of his report, created the pseudonym of "Jacky Jasper" as part of his business enterprise Holly Street King website and blog.[89]

132.3.   Mr. Izen's third case is Her Enterprises et. Al. v. Jacky Jasper.[90] Again, similar to the Tosh Berman case, the fact is that Mr. Angelone is named as one of many parties in the case, along with five other parties, including Angelone Entertainment, White Music Productions, Hollywood Street King, Darrick Angelone and Jacky Jasper. It is important to note in this case that Jacky Jasper is named as a defendant in the case, whereas Greg Comeau is named as a defendant AKA (also known as).

133.   Mr. Izen appears to rely solely upon being a party to a court matter along with Jacky Jasper as his sole method of concluding that Mr. Angelone is acting as Jacky Jasper. Mr. Izen does not provide any conclusion or opinion relevant to the HEFG matter at hand.

134.   I will refer back to my second rebuttal opinion *supra* where I presented facts about Jacky Jasper's identity by sharing a Dateline NBC clip of Sean Merrick under the guise of Jacky Jasper being identified by the NBC host Dennis Murphy.

135.   Mr. Izen has demonstrated that Mr. Angelone, the person responsible for the operations and technology of Hollywood Street King website, has been named as a party with Jacky Jasper (Sean Merrick) and Hollywood Street King, but has not demonstrated that Mr. Angelone has assumed the Jacky Jasper identity.

**B.   Mr. Izen's opinion that there was intentional interference with the HEFG social media properties, and further that Mr. Angelone was directly involved lacks a factual basis and is not supported by an independently verifiable analysis.**

---

[89] Izen Report p. 41 "In 2009, musician Sean Merrick co-founded the online tabloid news website Hollywood Street King, under the pseudonym Jacky Jasper"

[90] Her Enterprises et. Al. v. Jacky Jasper et. al., Los Angeles Superior Court, Case No. SC112442. Expert Exhibit 111

i. **Mr. Izen notes that there was an AOne logo post from HEFG assets, but no opinion is rendered or concluded as to the meaning of the post or the relevance to Mr. Angelone.**

136. Mr. Izen opines on his second topic which concerns interference with HEFG social media. In Topic 2, Section 1, Mr. Izen explains a post on the HEFG Instagram and X/Twitter pages that contains the AOne logo. There are screen captures of the posts and Mr. izen notes that Mr. Angelone "liked" the posts from his personal account.[91]

137. It is difficult to provide a forensics review of a screen shot to determine accuracy, and to verify the information in the capture. There are no other corroborating facts to review.

138. Mr. Izen does not provide any further documents or evidence, and offers no opinion, he merely purports that the events happened and infers that the screenshots are true and accurate depictions of what transpired.

139. Mr. Izen does not show any relevance of the images to this case and does not provide any verifiable information that would support a conclusion if one were to be made.

ii. **Mr. Iven's opinion that Mr. Angelone had any involvement in the Twitter account acting like "bot" activity has no supporting facts or evidence and ignores the most likely explanation that it was in fact a bot "acting like a bot".**

140. Mr. Izen continues his opinions supporting interference in Section 2 of this topic. In this opinion Mr. Izen documents the general observation that the HEFG X/Twitter account was behaving erratically, and swiftly concludes that a bad actor is replicating this behavior as a "digital alibi".[92]

141. The only evidence of this "abnormal" activity Mr. Izen offers to support his conclusion is a single screenshot showing the @hiddenempirefg account promoting click-through material for other X/Twitter accounts. Recall in my previous explanation of how websites market and generate revenue that these "click-through" items are a marketing activity and revenue source.

---

[91] Izen Report p. 47 noting figures 3, 4, 5 and 6
[92] Izen Report p. 48

142.   Mr. Izen shows this as an example of abnormal activity without first establishing a baseline of what would be considered "normal" activity by the HEFG account. There is no documented information that allows for comparison in Mr. Izen's work. We are left to assume the HEFG account would not reference this type of content normally and attribute this one screenshot to the work of a bad actor.

143.   It may be the bots. There may be an alternative explanation to the behavior Mr. Iven highlights, and one that is far more plausible. The behavior may be the work of "bots". X/Twitter bots are a type of software that performs autonomous actions such as posting to the account, liking something, following and unfollowing and so forth.[93] X/Twitter invented the bots to automate the process of maintaining a daily presence on the account so as to make the account seem very active and draw searches to it, something that Ms. Burke referenced in her discussion of "search algorithms".  Recall my explanation of how to market and generate revenue for a website, and one of those prime examples is publishing content on social media to drive traffic to your website. The examples Mr. Izen show in his screenshot are just such marketing items.

144.   Mr. Izen even explains this behavior in his own report as being like bot activity when he proclaims the actions "seemingly replicates a "bot".[94] Mr. Izen can see that the behavior is "like a bot" but refuses to explore any facts to support or dismiss the assessment.

145.   Further support that this activity was from a bot is an email from Mr. Angelone to Ms. Burke on October 11th, while Mr. Angelone was attempting to hand over control of the x/Twitter account, Mr. Angelone noted of the HEFG X/Twitter account; "They literally never once logged in and used it… it was mostly **automated bots** and not actively managed".[95] (bold emphasis added)

146.   In my review of Mr. Izen's opinion I cannot find any facts or forensic evidence that would indicate the activity that was "acting like a bot" was anything other than a bot. There is no evidence presented to me that Mr. Angelone had access to the HEFG  X/Twitter account or that he somehow instigated the activity.

---

[93] 2024_01_10 Tech Crunch - Twitter has a verified bot problem.pdf, Exhibit 111-28, p. 1
[94] Izen Report p.49
[95] 2022_1011_Suspension_Re_ _EXTERNAL_ RE_ Twitter suspension.msg.pdf

iii.   **Mr. Izen's opinion that Darrick Angelone was responsible for relabeling and then deactivating the HEFG twitter account does not provide any technical facts to support his position and is contrary to the observed facts available.**

147.   Mr. Izen begins his third and final section of the interference topic, again addressing the @hiddenempirefg X/Twitter account. In the dialogue, Mr. Izen declares that the @hiddenempirefg channel [account] was first relabeled and then deactivated. There are no documents cited or sources of fact that Mr. Izen references.  Except for the one embedded image in the report, there are no other references or facts for me to analyze. The embedded image purports to be a screenshot taken some time in the month of October.[96]

148.   Mr. Izen reasons that while searching for the missing @hiddenempirefg X/Twitter account turned up no results, X/Twitter did recommend another account named @darrickdidit and described as AOne Creative.[97] This alternate account had nearly 11 thousand followers and had an AOne logo like an image published on Instagram a month earlier. Mr. Izen came to the conclusion that the @hiddenempirefg X/Twitter account had been "relabeled" and then deactivated.

149.   It is possible to do what Mr. Izen suggests. The owner of a X/Twitter account can change their "handle", which is the username of their account, the part that follows the "@" sign, such as @hiddenempirefg. The username is what uniquely identifies someone on X/Twitter there can be only one in all the world. The descriptive text noted above it, "AOne Creative" in this case, does not have to be unique. When you change your username, that change propagates down through all your prior messages and all your followers are updated.[98]

150.   Mr. Izen provided no supporting facts, and no technical evidence that this is in fact what happened, only an assumption. My challenges with Mr. Izen's rationale and conclusion are many, all stemming from this lack of supporting evidence:

---

[96] I presume October because Mr. Izen declares the X/Twitter account was deactivated September 30th, and the return from X/Twitter informs us that the account @darrickdidit, the subject of the screenshot, was deactivated November 4th.
[97] Izen Report p. 50
[98] X-Twitter how to change your handle.pdf  https://help.twitter.com/en/managing-your-account/change-x-handle#

150.1.  There are no facts provided with the screenshot, who took it, how did Mr. Izen come about it, how it was created.

150.2.  There are no further details or screenshots whether the alternate account was "clicked" and what information that divulged.

150.3.  Mr. Izen observes that the alternate account has the same high number of followers as the @hiddenempirefg account, and yet there are no substantiating documents that show how many followers @hiddenempirefg actually had just prior to the deactivation.

150.4.  Mr. Izen did not document the join date of the alternate account. There is a key telltale sign whether this alternate account was the @hiddenempirefg relabeled, and that is the X/Twitter join date. The join date simply enough is the date that the account was originally created. The join date is published as part of the X/Twitter profile and can never be changed. If the @darrickdidit was brand new the profile would have a recent join date, if it was the @hiddenempirefg account, the join date would go back many years. That information would help and only required following the link to the alternate account and capturing the information.

150.5.  Mr. Izen does not provide a timeline of events, which prevents me from evaluating why the X/Twitter account, once found to have been deactivated, was not immediately reactivated. X/Twitter enables an account to be reactivated up to 30 days after deactivation.[99] If X/Twitter had reactivated the @hiddenempirefg account then forensic analysis could have been performed to fully explain what occurred.

151.  To aid in my review of this subject I utilized the Internet Archive (aka the Wayback Machine)[100] which is an historical archive of website pages that are searchable for past content.  I searched for all of the pages captured for the @hiddenempirefg channel on X/Twitter. The search results returned 23 pages of activity dating back to 2016, which indicates to me this is the original @hiddenempirefg account.[101]

---

[99] Twitter Support - Help with reactivating an X account.pdf https://help.twitter.com/en/managing-your-account/trouble-reactivating-x-account
[100] See Definitions *supra* (web.archive.org)
[101] Internet Archive Capture of twitter.com-hiddenempirefg 2024.pdf, this document is the capture of the first of 23 pages, the list is sorted in descending date order to show the most recent activity at the top.



*Figure 7Internet Archive (web.archive.org) showing the last activity for the Twitter account @hiddenempirefg*

152.    According to the Internet Archive, @hiddenempirefg shows activity from 2016 until August
12, 2022. There were 1,134 captures until that date, meaning the Internet Archive visited,
scanned, and captured content. There is no activity for @hiddenempirefg after August 12,
2022. The Internet Archive searches and captures changes. While these results are not a
definitive indication of inactivity, I believe it does infer little to no activity on the account and
indicates the account was suspended sometime in August as Mr. Angelone has stated in his
declaration.

153.    The response from X/Twitter shows that a new @hiddenempirefg account was created in
January 2023. The injunction by the courts was issued on September 30, 2022 and ordered to
comply by October 13, 2022. There has not been any activity on the new @hiddenempirefg
X/Twitter account, only one "Like", no followers, and only 4 following accounts.[102] The new
account is a separate digital property from the assets ordered in the injunction.

---

[102] 20230921 Twitter Subpoena Response 031141740424.pdf, Exhibit 111-56

154. This new @hiddenempirefg account on X/Twitter falls well outside of the injunction timeframe to have impeded the turnover of the accounts.

155. Mr. Izen has concluded that Mr. Angelone was responsible for the X/Twitter activity in September yet has provided no forensic evidence or technical facts to support his conclusion. Moreover, my observation of the activity on the X/Twitter account for @hiddenempirefg suggests that the account was inactive or possibly suspended in August and September.

## C.   Rebuttal Conclusions

156. Mr. Izen's opinion that Mr. Angelone is associated with the Hollywood Street King website and blog and that this association alone proves malicious activity by Mr. Angelone lacks a factual basis and is not supported by an independently verifiable analysis.

156.1. Mr. Izen's expert report is full of references to sensational content, with famous names and Hollywood insider drama, but contains no facts regarding Mr. Angelone's specific actions or involvement, there are no verifiable facts upon which to draw conclusions.

156.2. Mr. Izen's opinion that Jacky Jasper and Mr. Angelone are separate individuals is accurate to the best of my research.

156.3. Mr. Izen's opinion that publishing articles in a Hollywood online tabloid, and Mr. Angelone's technical and operation role for that tabloid amounts to malicious, extortion-like tactics is without merit and an intentional misrepresentation of the facts per the documents produced.

156.4. Mr. Izen does not acknowledge that Hollywood Street King web blog is part of a $3Bn Hollywood gossip industry and that revenue and payments are driving the push for more information.

156.5. Mr. Izen's opinion that the content published on the Hollywood Street King website is confidential HEFG information fails to show any ownership, privacy control, or chain of custody for the materials cited and does not demonstrate any relevance to Mr. Angelone.

156.6. Mr. Izen's opinion that the content published on the Hollywood Street King website was taken from HEFG email "servers" shows a complete lack of understanding

regarding Google Workspace security, and his conclusion lacks substantive facts and forensic evidence.

156.7.   Mr. Izen's cover and recitation of sensational content on Hollywood Street King website and blog fails to show any factual relationship or relevance to the defendant Mr. Angelone.

156.8.   Mr. Izen's selective use of court documents as "public records" to infer Mr. Angelone has assumed the identity of Jacky Jasper is misleading and a complete analysis of the facts indicates otherwise.

157.   Mr. Izen's opinion that there was intentional interference with the HEFG social media properties, and further that Mr. Angelone was directly involved lacks a factual basis and is not supported by an independently verifiable analysis.

157.1.   Mr. Izen notes that there was an AOne logo post from HEFG assets, but no opinion is rendered or concluded as to the meaning of the post or the relevance to Mr. Angelone.

157.2.   Mr. Iven's opinion that Mr. Angelone had any involvement in the Twitter account acting like "bot" activity has no supporting facts or evidence and ignores the most likely explanation that it was in fact a bot "acting like a bot".

157.3.   Mr. Izen's opinion that Darrick Angelone was responsible for relabeling and then deactivating the HEFG twitter account does not provide any technical facts to support his position and is contrary to the observed facts available.

## X.   AFFIRMATION

I certify under penalty of perjury, and pursuant to the laws of the United States of America, that the foregoing is true and correct.

Date 2/27/2024

_____

Rick Watts, JD, PSEM, PMP

## XI.   LIST OF MATERIALS REFERENCED ADDITION TO EXPERT MATERIALS

1. 2009_05_22 LA Times The Ulmer Scale a true test of hollywood star bankability.pdf
2. 2012 Dateline NBC The Perfect Catch interview Dennis Murphy and Jacky Jasper clip.mp4
3. 2015 The Week Gossip Payments .pdf
4. 2016_01_15 New York Times Article re Charlie Sheen 031141740402.pdf
5. 20221115 Namecheap Subpoena Response 031141740426.pdf
6. 2022_1005_D_FTI_GoogleWorkspaceAdminRevoked_EXTERNAL_ RE_ Google workspace.pdf
7. 20240224 WHOIS history for Icelandic Domains.pdf
8. 2024_01_10 Tech Crunch - Twitter has a verified bot problem.pdf
9. Berman v. Angelone.pdf
10. Google Support - An admin can never see a users files 2024.pdf
11. Google Support - Google Workspace Security whitepaper - compliance 2024.pdf
12. Google Support - How Google Drive protects your privacy 2024.pdf
13. Google Support - How to share content from Google Drive 2024.pdf
14. Google Support - Sending Google drive attachments in Gmail 2024.pdf
15. Google Support - What are Google Drive Shared Drives 2024.pdf
16. Google Support - What is encryption 2024.pdf
17. Google Support - what is Google Drive.pdf
18. Google Support Document Login Audit Activities.pdf
19. How Dynamic is the ISPs Address Space Towards Internet-wide DHCP churn estimation - ifip2015-TUD.pdf
20. IANA Resource Guide.pdf
21. Internet Archive Capture of twitter.com-hiddenempirefg 2024.pdf
22. Lasso - How to Start a Gossip Blog 2024.pdf
23. Medium 2023 Gen Z proves celebrity gossip is in its peak era.pdf
24. Namecheap and Google Workspace correlation of IP address.pdf
25. NBC Dateline The Perfect Catch Dennis Murphy interview Jacky Jasper additional resources.pdf
26. NYT 2011 Article The Gossip Machine.pdf
27. Securing Instagram with two-factor authentication.pdf
28. Twitter Support - Help with reactivating an X account.pdf
29. Update Instagram profile information with your Email.pdf
30. X-Twitter how to change your handle.pdf
31. Zoom info list of employees for username reference.pdf

**ATTACHMENT B - CV OF RICK WATTS**

**Rick Watts JD, PSEM, PMP – Page 1 of 9**                              **Quandary Peak Research**

---

# Summary

Mr. Watts has more than 30 years of experience leading software design, system implementation and information technology delivery in several industries and functional areas. His primary areas of expertise include enterprise software and systems architecture, cloud design and operations, technology risk management, and IT project management. Besides providing technology consulting to clients, Mr. Watts has held numerous senior management positions, leading teams in the areas of strategic business planning, large program & project management, knowledge management, and technology implementation. He has directly led a wide range of engagement sizes and types from strategic consulting assignments to global implementations of enterprise-wide solutions. Further, Mr. Watts possesses expertise in litigation consulting and expert witness testimony, having been involved in multiple litigation cases, providing valuable insights into areas such as enterprise architecture, software implementations, technical architecture design, project management, and system integrator delivery.

In addition to his JD, Mr. Watts has attained Information Technology's highest levels of certification in Cloud Architecture (GCP-CA), Project Management (PMP®) and Software Engineering (PSEM).

# Technology Domain Experience

### IT Services
- Business Process Outsourcing
- IT Managed Services (Applications and Infrastructure Outsourcing)
- Commercial Off the Shelf packaged software implementation
- System Integrator and System Implementation Partner
- Commercial Request for Proposal and Vendor Selection
- Architecture Assessment
- IT Asset Valuations
- Merger & Acquisition Due Diligence

### Governance
- Project, Program Management: Agile Scrum, Scrum of Scrum, Scaled Agile Framework (SAFe)
- Project Management: Jira, Monday, MSFT Project, Planview
- Data Quality & Management: DAMA DMBOK2
- Architecture Frameworks: Zachman, TOGAF
- Security & Controls: NIST 500, NIST 800, COBIT, ISO 27001
- Business Continuity: ISO22301, BSI 25999

### Data Management
- Applications: Cellular provisioning and billing, Litigation Management, IT System Management
- Data Warehouse Design & Deployment: Oracle OBIEE, Oracle Cloud, Google Big Query, Apache Hadoop, Snowflake

**Enterprise Business Systems**

- Enterprise Resource Management (ERM/ERP)
- Financials & Supply Chain (FSCM): PeopleSoft, Oracle EBS/Fusion, Microsoft Dynamics, SAP, Lawson, Workday
- Human Capital Management (HCM): PeopleSoft,  Workday, Lawson, Microsoft Dynamics
- Customer/Supplier Relationship Management (CRM/SRM): Salesforce, Pega, Microsoft Dynamics
- Service Management: Salesforce, ServiceNow
- Product Lifecycle Management (PLM): Siemens
- Governance, Risk & Compliance: RSA Archer, OneTrust
- City Management: SAP
- Real Time Location Services (RTLS): CENTRAK
- Digital Asset Management and Digital Content Management Solutions
- Electronic Medical Record (EMR): Cerner
- Digital Health Products: smart beds, nurse call, patient engagement

**Software Development**

- Applications: Cellular provisioning and billing, Litigation Claims Management, IT System Management
- Languages: C, C++, Java, Python, R
- Custom digital asset and content management solutions

**Technology Platforms**

- Cloud Infrastructure: Google, AWS, Azure, Oracle
- Databases: Oracle, SQL Server, MySQL, Postgres, Big Query, Snowflake, Exadata
- Virtualization: VMware, Cisco
- Interoperability: Boomi, MuleSoft
- Storage: Tintri, EMC, Dell
- Networking: Cisco, Dell, Palo Alto

# Employment History

### Enterprise Architecture & IT Expert

Quandary Peak Research | Washington D.C. | Jan 2024–Present

Expert witness and litigation consultant for failed software implementations and failed IT projects. Provides analysis and opinions in pre-litigation matters as well as active litigation; specializing in enterprise architecture, software implementations, technical architecture design and delivery, project management including schedule delay and system integrator delivery.

### Director Enterprise Architecture

H Lee Moffitt Cancer Center | 2020–2023

IT Leader in Moffitt's Center for Digital Health, the Director, Enterprise Architecture is the senior level Architect leading a team of architects (directly and indirectly) to achieve the organization's goals. The primary role of the Director Enterprise Architecture is to ensure that the respective business, application, data, and technology strategies are in line with the organization's business goals, strategies, policies, and standards. Responsible for direct oversight of the Moffitt Technology Roadmap and is key advisor to the Center for Digital Health, including Health Data Science, Digital Innovation, and Information Technology.

- Establish Enterprise Architecture as a Center practice, aligned to TOGAF framework
- Create Business and Solution Architecture competencies
- Partner for Digital Innovation strategies encompassing AI/ML, CRM, Patient Personalization, Patient Experience
- Integrate Architecture into the portfolio and project process
- Key Technologies & Focus:
  - New Hospital Build Patient Smart Room and Interactive Patient Systems
  - Digital Multidisciplinary Tumor Boards
  - Patient centric CRM and Patient 360°
  - Radiomics and Imaging Analytics

### Litigation Consultant and Expert Witness

DisputeSoft | 2009–2020

Expert witness and litigation consultant for failed software implementations and failed IT projects. Provided analysis and opinions in pre-litigation matters as well as active litigation; specializing in enterprise architecture, software implementations, technical architecture design and delivery, project management including schedule delay and system integrator delivery.

- Leading expert in five large software delivery litigation cases, all resolved in favor of client or agreeable settlement
- Pre-litigation opinions for four project management failure cases resolved favorably in mediation

### Senior VP Enterprise Architecture and IT Strategy

Aristocrat Technologies | 2018–2020

Global Head of IT Strategy and Architecture responsible for setting and socializing the strategy, vision, and roadmap for enterprise technologies to support Aristocrat's global business strategy. Change agent and champion for digital transformation, cloud-based microservices architecture and analytics-driven business decisions.

- Develop Enterprise Architecture as a corporate practice, integrate into all IT service management functions
- Align IT delivery to business objectives to ensure optimal value of IT to business
- Create 5-year strategic IT plan and roadmap to accomplish
- Interim executive leader of Project and Portfolio Mgmt., and Global Interoperability Teams
- Key Technologies & Focus:
  - Global analytics capabilities leveraging Google Cloud Platform
  - Digital transformation and functional journey to cloud using cloud adoption framework
  - Enterprise Master Data Management and Data Governance
  - Togaf 9 Enterprise Architecture Methodology

## Chief Information Officer

Howard University | 2016–2018

Executive IT leader for the University in all areas related to information technology, both for instructional and administrative applications. Directing the planning and implementation of enterprise IT systems in accordance with the mission, core values, and purposes of the University in support of faculty, staff and more than 10,000 students across 13 schools and colleges on a 64-building urban campus. Managing 200+ staff with annual spend of $60M+, providing operations, compliance, and strategy.

- Plan, source, and implement strategic network managed service to replace and manage all network and telecom infrastructure with zero OpEx increase
- Reduce year-on-year OpEx by 12% through portfolio rationalization and contract renegotiation
- Create strategic roadmap for enterprise applications and infrastructure moving to hybrid cloud
- Transform IT organization and operations to be more transparent and accountable to the academic mission
- Key Technologies & Focus
  - IT Operations optimization through service and work management tools
  - Managed services for hybrid and on-premises network and UCaaS
  - Infrastructure transformation using on-premises and hybrid cloud technology
  - IT Governance based upon ITIL v3 ITSM model in a bi-modal IT operation
  - Information Security framework aligned to NIST 800 in a HIPAA, PCI and FERPA environment

## Global Director Client Engagement/ Sr Architect

Atos | 2012–2016

Global account executive responsible for framing strategic initiatives with client CxO's and aligning to the Atos service delivery portfolio. Program Executive for large, complex multi-year strategic initiatives. Service portfolio from $5M to $150M.

- Program Executive, responsible for delivering digital transformation solutions to our key logo accounts across architecture, technology, and process
- Consulting CIO to cabinet or board, improving fiscal and operational performance within shared services IT
- Key Technologies & Focus:
  - Digital transformation using AI automation and automated workflow in energy and media industries
  - Robotic automation and business process analytics for Application Managed Services
  - Enterprise shared services architecture using ITIL v3

## Enterprise Architect

Sublimare Consulting, LLC | 2009–2012

Executive technical advisor to the CxO suite responsible for designing, planning, and implementing enterprise-wide business systems to fully leverage application/technology portfolios to reduce costs, build resiliency and ensure corporate and regulatory compliance.

- Develop enterprise architecture frameworks and organizational practice alignment to those frameworks to ensure compliance for a $3bn merger
- Design business solutions to fully leverage application/technology portfolios to reduce costs, build resiliency and ensure corporate and regulatory compliance for large multinational corporations
- Key Technologies & Focus:
  - Business Continuity Management aligned to ISO 22301 standards with CMDB and enterprise GRC

**Rick Watts JD, PSEM, PMP - Page 5 of 9**                    **Quandary Peak Research**

---

- ○ Enterprise security provisioning and rights management per COBIT v3, ISO 27001
- ○ Global data center outsourcing and in-sourcing with business applications rationalization
- ○ IT portfolio valuation from business goals to technology and infrastructure deployment

### Director, Oracle Technology Services
Capgemini | 2005–2008

Member of the practice leadership and a leader for the Oracle National Alliance, responsible for creating new delivery services in the Oracle Fusion space that complimented BPM and SOA business initiatives in North America and Europe.

- – Develop SOA business solutions for architecture, business process and technical integration for a $38M portfolio
- – Advise ERP clients on enterprise architecture and IT governance, IT strategy and application outsourcing strategy
- – Key Technologies & Focus:
  - ○ Enterprise IT governance using ITIL v2 and COBIT 4
  - ○ Business to technology alignment using Zachman enterprise business architecture framework
  - ○ Infrastructure plans and IT service portfolios to support technology and business process outsourcing
  - ○ Enterprise master data management (MDM) and IT Governance

### Director, Technology Service Delivery
Hackett Group (FKA Answerthink) | 2001–2003

Leader of technology resources within a Business Applications practice, creating technology product and service portfolios then managing development of each into revenue streams.

- – Provide client IT architecture and infrastructure strategies including system and process analysis and design
- – Technology liaison to client business leadership for enterprise systems operations and business practices
- – Establish technical architecture services and architecture assessment methodology within practice
- – Key Technologies & Focus:
  - ○ Enterprise technical architecture and performance management
  - ○ PeopleSoft and Oracle ERP/CRM/HCM architecture, design and deployment
  - ○ Enterprise solutions governance using COBIT 3 and ITIL v2

### Manager, Technology & Architecture
Information Management Associates, Inc | 1991–2001

Application architecture and infrastructure consultant; responsible for designing and deploying enterprise solutions, including PeopleSoft and Oracle ERP/FSCM/CRM/SRM systems, BI solutions, and data warehouses.
- – Enterprise Applications governance aligned to ITIL practices
- – PeopleSoft, Oracle Apps/database and EMC storage technical expert
- – Data warehouse design and implementation using Inmon model and Oracle best practices
- – ERM solution architect, PeopleSoft FSCM, HCM, SRM, CRM; Oracle Financials and OBIEE
- – Large and complex systems optimization, open systems performance expert
- – Provide client IT architecture and infrastructure strategies including system and process analysis and design
- – Technology liaison to client business leadership for enterprise systems operations and business practices

## Litigation Consulting

- **Hidden Empire Holdings, LLC v. <u>Darrick Angelone</u>** | Feb 2024–Present
  Jurisdiction: US District Court, Central District of California
  Case Number: 2:22-cv-06515
  Counsel: Kramer DeBoer & Keane
  Nature of Suit: Breach of Contract

- **Oriental Trading Company LLC v. <u>Denovo Ventures LLC</u>**
  **<u>Denovo Ventures LLC</u> v. Legacy Holding Group, LLC. D/B/A Tip Top Solutions** | Jan 2024–Present
  Jurisdiction: District Court of Douglas County, Nebraska
  Case Number: CI 2206047
  Counsel: Gordon Rees Scully Mansukhani, LLP
  Nature of Suit: Copyright, Breach of Contract

- **<u>City of Goodyear</u> v. Berry Dunn** | 2016
  In an arbitration regarding alleged failure of a for-hire project management firm to properly manage requirements, system integrator (SI) vendor selection and project delivery of a city-wide SAP ERP project. Conducted analysis of requirements documentation, SI vendor RFP and selection as well as project management artifacts to establish opinions that the defendant had failed to follow industry standards for requirements gathering, lacked expertise to select a vendor and manage an SAP project, did not use industry standards for project management. Case settled.

- **<u>Kemper Corporate Services, Inc</u> v. Computer Sciences Corporation** | 2016
  In an arbitration regarding the failed implementation of a property and casualty insurance system that was allegedly never made "generally available," conducted a code quality analysis of source code translated from COBOL to Java using industry standard code analysis software and rules databases. Compared performance testing data from single user testing, volume testing, stress testing, and batch testing to legacy system benchmarks and established test plans. Examined release documentation for evidence of independent quality control testing. Case settled.

- **<u>Orange County, CA</u> v. Tata Consulting Services** | 2016
  In this breach of contract and fraudulent misrepresentation case in connection with the implementation of a new property tax management system. Examined process documents, architectural documents, testing documents, source code, defect reports, and IBM Rational and Microsoft Team Foundation Server systems. Reached opinions that Tata failed to develop PTMS using an "n-tier" architecture in accordance with its RFP response and design documents, deviated from its established software development processes, and misrepresented the extent to which unit and system testing had been completed during the project. Drafted expert and rebuttal reports. Assisted with identification of exhibits for trial. Consulting expert. Case settled.

- **<u>City of Goodyear</u> v. Quintel Management Consulting** | 2015
  In a breach of contract case involving the implementation of an SAP ERP system for city-wide services management. Conducted analysis of RFP responses, project artifacts and software final delivery to determine if defendant's representations regarding software being fit for purpose and would meet requirements with out of the box functionality were accurate and whether software as delivered was standard or customized leaving major cost and supportability issues. Reviewed project artifacts and testing results to determine if software as delivered satisfied contractual requirements. Case settled.

---

- **3M v. State of Connecticut** | 2015
In an arbitration in which plaintiff was seeking payment for delivery of a state-wide integrated vehicle management system, the defendant contended that the software requirements had not been met. Conducted analysis of Microsoft's independent audit and application assessment in order to refute the results generated by the Microsoft Code Analysis Tool .NET (CAT.NET) which indicated certain security and code complexity requirements had not been met. Verbal report. Case settled.

- **CGI v. eHealth Ontario** | 2015
In this breach of contract case alleging wrongful termination for default of a contract to deliver a Chronic Disease Management System Diabetes Registry (CDMS-DR). Conducted analysis of documents and defect resolution tracking data to validate plaintiff's claims of delivery completion and establish that defendant impeded plaintiff's ability to deliver the project on schedule. Rebutted defendant's experts' claims that plaintiff failed to meet the contractual specifications and violated project management and software engineering standards causing delay and justifying defendant's termination of the contract. Parties agreed to a special arbitration wherein the plaintiff was awarded nearly $27 million CAD.

- **ACADEMY, LTD d/b/a ACADEMY SPORTS + OUTDOORS v. Wipro Limited and Wipro Inc** | 2015
In a breach of contract case involving the implementation of an Oracle Retail Merchandising System for a sporting goods retailer. Examined project management materials and process, architecture, and technical requirements as well as vendor roles in project delivery and key contractual deliverables. Reached opinions that the vendor failed to properly manage the project, deliver key personnel, and comply with contractual requirements for project delivery. Case settled.

- **3M v. Commonwealth of Kentucky** | 2014
In an arbitration in which plaintiff was seeking payment for delivery of a state-wide integrated vehicle management system, the defendant contended that the software requirements had not been met. Conducted analysis of Microsoft's independent audit and application assessment in order to refute the results generated by the Microsoft Code Analysis Tool .NET (CAT.NET) which indicated certain security and code complexity requirements had not been met. Case settled.

- **CedarCrestone, Inc v. Affiliated Computer Services, LLC n/k/a Xerox Business Services** | 2013
A software failure matter brought by a consulting and systems integration vendor against a Business Process Outsourcing (BPO) provider. Rebutted plaintiff's expert's opinions that project management failures and schedule delay allegedly caused by defendant impeded plaintiff's ability to attain critical project milestones. Proffered additional opinions that plaintiff's violations of project management and software engineering industry standards resulted in software defects that should have surfaced in plaintiff's developer testing, and which ultimately caused the failure of the overall BPO program. The plaintiff was subcontracted to provide a PeopleSoft upgrade forming the foundational system for the BPO. Established that the plaintiff's failure to successfully deliver the upgrade by the scheduled go-live date precluded the defendant's ability to go-live with the BPO, resulting in multi-million-dollar penalties and other consequential damages to the defendant. Case settled.

- **Brookings v. CedarCrestone, Inc** | 2010
In an IT project implementation failure case alleging the system integrator failed in deploying a PeopleSoft ERM grants system. Provided root cause analysis for project failure, focusing on the ISV role of the vendor in managing a project to delivery as well as actions by the plaintiff that contributed to the project failure. Opinions were core to the settlement of the suit. Case settled.

**Rick Watts JD, PSEM, PMP - Page 8 of 9**     **Quandary Peak Research**

---

### EDUCATION

**JD, Juris Doctor of Law**
Wake Forest University School of Law
**BA, Public Administration, w/ minor MIS**
Louisiana State University

### EXECUTIVE EDUCATION

**Leading Digital Transformation in Health Care**
Harvard Medical School
**Driving Digital Transformation**
International Institute for Management Development (IMD)
**Leading Strategic Growth**
Columbia Business School
**Managing Business Process Improvement**
University of South Florida
**Cost Management & Analysis**
American Management Association

### CERTIFICATIONS

Certified Healthcare CIO (CHCIO-CHIME)
Certified Data Privacy Solutions Engineer (CDPSE-ISACA)
Professional Cloud Architect (Google)
Project Management Professional (PMI)
Professional Software Engineering Master (IEEE)
Certified Enterprise Architect (EACOE)
Business Continuity Architect (RSA Archer)

### AFFILIATIONS

College of Healthcare Management Executives (CHIME)
Project Management Institute (PMI)
Enterprise Architecture Center of Excellence (EACOE)
American Society of Industrial Security (ASIS)
Institute of Electrical and Electronics Engineers (IEEE) - Computer Society
Information Systems Audit and Control Association (ISACA)
Maryland State Bar Association

**CERTIFICATE OF SERVICE**

I am employed in Los Angeles County, California.  I am over the age of 18 and not a party to this action; my business address is 21860 Burbank Blvd., Suite 370, Woodland Hills, CA 91367.  My email address is ynelson@kdeklaw.com.

I certify that on February 27, 2024, I served:  **SUPPLEMENTAL DECLARATION OF SANDRA CALIN IN OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE WHY SANCTIONS SHOULD NOT BE IMPOSED AGAINST DEFENDANTS** on the following parties or counsel of record as follows:

| | |
|---|---|
| LAWRENCE HINKLE (SBN 180551)<br>STEPHANIE JONES NOJIMA (SBN 178453)<br>JOSHUA ROY ENGEL<br>SANDERS ROBERTS LLP<br>1055 West 7th Street, Suite 3200<br>Los Angeles, CA 90017<br>Telephone: (213) 426-5000 - Facsimile: (213) 234-4581<br>E-Mail: lhinkle@sandersroberts.com;<br>sjonesnojima@sandersroberts.com;<br>jengel@sandersroberts.com; | *Counsel for Plaintiffs* |
| Justin Kian, Esq.<br>J.T. Fox, Esq.<br>LAW OFFICES OF JT FOX, APC<br>556 S. Fair Oaks Avenue, Suite 444<br>Pasadena, California 91105<br>Telephone: (888) 750-5530 - Fax: (888) 750-5530<br>Email:  jt@jtfoxlaw.com;<br>justin@jtfoxlaw.com | *Co-Counsel for Defendants* |

By ECF/CM: I electronically filed an accurate copy using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System.

I declare under penalty of perjury under the laws of the Unites States of America and the State of California that the foregoing is true and correct.  Executed at Santa Clarita, California on February 27, 2024.

_____/s/ *Yolanda Nelson*_____
Yolanda Nelson

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
21860 BURBANK BOULEVARD, SUITE 370
WOODLAND HILLS, CA 91367
TELEPHONE (818) 657-0255