1  JEFFREY S. KRAMER, State Bar No. 094049
   SANDRA CALIN, State Bar No. 100444
2  KRAMER, DEBOER & KEANE
   A Limited Liability Partnership
3  Including Professional Corporations
   27001 Agoura Road, Suite 350
4  Calabasas, California 91301
   Tel: (818) 657-0255 - Fax: (818) 657-0256
5  jkramer@kdeklaw.com;
   scalin@kdeklaw.com
6  Attorneys for Defendants, DARRICK ANGELONE, AONE CREATIVE, LLC
   and ON CHAIN INNOVATIONS, LLC
7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  HIDDEN EMPIRE HOLDINGS, LLC; a Delaware limited lability company; 12  HYPER ENGINE, LLC; a California limited liability company; DEON 13  TAYLOR, an individual, 14          Plaintiffs, 15  v. 16  DARRICK ANGELONE, an individual; AONE CREATIVE, LLC formerly known as AONE 17  ENTERTAINMENT LLC, a Florida limited liability company; ON CHAIN 18  INNOVATIONS, LLC, a Florida limited liability company, 19          Defendants. | Case No. 2:22-cv-06515-MWF-AGR Action Filed: September 12, 2022 Assigned to Honorable Judge Michael W. Fitzgerald **DECLARATION OF DEFENDANT DARRICK ANGELONE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** DATE:  August 18, 2025 TIME:  10:00am DEPT:  5A [Filed Concurrently with Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment; Declaration of Sandra Calin in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment; Declaration of Rick J. Watts in Opposition to Plaintiffs' Motion for Summary Judgment] |

20
21
22
23
24
25
26
27
28

KRAMER, DEBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

I, DARRICK ANGELONE, hereby declare as follows:

1.    I am one of the Defendants in the above-captioned case. I have personal knowledge of the following facts and, if called upon as a witness, could competently testify thereto, except as to those matters which are explicitly set forth as based upon my information and belief and, as to such matters, I am informed and believe that they are true and correct.

2.    I submit this declaration in opposition to Plaintiff's Motion for Partial Summary Judgment (hereinafter, the "Motion"). (dkt. 187)

**The Declaration of Roxanne Taylor Is Riddled With Factual Inaccuracies and Misrepresentations**

3.    I categorically dispute Roxanne Taylor's claim in her declaration (dkt. 187-2; hereinafter, the "R.Taylor Decl.") that I have "never been an … owner of … Hyper Engine." The following ownership records drafted and produced by Plaintiffs themselves illustrate otherwise:

    a.    2018 Operating Agreement. The March 1, 2018 Operating Agreement for Hyper Engine, LLC ("Hyper Engine") lists me (through AOne Creative) as a 16.66% member alongside Robert Smith, Deon Taylor, and Roxanne Taylor. This agreement was signed by Roxanne Taylor. A true and correct copy of the abovementioned 2018 Hyper Engine operating agreement is attached hereto as **Exhibit "A"**.

    b.    2019 Operating Agreement. After Hyper Engine was suspended by the California FTB, the parties circulated and executed an updated agreement between October and December 2019. The final version, signed by Deon Taylor and dated December 1, 2019, allocates 33.33% ownership to AOne Entertainment (my company) and 66.67% to Hidden Empire Film Group. A true and correct copy of the abovementioned 2019 Hyper Engine operating agreement is attached hereto as **Exhibit "B"**.

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

c.     Bank signature documents. Hyper Engine's September 2019 Bank of the West Business Debit Card Enrollment form lists me as an "Authorized Representative/Cardholder" together with Roxanne Taylor. Signature card packets forwarded by HEFG staff on September 21, 2019 include my individual debit card enrollment ("darrick debit card enrollment.pdf"). A true and correct copy of said Bank of the West Debit Card Enrollment form is attached hereto as **Exhibit "C"**.

d.     My contemporaneous text message to Deon Taylor. On August 22, 2022 I texted Deon: "You and Roxanne set up bank accounts and cards in my name for Hyper Engine … [and] filed [an] operating agreement … listing me as a partner." Plaintiffs attach that very message as Exhibit 22 to the Declaration of Deon Taylor (Dkt 193.) Plaintiffs mischaracterize the text as misconduct, but it is simply my own reminder of the ownership structure they created and documented, and which they are now attempting to repudiate.

4.     The 2018 and 2019 Operating Agreements, the banking paperwork, and my 2022 text all confirm that, since 2018, I have held a documented membership interest in Hyper Engine, LLC. Any of Plaintiffs' contentions to the contrary are false, and hence a material dispute in this action.

5.     I dispute Ms. Taylor's claim that HEFG has "always" owned hiddenempirefilmgroup.com (See R. Taylor Decl. at ¶¶ 7-8; Dkt. 187-2.) Indeed, even Hidden Empire Holdings ("HEFG") admits the 2014 lapse in ownership. In the e-mail chain dated December 10-11, 2014 (R. Taylor Decl., Exh. 3), Roxanne wrote: "It expired and I didn't know and someone else bought the domain." The thread includes a public WHOIS lookup showing "nicolas ortega"—not HEFG—as registrant.

6.     After confirming the lapse, I purchased the domain on October 13, 2015 through Namecheap Order # 17608799. Thereafter, every annual renewal was paid

from the same aoneent account. When HEFG exploited this domain for marketing campaigns, it reimbursed only the out-of-pocket renewal fee shown on the Namecheap receipts. However, Plaintiffs never (1) paid a transfer fee, (2) executed an ICANN "change of registrant," or (3) appeared as registrant on WHOIS. Despite this, the domain was transferred to HEFG only after the Court's September 30, 2022 Order re preliminary injunction. My compliance declaration dated October 13, 2022 (¶ 21) confirms I transferred the domain to HEFG's chosen domain registrar. Because HEFG allowed its GoDaddy registration to lapse in 2014 and never re registered the domain, Ms. Taylor's assertion of uninterrupted ownership is inaccurate. From October 13, 2015 until the Court ordered transfer in October 2022, I, through my "aoneent" Namecheap account, was the lawful registrant/owner. Reimbursement of renewal fees did not change that legal status.

7.    In Paragraph 9 of her declaration, Ms. Taylor further makes three incorrect and disputed claims that (1) Hidden Empire Film Group, LLC assigned the 2012 Agreement to Hidden Empire Holdings, LLC before suit was filed; (2) that the Agreement "has not been amended, modified or terminated"; and (3) that HEFG has "paid in full all of the invoices it has received from AOne." All three assertions are inaccurate or at least genuinely disputed. For one, the contract itself bars oral assignments. Paragraph 14 of the 2012 Agreement provides: "Modifications of the terms of this contract must be written and authorized by both parties." Plaintiffs have produced no signed assignment or amendment in discovery or with their MSJ filings. Further, if the contract was "assigned," that constitutes a modification requiring the written consent mandated by Paragraph 14, directly contradicting Ms. Taylor's statement that the Agreement was "not modified." Moreover, California Secretary of State records show that Hidden Empire Film Group LLC is **suspended**, stating clearly: "FTB SUSPENDED – 06/16/2016." A suspended LLC lacks capacity to assign contracts (See Cal. Rev. & Tax Code § 23301; Corp. Code § 17713.10(c)). Any pre suit "assignment" is therefore void. A true and correct copy of a screenshot

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

depicting Hidden Empire Film Group LLC's suspended status is attached hereto as **Exhibit "D"**.

8.    Additionally, the 2012 project called for by the 2012 agreement was completed and closed out in 2013. Namely, on October 22, 2013, Deon Taylor e-mailed me and Roxanne: "Please confirm the final amounts needed to close out the online work." This email confirms the only deliverables under the 2012 agreement (i.e., development of two websites) were finished, invoiced, and ready for final payment. A true and correct copy of the aforementioned October 2013 email is attached hereto as **Exhibit "E"**. The 2012 Agreement was therefore fully performed and discharged by late 2013. Subsequent work orders did not amend the 2012 agreement or add any IP obligations. From 2015 onward, HEFG retained AOne only for marketing support retainers (paid media buys, social media posting, e mail/Workspace administration), which were well outside the scope of the 2012 agreement. Further, the "Independent contractor" clause (¶ 15) is undisputed but irrelevant. Both sides agree AOne operated as an independent contractor. This does not resolve ownership of Hyper Engine or outstanding payables.

9.    Contrary to Ms. Taylor's assertions, HEFG has not "paid in full" its obligations. With respect to the May to Aug. 2022 invoices due to AOne, After HEFG demanded AOne "stop/pause all services" in May 2022, AOne still provided hosting and Workspace support through August 2022. Seven invoices were generated totaling $35,818.41, none of which have been paid.

10.    Roxanne Taylor goes on to allege that in December 2012 I asked for temporary GoDaddy access, and using that I kept the GoDaddy/Namecheap credentials, moved the HEFG domain to Namecheap and secretly registered it in my own name, and that I refuse to return the credentials such that HEFG cannot recover its domain. However, Ms. Taylor's doubtful narrative omits the critical fact that HEFG let the domain expire in 2014, and did not pay for a single renewal thereafter. Ms. Taylor is equating one instance of temporary access with ongoing control. Yet,

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

DECLARATION OF DARRICK ANGELONE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

the December 3, 2012 e-mail chain referenced by Plaintiffs (R. Taylor Decl., Exh. 2) demonstrates that I asked for temporary GoDaddy access solely to point an "A record" at my dev server while I built HEFG's website. I explicitly wrote: "You can change [the password] back once I am done." That limited request in 2012 has no bearing on who owned or paid for the domain after 2014. Again, HEFG concedes it lost the domain in 2014. In a December 10, 2014 e mail thread titled "HEFG Site," Roxanne wrote: "It expired and I didn't know and someone else bought the domain." The embedded WHOIS lookup shows registrant "nicolas ortega." (See R. Taylor Decl., Exh. 3.) I lawfully re-registered the domain in 2015, under my Namecheap account "aoneent." Namecheap Order # 17608799 dated October 13, 2015 lists User Name: aoneent and "Registrant/Administrative Contact: AOne Entertainment, LLC" for <hiddenempirefilmgroup.com>. Again, while HEFG reimbursed Aone for renewal fees, there was never an agreement to transfer ownership. HEFG never submitted a written ICANN "Change of Registrant" request, never designated its own Namecheap account to receive the push, and never disputed the yearly renewal invoices bearing the aoneent account. HEFG's loss of the domain in 2014 required AOne to re-acquire the asset in 2015 to keep the website live. From 2015 to October, 2022 I remained the lawful registrant of record. HEFG's present control exists only because I cooperated with the Court ordered transfer; therefore Ms. Taylor's assertions that I "took" their domain and "refuse" to return credentials are factually incorrect.

11.     Ms. Taylor further wrongfully asserts I used the GoDaddy credentials in 2012 to create the HEFG web site, that AOne has managed that site ever since, and that HEFG's ownership of both the domain and the web site "has never been questioned." (See R. Taylor Decl. ¶¶ 12–13.) The contemporaneous record shows that after I delivered the finished site in 2013, HEFG—not AOne—controlled the GoDaddy hosting, and HEFG itself lost both the domain and the site in 2014. On October 22, 2013, Deon Taylor asked Roxanne to "confirm the final amounts needed to close out the online work". I then delivered the WordPress export and database

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

files. From that point forward, HEFG was free to host the site wherever it wished. Further, in a December 10, 2014 e-mail thread titled "HEFG Site" (R. Taylor Decl., Exh. 3) I told Roxanne: "The files should still be on your GoDaddy account, but someone forwarded the DNS or domain from somewhere on your side." I also pasted a WHOIS lookup showing that the domain now belonged to a third-party registrant, "nicolas ortega." Roxanne replied: "It expired and I didn't know and someone else bought the domain." These statements contradict her claim that AOne possessed the credentials or controlled the web site at that time.

12.    Further, because HEFG changed its GoDaddy password after my 2012 development work (as I instructed), I could not retrieve the site files in 2014. I instead advised Roxanne to log into her GoDaddy dashboard to locate them. I re-registered the domain only after HEFG's 2014 lapse in ownership. To get the site back online, in December 2014, at my own initiative I registered the domain hiddenempirefilms.com so that HEFG could bring a website back online and have a domain to use with email. I lawfully acquired <hiddenempirefilmgroup.com> on October 13, 2015 through my Namecheap account "aoneent", as set forth above. This was a salvage operation, not a "secret registration." Roxanne's statements (¶¶ 12-13 of her declaration) conflate two different assets—the domain registry and the HTML/Java site files—and ignore HEFG's 2014 lapse. The undisputed record shows I did not possess the GoDaddy credentials after 2013, and did not "secretly" take the domain.

13.    Plaintiff Roxanne Taylor additionally makes three incorrect claims: (i) that AOne still controls the Hidden Empire Film Group ("HEFG") Google Workspace; (ii) that I "re-registered" the domain in AOne's name; and (iii) that I am withholding current log-in credentials. Google's audit file—EnterpriseAccountInformation.json (a system-generated report that records the exact date a Workspace domain is created and identifies the first "super-administrator")—shows that the Workspace for hiddenempirefilmgroup.com was created on

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

18 October 2017 at 14:58 UTC, and that I, darrick@hiddenempirefilmgroup.com, was the initial super-administrator. A true and correct copy of the abovementioned Google audit file is attached hereto as **Exhibit "F"**. No account—and therefore no credentials—existed before that time, so Roxanne could not have "provided" me any credentials or log-ins to their Google account to set up Google's Gsuite as it was then known. Google Workspace is a permission-based system: every user has a unique username and password; there is no single master password that controls all access. Moreover, from November 2017 through August 2022, every Google invoice lists "Darrick Angelone" as the contracting and billing party, and the monthly fees were charged to AOne's corporate credit card. HEFG never paid Google directly during that period.

14.    Moreover, On September 6, 2022, Google suspended my super-administrator privileges while it investigated a "rogue administrator" report submitted by Roxanne Taylor; this is reflected in Google's support case notes. From that moment, I had no ability to reset other users' passwords or change registration data. By October 5, 2022, pursuant to the Court's preliminary injunction order, I delivered the domain hiddenempirefilmgroup.com into Plaintiffs' registrar account. After that hand off, HEFG/FTI had complete DNS control and could either (a) restore the existing Workspace account or (b) create a brand new one with no connection to me.

15.    The documentary record shows I no longer held admin. authority after September 6, 2022, and that Plaintiffs obtained full exclusive technical control of the domain on October 5, 2022. Roxanne Taylor's statements that I still "control the credentials," "changed the registration to AOne," or "refused to supply log ins" are therefore completely inaccurate.

16.    Contrary to Ms. Taylor's claims that I "locked out" HEFG and its staff from their Google email server (R. Taylor Decl. ¶¶ 18-19), no permanent lock out ever occurred. Rather, AOne suspended Plaintiffs' services due to their nonpayment, and restored it within seven days pending ongoing discussions with counsel. This was

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

purely a business decision and common protocol when a client continually fails to pay for services.

17.    To elaborate, on August 2, 2022 (one week before any suspension), I e-mailed Roxanne Avent-Taylor and Sean Miller notifying them that, because seven invoices covering May 1 – July 31, 2022 remained unpaid, AOne would discontinue web-hosting and Google Workspace services and that HEFG needed to (i) establish its own replacement accounts and (ii) request a proper technical transfer protocol so that domains, DNS settings, and Workspace data could migrate smoothly. A true and correct copy of said August 2, 2022 email is attached hereto as **Exhibit "G"**. HEFG never responded with a migration plan or requested the protocol. Consequently, when payment was still outstanding on August 9, 2022, I paused the services tied to the hiddenempirefilmgroup.com domain. The temporary loss of e-mail functionality that Ms. Taylor labels a "lock-out" was the direct and foreseeable result of the suspension for non-payment and lack of diligence, not any withholding of credentials.

18.    Following counsel's good-faith discussions, I fully restored the Google Workspace on August 16, 2022—seven days after the temporary pause. Google's subpoenaed audit logs confirm that HEFG users (including *roxanne@*, *quincy@*, and *sean@hiddenempirefilmgroup.com*) logged in successfully that same day, using the exact credentials and permission levels they had always possessed. The brief interruption was a pure billing matter that HEFG could have avoided—or resolved immediately—by (a) paying the overdue $35,818.41 balance, and (b) implementing the step-by-step transfer protocol I requested on August 2 to migrate the Workspace to accounts under its own control.

19.    In ¶¶ 20-25 of her declaration, Ms. Taylor furthers inaccurate claims regarding HEFG domain ownership. Again, on December 10, 2014 Ms. Taylor informed me she had allowed hiddenempirefilmgroup.com to lapse (expire), and that "someone else bought the domain." (See R. Taylor Decl., Exh. 3.) To avoid another such loss, I offered that AOne could manage future registrations on its

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27011 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

infrastructure—a service I routinely provided to other clients. The very next day, I secured hiddenempirefilms.com and, on October 13, 2015, AOne purchased hiddenempirefilmgroup.com in its own Namecheap account using AOne funds; the original receipt lists "AOne Entertainment" as purchaser. HEFG was never invoiced for that acquisition, and no written assignment transferring ownership to HEFG exists.

20.    HEFG did ask AOne to manage certain domains, but our relationship remained that of an independent vendor until March 2018 when we formed the partnership of Hyper Engine. All domains were registered through the long-standing Namecheap user ID "aoneent," which is permanently tied to AOne and cannot be re-branded as an HEFG account.

21.    Wherever HEFG requested new domains or renewals, AOne advanced the registrar fees and then invoiced HEFG for reimbursement. HEFG frequently declined or delayed payment, leaving AOne as the sole payor-of-record.

22.    Moreover, many of the "HEFG name" domains listed by Ms. Taylor (see Decl. at ¶22) were never owned or controlled by me; several expired years ago after non-use, and others were simply never registered at all. For example, hiddenempirereleasing.com,                                 hiddenempireproductions.com, hiddenempire.productions, hiddenempire.media, and hiddenempiremedia.group all lapsed on August 6, 2022 without ever being used by HEFG, and I currently hold no interest in them. The following domains identified by Ms. Taylor were never owned or controlled by AOne, and therefore could not be transferred: hefg.com, climb.org, fearthemovie.com, factsnotpolitics.com, and 2getherwewillsavelives.com. Public ICANN WHOIS records confirm that each of these names has, since at least 2019, been held by third party registrants unrelated to AOne or HEFG.

23.    I do not generally dispute that Ms. Taylor personally registered meettheblacksthemovie.com in 2015, and provided credentials to me. I never changed those credentials without authorization, and HEFG has retained uninterrupted access. By contrast, AOne did purchase numerous film-related domains, including

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

fatale.movie, traffik.movie, theintruder.movie, all at AOne's expense, and all within the same registrar account that documents AOne as registrant of record. Domain-level passwords are not generated by registrars; access is controlled via the single AOne account, so the allegation that I "subsequently changed" individual domain passwords is factually impossible.

24.    The July 6, 2018 e-mail transmitting a spreadsheet of social-media log-ins, referenced in ¶24 of Ms. Taylor's declaration, was part of ordinary client reporting. Providing that list did not concede HEFG ownership of any underlying domains; it merely summarized active credentials so the marketing team could coordinate postings. My cautionary note about the risk of malicious password changes reflects standard IT practice, not an admission of HEFG title.

25.    Pursuant to the Court's Preliminary Injunction issued September 30, 2022 (Dkt. 25), I worked with FTI Consulting to transfer all Project Domains under AOne's control to the new HEFG Namecheap account designated by FTI. The transfer was completed and confirmed by FTI on October 4, 2022. Accordingly, since October 2022, neither I nor AOne has possessed administrative control over any Project Domain referenced in Ms. Taylor's June 2025 declaration (Dkt. 187-2).

26.    To correct Ms. Taylors's assertions in ¶¶ 26-27 of her declaration - AOne utilized their company Namecheap account to register and renew the Hidden Empire–related domains and advanced every registrar or server fee on its corporate card. Invoices often remained outstanding for up to 18 months. Yet, apart from the May–August 2022 invoices that are the subject of Counterclaimants' unjust enrichment claim, HEFG eventually reimbursed AOne at pure cost, with no markup whatsoever. That no margin structure reflected the parties' mutual intent that AOne's technical infrastructure and labor serve as an in-kind capital contribution to the Hyper Engine partnership established under the 2018 Operating Agreement.

27.    Exhibit 9 to Ms. Taylor's declaration reflects a January 17, 2018 email exchange concerning HEFG's payment dispute with Codeblack/Lionsgate executive

Jeff Clanagan. Importantly, in an email chain dated January 16-17, 2018, Mr. Clanagan expressly noted that AOne was not contracted by Lionsgate, and that any outstanding balance was HEFG's responsibility. At Ms. Taylor's request, I had merely forwarded an unpaid Traffik invoice to Mr. Clanagan. A true and correct copy of the abovementioned January 2018 email chain is attached hereto as **Exhibit "H"**.

28.    Additionally, subsequent July 19, 2018 email proposing a $5,000 monthly maintenance retainer was a settlement offer conditioned on HEFG first paying roughly $59,000 in past-due AOne invoices tied to the Traffik and 2016 Meet the Blacks campaigns. This runs contrary to Ms. Taylor's assertions (R. Taylor Decl. at ¶27, Exh. 9.) The proposal was never accepted, and no retainer was ever paid. Accordingly, Exhibit 9 cannot be interpreted as either (a) an admission that AOne was only a vendor with no partnership interest, or (b) evidence that Lionsgate reimbursed AOne.

29.    The April 22, 2022 email chain Ms. Taylor attaches as Exhibit 10 to her declaration is also stripped of context. It follows earlier discussions, both with HEFG principals and with AOne's counsel Mr. Darrell Thompson, who had been engaged to negotiate formal Hyper Engine partnership terms which arose out of HEFG's persistent evasion of formalizing the 2019 Operating Agreement we had been operating under since it superseded our 2018 Hyper Engine operating agreement. My statement that "HEFG has almost always engaged AOne" and "we are only looking for a commitment to be that vendor" was intended solely to facilitate marketing operations for the Fear release under existing informal arrangements, not to concede that AOne lacked any equity or partnership stake in Hyper Engine. That same email confirms my readiness to finalize a comprehensive Master Services Agreement once HEFG agreed to the renegotiated partnership terms in good faith.

30.    Ms. Taylor's claim that HEFG has "paid in full all of the invoices it has received from AOne" (R. Taylor Decl. ¶ 29) is demonstrably false. AOne issued seven invoices between May and August 2022 for continued use of services including

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

Google Workspace administration, DNS/domain registrations, and server hosting, all of which remained active at HEFG's request even after HEFG expressly asked AOne to pause marketing work. As of the date of this declaration, those May–August 2022 invoices remain unpaid in full, with an outstanding balance of $35,818.41. These unpaid charges are the subject of AOne's unjust enrichment claim, and no evidence has been produced by HEFG showing reimbursement, partial payment, or formal dispute.

31.    To correct Ms. Taylor's assertions regarding a "lock-out" from certain domains (R. Taylor Decl. ¶¶ 30-31): On May 3, 2022, Plaintiffs formally requested by email that AOne "pause all work" pending negotiation of a new Master Services Agreement ("MSA"). At that time, all HEFG and Hyper Engine domains remained hosted on AOne's servers and registered under AOne's Namecheap account, which was funded solely by AOne's corporate credit. Despite the pause, Plaintiffs continued to rely on AOne's infrastructure for active websites, domain routing, and Workspace email. Yet, from May through August 2022, Plaintiffs made no attempt whatsoever to establish their own domain registrar account, migrate to a new email server, or request a technical transfer protocol—steps which are essential for any transition under ICANN rules. AOne could not unilaterally assign control without a formal registrar and admin destination from Plaintiffs, which was never provided despite request for the same.

32.    Furthermore, I did not "lock out" HEFG or any of its personnel from accessing domain names. This claim reflects a fundamental misunderstanding of how domain registration and access actually work. Domains do not have individualized usernames or passwords. Rather, they are managed collectively through a registrar account. In this case, AOne's long-established Namecheap account, registered in AOne's name and funded by AOne's credit card, was the registrar. Access to domain settings (such as DNS, WHOIS, and MX records) is performed within the registrar account, not through individual domain login credentials for each domain. Roxanne

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

DECLARATION OF DARRICK ANGELONE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Taylor's repeated reference to "locking out" HEFG from the domains conflates email access (which occurs via Google Workspace) with domain registrar control, which is a separate and centralized administrative function.

33.     To transfer any domain to HEFG, Plaintiffs would have needed to set up their own registrar account and request a formal ICANN transfer using the standard EPP code and authorization process. At no time between May and August 2022 did HEFG submit such a request, nor did they designate a registrar or technical contact to receive transfers. Instead, they waited until early August, after three months of service usage and non-payment, to raise access complaints. Had they followed standard industry protocol and provided a destination registrar, I would have immediately released control of any domains owned by Plaintiffs. The only access limitations that existed were inherent in the registrar architecture: as long as domains were in AOne's Namecheap account, only AOne could modify them. That was never concealed, and in fact, it was exactly why Plaintiffs were advised to initiate a proper transfer.

34.     Roxanne Taylor's reference to my December 2014 emails (R. Taylor Decl., Exh. 11) misrepresents the context and nature of my communications. I never claimed ownership over HEFG social media accounts in that exchange, nor did I acknowledge any such issue. I was merely providing strategic marketing advice, encouraging HEFG to proactively register social media handles tied to their films to avoid exploitation by third parties. My suggestion that "you guys should definitely set up Facebook, Twitter and Instagram accounts" was just that—a suggestion. The idea of "own[ing] them before someone else does" was industry-standard brand protection advice and not a statement of legal ownership or agency. My separate comment about "Snapchat marketing" was part of that same creative exchange.

35.     To the extent Ms. Taylor now tries to link these comments to the 2012 Website Development Agreement, such connection is baseless. The 2012 agreement (R. Taylor Decl., Exh. 1) was strictly limited to the development of two websites— LMAOcomedyseries.com   and   HiddenEmpirefilmgroup.com—and   contains   no

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

DECLARATION OF DARRICK ANGELONE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

reference to social media services, accounts, or digital brand strategy. Moreover, the 2012 agreement was fully performed and terminated long before 2014, it does not govern any services rendered after 2013, as set forth above. (See Exhibit E.)

36.    Ms. Taylor inaccurately claims that she "decided to have AOne create and manage" social media accounts and that she sent me credentials as part of this assignment. (R. Taylor Decl. at ¶33.) The October 22, 2015 email she references (Exh. 12) simply reflects the reverse of what she suggests: she sent me credentials for a few film-related accounts she had personally created using her own Gmail address, such as the Meet_the_Blacks handles. Those credentials were submitted to me after the fact so I could secure, link, and professionalize those accounts under AOne's broader platform strategy, including linking them to verified domains and adding analytics, branding consistency, and advertising tools. That single list of shared credentials did not reflect all HEFG-related accounts, most of which were independently created and managed by AOne. Indeed, many film and initiative accounts (e.g., @Traffikmovie, @theintrudermovie, @blackchairshow, @fatale.movie, and @bewoke.vote) were created entirely by AOne, on AOne infrastructure, using AOne-managed logins. Access to those accounts was shared as-needed with HEFG, often via administrator privileges or direct session links, but ownership of those accounts was <u>never</u> transferred and remains with AOne to this day absent any formal agreement or compensation, which Plaintiffs have not produced.

37.    The list of social media accounts provided in ¶ 34 of Ms. Taylor's declaration appears to reflect the current or aspirational branding used by HEFG across social media, but it omits the key facts of account origin, registration, and administrative control. Many of the accounts listed, including @traffikmovie, @theintrudermovie, @blackhistoryintwominutes, @bewoke.vote, and @fear.movie, were created and originally registered by AOne, not HEFG. In these instances, the platforms (e.g., Facebook, Instagram, Twitter, YouTube) were configured using AOne-linked email addresses or phone numbers, which control primary

KRAMER, DEBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

administrative access. AOne bore the cost of setup, integration, security, and third-party tools used to manage these platforms. HEFG's failure to reimburse or contractually document these registrations further undermines any claim of "ownership." Plaintiffs have offered no chain-of-title, assignment, or contemporaneous documentation to support the assertion that these accounts belong to HEFG, and no platform transfer request was ever initiated.

38.    To further clarify, social media platforms do not provide fixed, transferable "credentials" in the way Ms. Taylor describes. Most operate through tiered access roles (e.g., Meta Business Manager, YouTube Brand Accounts), where the party who creates the account using a verified email or mobile number retains permanent administrative control unless a transfer is executed through the platform. While HEFG team members were occasionally granted user or moderator-level access, AOne retained the master-level admin privileges on the vast majority of accounts. Ms. Taylor's Exhibits 7 and 12 depict shared credentials for a few "Meet the Blacks" related accounts, but they do not demonstrate ownership over the full list in ¶ 34 of her declaration. Notably, many of those credentials were either set up by AOne, or restored after HEFG failed to manage passwords, lost recovery access, or relied on personal Gmail accounts (e.g., roxanneavent@gmail.com) without business continuity safeguards.

39.    Another misrepresentation is that I "locked out" HEFG, Hyper Engine, or any HEFG personnel from accessing social media accounts. To the contrary, access to HEFG-related social media was always maintained through centralized platform controls, such as Meta Business Manager, YouTube Brand Account roles, and Twitter/X team access settings which use role-based permissions rather than static "login credentials." The notion that I "changed the credentials provided to me by HEFG" is factually wrong and misleading. In nearly every instance, the social media accounts in question were originally created by AOne (not by HEFG), and were linked to AOne-controlled recovery emails, phone numbers, or third-party tools. HEFG did

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

not "provide credentials" to me that I later altered; rather, I granted HEFG collaborators access to accounts I had created or was administering as part of our marketing responsibilities.

40.     Furthermore, I made clear in multiple communications that AOne would transfer control or admin rights upon payment of outstanding invoices and confirmation of a designated business recipient for each platform. HEFG has never submitted any such verified destination, nor have they followed standard procedures for claiming ownership via platform-based requests (e.g., Business Manager admin transfer request on Facebook or branded channel reassignment on YouTube).

41.     In addition, any claimed refusal to provide credentials is contradicted by the Court record: all credentials within AOne's control were transferred through FTI Consulting pursuant to the Preliminary Injunction Order dated September 30, 2022, with confirmation that no access limitations remained after the FTI-facilitated handoff. Any current lack of access by Plaintiffs is either (a) the result of account creation tied to personal Gmail addresses they mismanaged internally, or (b) based on accounts AOne never had control of in the first place.

42.     Unlike what Ms. Taylor alleges (R. Taylor Decl. at ¶37), I did not use any HEFG social media accounts to promote AOne or claim ownership of HEFG. The Instagram and Twitter posts dated September 6, 2022 that Roxanne Taylor references (Exh.13) were automated posts generated by pre-configured cross-platform tools. These systems were long used in HEFG's digital campaigns to schedule and auto-publish content across Instagram, Twitter, and Facebook without requiring manual logins. The specific image that says "brought to you by AOne" was not created to suggest AOne owned HEFG, but to acknowledge that AOne continued to provide hosting, marketing, and infrastructure for HEFG at that time. At the time of that post, HEFG had not paid for over three months of services and had made no effort to formally transition control of the accounts. HEFG also never submitted platform-based requests to assume administrator access or replace AOne infrastructure. All

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

DECLARATION OF DARRICK ANGELONE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1  content, including the posts cited, was managed or generated as part of the same

2  systems I used to support HEFG's campaigns for years.

3      43.    My actions were neither hidden nor malicious. I did not delete any posts.

4  I did not restrict access to these accounts. Plaintiffs' own expert admitted the social

5  media behavior resembled automation, not manual interference. As confirmed by

6  Defendants' independent expert Rick Watts, the accounts were still connected to bot

7  and automation services when the posts occurred.

8      44.    As to Ms. Taylor's allegations regarding the Fear game and movie (R.

9  Taylor Decl. ¶¶38-40) - beginning in November 2021 I developed a game and NFT

10  activation titled "Fear – The Game" as part of a joint theatrical marketing campaign

11  for HEFG's Fear film. The concept decks and design documents were circulated to

12  Deon Taylor, Quincy Newell, Roxanne Taylor, and Omar Joseph, including the Fear

13  Game + NFT Roadmap, pixelated character previews, and gameplay mechanics. The

14  characters in the game were intentionally modeled as pixelated likenesses of the film's

15  cast and named after the film's characters including Rom, Meg, Serena, Michael, and

16  Bianca. This was specifically to create an immersive, fan-based promotional

17  experience tied to the theatrical release. At all times, the game was framed and pitched

18  as a co-branded digital activation, and no objections were raised by HEFG leadership

19  until May 2022.

20      45.    In communications throughout December 2021 through May 2022, I

21  kept Plaintiffs fully informed of the Fear game's development and marketing plan.

22  On May 6, 2022, I sent Deon Taylor a detailed business breakdown of the Fear game

23  and collectible NFT strategy. Deon responded by confirming receipt and asking for a

24  walk-through with Roxanne and Omar so their counsel could "dive into formalizing

25  a partnership. A true and correct copy of this May 6, 2022 email discussion is attached

26  hereto as **Exhibit "I"**. At no point prior to this did HEFG suggest the game was

27  unauthorized. In fact, Deon Taylor acknowledged in an audio message dated May 3,

28  2022 that "you've been trying to do diligence with me for eight months" and that you

KRAMER, DEBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

"spent [your] own money making it." He also stated, "we all love the game, we want you to put it out… [but] the issue is we need to do the other side of the business".

46.    I have never concealed the existence or development of the Fear game. HEFG was looped into every stage, from naming and branding to gameplay footage and monetization planning. The site "fear.game" was shared privately via Dropbox for internal HEFG review. The game's press release was drafted and distributed only after multiple draft versions were shared with Deon Taylor and Omar Joseph and no objections to its release were made. Although I developed the Fear Game as a co-branded marketing activation in good faith, and with direct input from HEFG leadership, Plaintiffs have since alleged in this lawsuit that I infringed on copyrighted expressions from the film, including character names and visual elements. I dispute these allegations. At all times, I understood the development of the Fear Game to be a joint campaign initiative based on repeated communications with Deon and Roxanne Taylor, as well as direction from their film marketing team. My work was conducted with HEFG's full knowledge, circulated openly across internal channels, and structured to benefit the film's theatrical release.

47.    The May 2, 2022 press release regarding the Fear game (see R. Taylor Decl. ¶¶ 41-46) was issued after months of collaborative planning with HEFG, during which I repeatedly shared concept decks, activation timelines, and site previews for HEFG's input and review. The headline used in the Longview News Journal ("On Chain Innovations Partners with Hidden Empire Film Group…") was based on HEFG's internal approvals and Deon Taylor's own back and forth communications at that time. Deon confirmed that Glen Mastroberte and Darrell Thompson were being brought in "to get this done" and finalize deal points for the game. At no time prior to the press release did HEFG object to the materials circulated, which included versions of the character artwork, marketing roadmap, and NFT tier breakdown. The reference to a partnership was made in anticipation of the formal agreement that Deon and Quincy had already committed to working toward.

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

48.    While no written partnership agreement had yet been executed, the parties were actively negotiating one, and the marketing deck, including the partnership language, was drafted and reviewed in that context. As reflected in Deon Taylor's own audio message from May 3, 2022, he acknowledged the existence of the game, my investment, and his role in working to resolve the paperwork. He stated, "You've been on every call. You've shared this with everyone. The issue is we haven't done the paperwork". The article's reference to a "partnership" reflected these ongoing efforts, not a unilateral fabrication.

49.    I did not dispute being listed as CEO of On Chain Innovations LLC. That company was formed by me in 2022 to separate blockchain-related work from AOne Creative's broader agency services. On Chain Innovations was disclosed to HEFG as early as February 2022 in the campaign roadmap.

50.    The quote attributed to Deon Taylor in the May 2022 Fear Game press release was included in draft versions of the release that were circulated to Deon Taylor and other HEFG representatives for review prior to publication. It is standard industry practice for PR representatives and campaign teams to draft suggested quotes on behalf of company executives during the press development process. The version circulated to HEFG was clearly labeled as a draft, and no objection was raised to the inclusion of the placeholder quote until after publication. As soon as I was informed by HEFG's counsel that Deon had not personally approved that statement, I worked with my publicist to remove it from subsequent use and update any forward-facing materials. At all times, I acted in good faith based on our active and ongoing collaboration regarding the Fear game campaign.

51.    The statement that the Fear game was On Chain Innovations' "first product" was accurate. I disclosed this positioning in investor pitch decks, marketing strategy documents, and in my communications with HEFG as early as Q1 2022. No confidential information from HEFG was used, and all creative assets were either generated by AOne or already circulated to HEFG for approval.

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

52.    My Instagram post referencing the Fear Game (see R. Taylor Decl. at ¶46) was published as part of the broader promotional rollout, after more than seven months of collaborative development with HEFG's leadership and marketing personnel. The same content had already been shared with Deon, Quincy, and Roxanne multiple times. Deon Taylor himself confirmed in a May 3, 2022 audio message that I had been on "every call" related to the project and that the objection was not about the game's substance, but rather timing and documentation. That post was made in good faith, consistent with our then-active business relationship, and never intended to suggest exclusivity or final authorization in the absence of a signed deal.

53.    Contradictory to assertions in ¶¶47-48 of Ms. Taylor's declaration, I did not withhold intellectual property assets from HEFG as a form of leverage to gain equity in Hyper Engine, as Ms. Taylor suggests. That accusation mischaracterizes the situation. By May 2022, HEFG had failed to pay over $125,000 in past-due invoices going back as far as 18 months prior. Come August 2022, when the past due amounts were finally paid, more than $35,800 for services rendered between May and August 2022 had not been paid, after HEFG themselves had requested a pause in services without terminating use of the infrastructure AOne continued to host and maintain. Despite this ongoing non-payment, I repeatedly offered to coordinate the orderly transfer of digital assets, domains, and accounts, emphasizing that such transfers require formal protocols, including account destination, registrar access, or business manager assignment as set forth above.

54.    Instead of providing that technical protocol, HEFG repeatedly demanded only "credentials," which is insufficient for the secure and proper transfer of most digital assets, including social media, domain registration, and cloud-based servers. HEFG never followed ICANN domain transfer processes or initiated Meta Business Manager reassignment protocols. Their failure to cooperate in a standard transition process, combined with months of unpaid invoices, necessitated my temporary

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

DECLARATION OF DARRICK ANGELONE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

retention of access pending resolution of outstanding obligations. Any suggestion that I demanded equity in Hyper Engine as a condition for returning assets is contradicted by the record and was never communicated. As outlined in Defendants' Fourth Amended Counterclaims and my past declarations, I already had a 33.33% ownership interest in Hyper Engine, which Plaintiffs themselves acknowledged through multiple iterations of executed written agreements and years of performance. (See Exhibits A-C).

55.     I categorically deny that I "read through" HEFG's confidential emails or improperly accessed attorney-client communications. The September 20, 2019 Bank of the West email, which Ms. Taylor attaches as Exhibit 18, was forwarded to me directly at info@hiddenempirefilmgroup.com on November, 27, 2019, as part of the business onboarding process for the Hyper Engine LLC bank account. This was not a hack or unauthorized access. It was a routine internal communication, and I was listed on the account and corresponding banking documents.

56.     Similarly, the November 25, 2019 email from Velma Sykes to Stephanie Pottier regarding edits to the Hyper Engine LLC operating agreement (R. Taylor Decl. at ¶48) was also forwarded to me as a cc-recipient, which is evident on the face of the email. The communication pertained to the proposed governance structure, revenue splits, and ownership terms of Hyper Engine, including a provision that "12% of all accounts/project will be split with AOne and HEFG" and proposed language stating HEFG would act as managing member. This was part of my ongoing participation in Hyper Engine, which was founded jointly by HEFG and me. At no time was I a stranger to these communications, nor was I accessing anything to which I was not already a party.

57.     Any assertion that I viewed privileged or confidential materials without authorization is false, contradicted by the email headers, and unsupported by any expert findings. As Rick Watts stated in his expert rebuttal, Plaintiffs failed to produce any forensic evidence that I accessed, altered, or used confidential materials in an

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

improper way. I was copied on the communications in question, and I had administrative access to HEFG's systems pursuant to my role managing their domain and email infrastructure from 2014 through mid-2022.

58.    Based on my information and belief, the "damages" Plaintiffs claim in ¶¶49-50 of Ms. Taylor's declaration are entirely self-inflicted and not supported by any credible forensic findings. Defendants' court-appointed forensic expert, Rick Watts, conducted a full review and concluded that there was no evidence of malicious activity, "unauthorized access," or deletion of Plaintiffs' emails, domains, or social media accounts. His report specifically found that the accusations raised by Plaintiffs' consultant lacked factual basis, and that the so-called "unauthorized access" was more likely the result of routine administrative access tied to the infrastructure AOne built and maintained. I was the administrator of the Google Workspace and domain accounts at all times until September 6, 2022, something Plaintiffs openly relied upon until they sought to retroactively reframe that relationship as unauthorized.

59.    Additionally, HEFG never retained their own registrar, never created a secure IT infrastructure, and never followed the industry-standard protocols for account transfer that I repeatedly requested. Plaintiffs' failure to transition properly, coupled with their refusal to pay over $125,000 in past-due services, plus the three months of unpaid services through August 2022, is the true source of delay and disruption.

60.    I categorically deny that I ever misrepresented ownership of HEFG or accessed Plaintiffs' emails in violation of the law. As confirmed by the Rick Watts expert report, I was never shown to have deleted, exploited, or wrongfully disseminated any data. Rather, all account access was consistent with my role as administrator of AOne-managed systems—including email, cloud storage, and web services—until September 6, 2022 at which point my administrator privileges were suspended by Google due to a complaint filed by Roxanne Taylor. The claim that I "read through HEFG personnel emails" to extract financial leverage is false and

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

1   unsupported by any evidence in this action or otherwise.

2   61.   Furthermore, the September 6, 2022 Instagram post cited by Ms. Taylor

3   (Decl. at ¶50), which shows an image reading "brought to you by AOne", was part of

4   a campaign we had developed together over months and was not an assertion of

5   ownership, but rather a fair acknowledgment of AOne's role in hosting and supporting

6   HEFG's digital infrastructure at its own expense. As Rick Watts explained, this

7   content was likely automated based on pre-scheduled activity from third-party tools

8   already linked to HEFG's Instagram and Twitter accounts. The claim that this harmed

9   investor confidence is speculative and unsupported by a single investor

10  communication or declaration.

11  **The Declaration of Deon Taylor is Likewise Factually Inaccurate and**

12  **Misleading**

13  62.   Deon Taylor's assertion that I refused to provide HEFG with

14  "credentials" in July 2022 is materially misleading (See Declaration of Deon Taylor,

15  ¶7, Dkt. 193; hereinafter, "D. Taylor Decl."). Between May and August 2022, I

16  repeatedly informed HEFG leadership, including Deon, Quincy Newell, and Roxanne

17  Taylor, that access to digital assets could only be transitioned securely through

18  standard administrative transfer protocols, not informal demands for credentials. This

19  includes platform-initiated administrator transfers for Google Workspace, domain

20  registrar release codes, and Meta Business Manager delegation, all of which require

21  cooperation by the receiving party.

22  63.   Unsurprisingly, HEFG never initiated or proposed these proper

23  protocols, and instead, repeatedly insisted that I simply hand over logins and

24  passwords—requests that are insecure, incomplete, and often technically impossible.

25  Furthermore, HEFG had failed to pay for services rendered from May through August

26  2022 totaling $35,818.41, following a prior unpaid balance exceeding $125,000. Until

27  these issues were resolved, and without a formal plan for infrastructure separation, I

28  remained administrator as a matter of necessity and business protection.

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

64.    I further did not "lock out" HEFG or any of its personnel from their emails on August 7, 2022. In fact, the record shows that email access and social media services continued through August 9, at which point services were disabled only after months of nonpayment, and after I notified HEFG on August 2, 2022, that service would be discontinued. Contrary to Mr. Taylor's claim, HEFG had repeatedly acknowledged receiving notice that services would be discontinued due to outstanding invoices. Deon Taylor's own August 11, 2022 email (D. Taylor Decl., Exh. 19) further undercuts his own claim, as it confirms (1) he was aware emails were turned off due to a business dispute, not a malicious lockout, and (2) he admits AOne had been paid only *after* emails were disabled, which is consistent with my timeline. He also admits the company "has no access to business accounts/logins to banking info, contracts, agreements" because those systems had never been transferred out of AOne's infrastructure, despite multiple invitations to do so.

65.    Moreover, Deon Taylor's August 11, 2022 email (Exhibit 19) must be understood in context: the breakdown in communication and narrative shift from HEFG began only after AOne retained attorney Darrell Thompson in February 2022, to formalize the longstanding Hyper Engine partnership between AOne and HEFG. Prior to that point, there were no disputes raised by HEFG regarding ownership, control, or administrative access to any shared infrastructure, including emails, domains, websites, or social media accounts. HEFG relied on AOne's infrastructure and administration continuously, acknowledged my contributions to Hyper Engine, and never questioned my role or authority.

66.    Once counsel was introduced, and a formal operating structure was proposed (consistent with the terms HEFG had previously approved), the tone changed abruptly. HEFG refused to sign, began withholding payment for ongoing services, and initiated a campaign to recast the narrative by shifting from a working business relationship to baseless claims of "lockouts" and unauthorized access. This strategy appears designed not to resolve technical issues, but to evade their obligations

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

to formalize the Hyper Engine partnership and to eliminate me from the record despite years of documented co-management. Further, Deon Taylor's aforementioned August 11 email includes language that I and my attorneys found to be intimidating and inappropriate. He wrote, "there is a extremely large issue looming and A major presence that is aware of these actions taken by you all, And this presence, Has its own methods to resolving this matter." He then warned of consequences that could be "catastrophic" unless I complied. This ominous language came after I had repeatedly offered to coordinate transfers and resolve all matters professionally. Again, HEFG had not followed any proper digital transfer protocol, had not paid for services provided between May and August 2022, and had never opened a registrar, email, or server account to receive control. Their claim that "all invoices were paid" is also misleading. HEFG had only paid for balances due pre-April 2022.

67.     Deon's message reveals not only the truth (i.e., that Plaintiffs had failed to prepare for the transition), but also HEFG's modus operandi: escalate, fabricate a coercion narrative, and avoid the legal implications of a written Hyper Engine partnership they no longer wanted to honor.

68.     Deon Taylor's assertions that I accessed HEFG emails "without authorization" (D. Taylor Decl. ¶¶10, 12) is false and contradicted by the documentary record. The Bank of the West debit card enrollment form which Mr. Taylor references was not obtained through any improper access to HEFG email. That document, dated September 20, 2019, was part of the formal business onboarding process for Hyper Engine LLC, a company jointly formed and operated by HEFG and myself. I was listed as an authorized cardholder, and my name appears clearly on the face of the form as such. These documents were openly circulated to me by HEFG personnel, as part of my role in co-managing Hyper Engine's finances and operations.

69.     Indeed, Plaintiffs' own exhibits show that Roxanne Taylor herself was the signatory on the Bank of the West enrollment form, and the associated bank account was linked to an operating agreement that listed me as a named partner.

Deon's claim that I accessed these materials without permission is directly contradicted by the fact that I was included on communications regarding the Hyper Engine bank account setup in 2019, as documented in multiple forwarded messages and shared files. I never breached any email account or obtained private information beyond what was administratively accessible in the systems I was asked to build and manage. Ironically, Mr. Taylor's position implies that, despite being a named member of Hyper Engine LLC, I should not have access to company bank records and formation documents.

70.    Moreover, no forensic expert or discovery record has shown that I accessed any privileged materials, and Plaintiffs have failed to produce the full native email logs or Dropbox metadata to support the claims they now assert. The limited screenshots attached to Deon's declaration are partial, selectively cropped, and lack headers or source authentication. (See D. Taylor Decl., Exhs. 20, 21.) I maintain that my access to administrative materials in 2019–2022 was lawful, within the scope of my role as co-manager of digital infrastructure, and part of a longstanding partnership that HEFG later attempted to deny after engaging legal counsel to unwind our relationship.

71.    Similarly, Deon Taylor's claim that I improperly disclosed or accessed "private emails between Roxanne and HEFG's accountants" (D. Taylor Decl., ¶11) is false and misleading. The emails in question (D. Taylor Decl., Exh. 21) are from September 11, 2019, and pertain directly to the formation, compliance status, and accounting obligations of Hyper Engine LLC, a business I co-founded and for which I am named in the operating agreement as a 33.33% partner. The referenced email thread, initiated by Roxanne Taylor and forwarded among her and her accountants, concerned the EIN, tax status, and financial onboarding of Hyper Engine LLC. As a founding member and co-manager, I was entitled to receive these materials and was included on earlier communications regarding the entity's formation, banking, and governance, none of which were confidential or privileged as to me. These messages

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

were either forwarded directly to me at the time, shared through the central HEFG Gmail accounts I helped administer, or provided in connection with my ongoing business responsibilities.

72.     Moreover, Deon Taylor's own message dated August 11, 2022, referenced above and attached as Exhibit 19 to his declaration, illustrates that I was openly managing systems containing "contracts, agreements, and employee emails" that HEFG had never transitioned to independent infrastructure. Plaintiffs' sudden pivot to framing such messages as "unauthorized" is a litigation strategy, and not a reflection of reality. They were fully aware of my administrative access, and at no point in 2019, 2020, 2021, or the first half of 2022 did they request a firewall, independent IT audit, or data separation. I was fulfilling routine account maintenance duties when I received or accessed those materials, which were never marked confidential or privileged as to me.

73.     Deon Taylor's claim that I "looked through years' worth of [his and Roxanne's] private emails" (D. Taylor Decl. ¶ 12) is equally false and unsupported by any forensic evidence. The materials I referred to in the August 22, 2022 text messages, including the Bank of the West form and the Hyper Engine operating agreements, were not obtained by searching through anyone's personal email. These materials were sent to me either contemporaneously (in 2019), or maintained in shared folders and accounts that I had administrative access to as the longtime IT administrator for HEFG's digital systems. I was included on relevant correspondence regarding Hyper Engine's banking, tax, and formation processes. For example, the Bank of the West enrollment form lists me by name as an authorized cardholder. I was never removed from system administrator roles nor ever instructed to segregate archived communications until long after the parties' business relationship deteriorated.

74.     The phrase "Until this deep dive I had not noticed how badly I was being gaslighted," referenced in Exhibit 22 to the D. Taylor Decl., does not admit or

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

KRAMER, deBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

otherwise evidence unauthorized access. Much like a lawyer would take a "deep dive" into their own case files, this statement reflects my internal review of documents that I had lawfully obtained or had access to during approximately eight years of operational oversight of HEFG's digital infrastructure, including domains, cloud-based file systems, and shared workspaces. Plaintiffs' deliberate and continued failure to produce the native Dropbox metadata, email headers, or administrative logs they now rely on prevents this Court from seeing the actual scope of access and timeline of possession. No discovery to date establishes I engaged in improper access of personal or privileged communication. This is simply another attempt by Plaintiffs to take matters completely out of context and make it align with their false narrative.

75.     The draft operating agreement Deon Taylor references in ¶13 of his declaration was circulated by HEFG's own personnel, including Velma Sykes and other business affairs contacts, during the early formation of Hyper Engine in 2019. The document, titled "Hyper Engine Operating Agreement," lists me by name and reflects my status as a founding partner. It is not a privileged legal memo, nor was it ever marked "confidential" or withheld from me. The document was shared internally among stakeholders and, in some versions, posted to a shared Dropbox folder that I was invited to access. At no time during the partnership formation period was I excluded from communications regarding entity governance.

76.     The suggestion that my access to or possession of this document constitutes a violation of privilege is unsupported and illogical, given my role in the partnership and the fact that I had been engaging in active discussions with HEFG leadership and their legal counsel regarding formalizing the partnership in early 2022. It is in fact strange how Plaintiffs are so intent on proving that I should not have had access to Hyper Engine LLC banking information and governance documents, all while both the Taylors' signatures appear on signed operating agreements for Hyper Engine. My August 22, 2022 communications do not reflect any misuse of confidential materials. Rather, they memorialize my frustration at being stonewalled

DECLARATION OF DARRICK ANGELONE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

while the documents Plaintiffs relied on to form and fund Hyper Engine continued to show my partnership interest, which they later tried to repudiate, and continue to do so in this action.

I certify under penalty of perjury that the foregoing is true and correct. Executed this 4th day of August, 2025, at Los Angeles, California.


_____/s/ Darrick Angelone_____
DARRICK ANGELONE, Declarant

DECLARATION OF DARRICK ANGELONE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

KRAMER, DEBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255

# Exhibit A

**OPERATING AGREEMENT**

**OF**

**Hyper Engine, LLC**

**Federal Tax Identification:  82-5286902**

**California Secretary of State Number 201807410500**

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS.  SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED.  ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

## OPERATING AGREEMENT FOR
## HYPER ENGINE, LLC

This Operating Agreement **("Agreement")** is made as of March 1, 2018 ("Effective Date"), by and among Robert F. Smith, Deon Taylor, Roxanne Taylor, and Darrick Angelone, dba Hyper Engine, LLC (Company) a California limited liability company, and each of those who become a Company Member in accordance with the terms of this Agreement.

### RECITALS

WHEREAS, the Members desire to form a limited liability company under the Beverly‒Killea Limited Liability Company Act **("Act");** and

WHEREAS, the Members desire to enter into this Agreement for the Company to delineate their rights and liabilities as Members, to provide for the Company's management and to provide for certain other matters, all as permitted under the Act.

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings herein specified and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, with the intent to be obligated legally and equitably, the Members hereto agree as follows:

### ARTICLE I

### <u>DEFINITIONS</u>

1.1    The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein), and other terms are defined in other sections of this Operating Agreement:

(a)    "<u>Articles of Organization</u>" shall mean the Articles of Organization filed with the California Secretary of State on <u>March 1,</u> 2018    __, as evidenced by the Articles of Organization of Company.

(b) "<u>Budget</u>" shall mean U.S. Dollars (USD $_____.00).

(c) "<u>California Act</u>" shall mean the California Revised Uniform Limited Liability Company Act, codified in the California Corporations Code, § 17701 *et seq*., as the  same may be amended from time to time.

(d) "<u>Capital Account</u>" as of any given date shall mean the capital account established and  maintained for each Member in accordance with Section 4.4.

(e) "<u>Capital Contribution</u>" shall mean any contribution to the capital of the Company in   cash or property by a Member whenever made as set forth in Schedule "B" hereof, and  as such Schedule may be later amended from time to time.

(f) "<u>Class A Managing Member(s)</u>" shall mean a n y Persons who becomes successor Class A Managing Member(s) solely in accordance with the  terms hereof.

(g) "<u>Class A Unit(s)</u>" shall mean units of interest in the Company acquired by the Class A  Managing Member(s) as contemplated herein and allocated among the Class A Managing Member(s) as set forth in Schedule "A" hereof, and as such Schedule may be  later amended from time to time.

(h) "<u>Class B Non-Managing  Member</u>" shall mean any subscriber to Class B Unit(s) pursuant to Section 4.01 as stated on Schedule "B" hereof and, to the extent Class B  Unit(s) have  been  transferred  in  accordance  with Article IX, their successors and  assigns.

(i) "<u>Class B Unit(s)</u>" shall mean the interest in the Company acquired by the Class B Non-  Managing Members.

(j) "<u>Code</u>" shall mean the Internal Revenue Code of 1986 or corresponding provisions of superseding federal revenue laws.

(k) "<u>Company</u>" shall refer to  Hyper Engine, LLC.

(l) "<u>Deficit Capital Account</u>" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year.

(m) "<u>Gross Receipts</u>" means all non-returnable monies or other sums actually received by or credited to the Company from any sources worldwide, including without limitation, amounts derived from the exercise by the Company the  underlying rights (if any) or any ancillary, allied, subsidiary and derivative rights related   thereto, including without limitation; any and all tax credits, rebates or other governmental incentives generated by the  Company, and any unspent contingency or other amounts included in the Budget.

(n) "<u>Interests</u>" or "<u>Membership Interests</u>" shall mean the Class A Interests, and/or Class B Interests, as applicable.

(o) "<u>Majority-in-Interest</u>", when used with respect to Percentage Interests, shall mean interests in the Company representing in excess of fifty percent (50%) of the Percentage Interests of all Units, Class A, and Class B.

(p) "<u>Member(s)</u>" shall mean the Class A Managing Member(s), and Class B Non-

Managing Member(s), and such other Members admitted to the Company as provided herein.

(q) "<u>Net Profits</u>" and "<u>Net Losses</u>" shall mean the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with the accounting methods followed by the Accountants of the Company for income tax purposes.

(r) "<u>Percentage Interest</u>" as shall mean:

    (i)      as applied to the Class A Managing Member(s) fifty percent (50%) as set forth in Schedule "A" hereof; and

    (ii)      as applied to each Class B Member as set forth in Schedule "B" hereof and their respective subscription agreement, with all such interests to a total of fifty percent (50%) in the aggregate.

(s) "<u>Persons</u>" shall mean any individual or entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context permits.

(t)  "<u>Units</u>" shall mean the Class A Units, and the Class B Units issued pursuant to this Operating Agreement.

(u)  "<u>Unit Subscription Agreements</u>" shall mean the agreements between the Company and the Class B Non-Managing Members, by which each such Class B Non-Managing Member subscribes for Units.

(v)  "<u>U.S. Treasury Regulations</u>" shall include temporary and final regulations promulgated under the Code in effect as of the date of filing the Certificate of Formation and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

**ARTICLE II**

**<u>FORMATION OF COMPANY</u>**

2.1  <u>Name</u>. The name of the Company is Hyper Engine, LLC, or such other lawful name as hereafter may be designated in writing by the Class A Managing Member(s), in Class A Managing Members' reasonable discretion, to the other Members.

2.2  <u>Formation</u>. On   March 1 , 2018  , Company was organized by executing and delivering Articles of Organization to the Secretary of State of California in accordance with and pursuant to the California Act.

2.3  <u>Principal Place of Business</u>. The Company may locate its places of business and registered office at lawful place(s) as the Class A Managing Member(s) may from time to time deem advisable upon notice to the Class B Non-Managing Members.

2.4  <u>Registered Office and Registered Agent</u>. The Company's initial registered office shall be 10250 Constellation Blvd., #1100, Los Angeles, CA 90067. The registered office may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State pursuant to the California Act.

2.5  <u>Term</u>. The term of the Company shall be from the date the Company was formed until dissolved in accordance with either the provisions of this Operating Agreement or the California Act.

2.6  <u>Qualification in Other Jurisdictions</u>. The Class A Managing Member(s) shall cause the Company to be qualified in any jurisdiction in which the Company owns property or transacts business if such qualification is necessary in order to protect the limited liability of the Members or to permit the Company lawfully to own property or transact business. The Class A Managing Member(s) shall execute, file and publish all such certificates, notices, statements or other instruments necessary to permit the Company to conduct business as a limited liability company in all jurisdictions where the Company elects to do business and to maintain the limited liability of the Members.

## ARTICLE III

## <u>BUSINESS OF COMPANY</u>

3.1     The objects and purposes of the Company are solely:

(a) to engage in the development, financing, and other exploitation   of the services, now known or hereafter devised;

(b) to enter into, make and perform all such contracts and other undertakings, and engage in all such activities and transactions, as are reasonably necessary or appropriate to carry out the objectives and purposes stated in (a).

3.2     The Company may apply for and pursue any and all federal, state, local, and/or foreign tax credits it is entitled to receive and are available to the Company. The Class A Managing Member(s) shall cause the accountant for  the Company annually to prepare a statement of the Tax Credits, if any, received for  the calendar year utilized by the  Company as a credit against taxes due or as a refund of taxes paid or payment to the  Company. The Class A Managing Member(s) shall be permitted, in their sole discretion, to  have the Company make  any and all corporate or tax elections or other business decisions required to capture and/or  monetize such Tax Credits. In connection with any such Tax Credit monetization,  the Class A Managing Member(s) shall be  permitted to  provide a  first position security interest to third party lender(s) in and to the Tax Credits. For the avoidance of doubt, all  Tax Credits banked or monetized (i.e. used as collateral for a loan or loans that partially  finance a project) shall not be considered part of the Gross Receipts or any computation or  distribution thereof, but shall rather be paid directly to such lender(s) in satisfaction of such  loan(s).

## ARTICLE IV

## <u>CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS</u>

4.1     <u>Capital Contributions</u>. From and after the date hereof, the Class A Managing Member(s), on behalf of Company, may in Class A Managing Members' sole discretion, from time to time, accept subscriptions for Class B Units, for a total aggregate consideration, not to exceed U.S. _____ Dollars (USD $_____.00), in each case by execution and   delivery of a Unit Subscription Agreement and such other agreements and documents as the   Class A Managing Member(s) may deem necessary or appropriate.  Each subscriber to Class  B Units under this Section 4.01 shall be admitted by the Class A Managing Member(s) as a  Class B Non-Managing Member, provided such subscriber or assignee, as applicable, shall   in writing have accepted and adopted all the terms and provisions of this Operating   Agreement. Each Class B Unit will be offered at a price of U.S. _____Dollars (USD $_____.00). The Class A Managing Member(s) may elect to admit  Member(s) upon receipt of acceptable subscriptions for less than one (1) Class B Unit, or  fractions thereof. The Class A Managing Member(s) shall be permitted to expend Capital  Contributions in furtherance of the objects and purposes of the Company (as set forth in  paragraph 3.1 and its subsections) upon receipt of such amounts from the Class B Non-  Managing Member(s).

4.2    <u>In-Kind Contributions</u>. From and after the date hereof, the Class A Managing Member(s), on behalf of Company, may in Class A Managing Members' sole discretion, from time to time, accept subscriptions for Class B Units in exchange for in-kind contributions ("In-Kind Contributions"), in each case by execution and delivery a Unit Subscription Agreement and such other agreements and documents as the Class A Managing Member(s) may deem necessary or appropriate. Each subscriber to Class B Units under this Section 4.02 shall be admitted by the Class A Managing Member(s) as a Class B Non-Managing Member, provided such subscriber or assignee, as applicable, shall in writing have accepted and adopted all the terms and provisions of this Operating Agreement. The value of the In-Kind Contributions and the corresponding amount of Class B Units(s) (or factions thereof) provided to such parties providing In-Kind Contributions shall be determined by the Class A Managing Member(s) in their sole discretion, with such determination to be based upon the Class A Managing Member(s) reasonable business judgment.

4.3    <u>Nature of Contributions</u>: No Member shall be required or obligated (a) to contribute any capital to the Company other than as provided in the Unit Subscription Agreement executed by such Member, or (b) to lend any funds to the Company. No interest shall be paid on any capital contributed to the Company and, except as otherwise provided herein, no Member may withdraw such Member's Capital Contribution. None of the terms, covenants, obligations or rights contained in this Section is or shall be deemed to be for the benefit of any Person or entity other than the Members and the Company, and no Person that is not a Member shall under any circumstances have any right to compel any actions or payments by any of the Members.

4.4    <u>Capital Accounts</u>.

(a)  Cash Distributions.  All cash resulting from the normal business operations of the Company and from a Capital Event shall be distributed between the Members in proportion to their Percentage Interests.  Member's Capital Account will be decreased by (1) the amount of all Adjusted Gross  Receipts distributed to that Member by the Company; (2) the fair market value of  property distributed to that Member by the Company (net of liabilities secured by such  distributed property that such Member is considered to assume or take subject to under  Section 752 of the Code); and (3) allocations to the account of such Member of Company net losses and deductions, in conformity with the Treasury Regulations,  taking into account adjustments to reflect book value.

(b)  The manner in which Capital Accounts are to be maintained pursuant to this Section 4.04 is intended to comply with the requirements of Section 704(b) of the Code and the Treasury Regulations promulgated thereunder.

(c)  Upon liquidation of the Company (or any Member's Membership Interest), liquidating distributions will be made in accordance with the positive Capital Account balances of the respective Members, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidating distributions may be made in cash or property.

(d) Except as otherwise required in the California Act, no Member shall have any liability to restore all or any portion of a deficit balance in such Member's Capital Account.

**ARTICLE V**

**ALLOCATIONS OF INCOME, TAXES, AND DISTRIBUTIONS; BOOKS OF ACCOUNT AND COMPANY RECORDS**

5.1.    Definition of Net Income and Net Losses.

(a)    "Net income" and "net losses" shall mean the income or losses of the Company as determined in accordance with the accounting methods followed by the Company for federal income tax purposes, in addition to accounting for: net income exempt from tax as described in Section 705(a)(1)(B) of the Code; expenditures not deductible in computing taxable income as described in Section 705(a)(2)(B) of the Code; adjustments as required by U.S. Treasury Regulation 1.704-l(b)(2)(iv)(g) with respect to property contributed to the Company capital; and adjustments based upon the fair market value of the Company property revalued under Section 704(b) of the Code; and otherwise in accordance with accounting principles set forth herein this Operating Agreement. The Class A Managing Member(s), in consultation with the accountants of the Company, shall determine the accounting methods to be followed by the Company for federal income tax purposes and on all accounting decisions and elections permitted to be made by the Company for federal income tax purposes in such manner as will be most advantageous to those Members holding a Majority-in-Interest of the Percentage Interests.

(b)    Any allocation to a Member of the net income earned or net losses incurred by the Company under this Article V shall be deemed to be an allocation to such Member of the same pro rata share of each item of income, gain, loss expense, deduction, credit or tax preference applicable to the period during which such net income or net losses was realized.

5.2    Annual Accounting Period.  All books and records of the Company shall be kept on the basis of an annual accounting period ending December 31 of each year, or other date as determined by the Class A Managing Member(s), except for the final accounting period, which shall end on the termination of the Company. All references herein to "fiscal year of the Company" or to "fiscal year" or to "taxable year" are to the annual accounting period described in the preceding sentence, whether the same shall consist of twelve (12) months or less.

5.3    Distributions. To the extent that Gross Receipts exists that is not reasonably required in the continuing operations of the Company or for the payment of expenses due or for the creation of reserves for expenses, all as contemplated by Section 1.01(a), distributions thereof shall be made by the Company to the Members subject to Section 5.09 below and the California Act, subject to the following priorities and from the following sources:

(a)    From Gross Receipts attributable to the worldwide revenues:

i.    First, the following customary "off-the-top" payments (which, for clarification, are not necessarily payable in the order of 5.03(a)(i)(1), 5.03(a)(i)(2) and 5.03(a)(i)(3) below):

1. payments actually made by Company, or a reserve for sums reasonably anticipated to be due by Company;

2. payments actually made by Company, or a reserve for sums reasonably anticipated to be payable by Company, for any actual, direct, customary, third party, out-of-pocket costs and expenses of auditing, administering and collecting moneys paid and/or owing to Company f r o m licensees (including without limitation collections account management fees and licensing intermediaries) and of paying taxes (but not income taxes) and other administrative expenses of Company;

3. the fees and expenses actually paid by Company to any unaffiliated sales representative or sales agent, and to the attorney(s) for their reasonable fees solely in connection with the Services; and

4. the repayment of any loans until such lenders have been distributed an aggregate amount equal to their principal loan amounts, plus the interest and expenses of such loans.

ii. Then, one hundred percent (100%) to the Class B Non-Managing Members, if any, pro rata on the basis of their respective Percentage Interests, until each Class B Non-Managing Member shall have been distributed an aggregate amount equal to its Capital Contribution, plus a fixed premium of twenty percent (20%) of such Non-Managing Member's Capital Account in Class B Unit(s) (the "Class B Preferred Return");

iii. Then, to any and all deferments payable in connection with the Company, if any; and

iv. Thereafter, the remaining balance (the "Net Proceeds") shall be allocated as follows: (i) fifty percent (50%) to the Class A Managing Member allocated pro rata on the basis of their respective percentages of the Class A Units set forth in Schedule "A" and any third party participants as determined by the Class A Managing Member in its sole discretion and (ii) fifty percent (50%) to the Class B Non-Managing Members allocated pro rata pari passu on the basis of their respective Percentage Interests as related to the other Class B Non-Managing Members set forth in Schedule "B.

5.4    Limitation Upon Distributions. No distribution shall be declared and paid under section 5.03 unless, after the distribution is made, the assets of the Company would be in excess of all liabilities of the Company, except liabilities to Members on account of their Capital Contributions.

5.5    Loans to Company. The Class A Managing Member(s) shall be permitted to obtain secured or unsecured loans to the Company by agreement from the Members or independent third parties, if in the Class A Managing Member(s) reasonable business judgment the loan(s) is/are

reasonably necessary or appropriate to carry out the objectives and purposes stated in 3.01(a). Nothing in this Operating Agreement shall prevent or obligate any Member from making secured or unsecured loans to the Company by agreement with the Company, all of which loans shall be treated by the Company in the same manner as loans from independent third parties, provided, however, that all such loans fully comply with the limitations set forth in the Certificate of Formation and this Operating Agreement.

5.6    Books of Account. The Class A Managing Member(s) shall keep and maintain, or cause to be kept and maintained, complete and accurate books, records and accounts of the Company (the "Books"). Such Books shall be kept on a cash or accrual method of accounting and shall be closed and balanced at the end of each year. The Books shall be maintained by a competent bookkeeper in accordance with, and with the oversight of, a certified public accountant from a reputable accounting firm.

5.7    Inspection. Each Member shall have the right (at that Member's sole expense) to cause the Company's Books to be examined or audited (not more than once annually) at the place where the Company normally keeps such Books, by such certified public accountants as the Member may choose. Any such examination or audit shall be conducted during Company's normal business hours in such a manner as not to materially interfere with the normal conduct of Company's business and for not more than fifteen (15) business days. The Class A Managing Member(s) shall provide such certified public accountants with the complete Books and records of the Company and reasonable office space for performance of the audit. If such office space is not available, then the certified public accountants shall be permitted to cause a copy of all the Books and records to be made by a reputable commercial copying firm, such that the audit may be performed at a location of the certified public accountants' election. No Member shall hinder the work of such certified public accountants.

5.8    Bank Accounts. Company shall maintain one or more accounts in a bank which is a member of the Federal Deposit Insurance Corporation, in which shall be deposited the receipts and income received by the Company from its operations (including all amounts borrowed from third parties). All amounts required by this Section 5.08 to be deposited in said accounts shall be and remain the property of the Company, and shall be received, held and disbursed solely for the benefit of the Company in accordance with this Operating Agreement. There shall not be deposited in said accounts any funds other than those above specified, and no other funds shall be in any way commingled with such funds.

5.9    Reports.

(a)    Within seventy-five (75) days after the end of the Company's fiscal year or earlier if required by law, the Class A Managing Member(s) shall furnish each Member with all information necessary for the preparation of such Member's United States income tax returns, including informational reports required by the Code or U.S. Treasury Regulations.

(b)    Within ninety (90) days after the end of each fiscal year of the Company's operations, the Class A Managing Member(s) shall prepare or cause to be prepared and provide to each Member an annual report containing a balance sheet as at the end of such year and statements of income and members' equity, which shall be prepared in accordance with accounting principles set forth herein this Operating Agreement.

(c)    At such times and from time to time as shall be determined by the Class A Managing

Member(s), or pursuant to any request submitted by Class B Non-Managing Members holding more than fifty (50%) percent of Class B Units, the Class A Managing Member(s) shall furnish all Members with a report describing the progress of the Company's operations and business and the development of its operations and business as contemplated in this Operating Agreement, as well as any other matter material to such operations and business.

(d) The Class A Managing Member(s), at the expense of the Company, shall cause tax returns to be timely filed on behalf of the Company, reflecting the Company income and expense for federal income tax purposes, or for purposes of any other jurisdiction where the Company conducts operations and which requires income tax returns, presenting the transactions of the Company in conformity with this Operating Agreement and applicable law. A copy of each return for each fiscal year shall be furnished by the Class A Managing Member(s) to each Member within thirty (30) days after filing thereof. The Class A Managing Member(s) hereby designate R o x a n n e  T a y l o r as the Tax Matters Partner for purposes of executing the duties
described in Sections 6221 through 6233 of the Code and the U.S. Treasury Regulations thereunder.

## ARTICLE VI

## MANAGEMENT, POWERS OF THE CLASS A MANAGING MEMBER, AND ALLOCATION OF CLASS A UNITS

6.1   Employment and Expenses.

(a) The Class A Managing Member(s) shall be entitled to receive from Company reimbursement for all reasonable, out-of-pocket costs and expenses incurred by Class A Managing Member(s), whether prior or subsequent to the date hereof, and allocable to Company and consistent with the business and purpose of Company as set forth in Article III hereof, including, without limitation, all costs and expenses in connection with the organization of Company, and those expenses specified by way of example, but not by limitation, in Section 1.01 hereof. All costs and expenses incurred by the Class A Managing Member(s) shall be reimbursed in the amounts expended.

(b) The Members agree that Class A Managing Member(s) may provide services on behalf of the Company, and be compensated for such services in reasonable amounts commensurate with the Budget, which amounts also shall be generally consistent with rates and costs that would be charged by others for similar services. All such services shall be performed to industry or professional standard, as applicable.

(c) The Company may contract for services for the benefit of the Company with Persons furnishing rights or performing services as reasonably determined by the Class A Managing Member(s) to be in the best interests of the Company and compensate such Persons in an amount commensurate with the Budget.

6.2   Management.

(a) The business and affairs of the Company shall be managed primarily by the Class A Managing Member(s) subject to this Operating Agreement. Subject to this Operating Agreement, the Class A Managing Member(s) shall direct, manage and control the business of the Company in their reasonable business judgment to fulfill the objects and purposes set out in section 3.01. The Class A Managing Member(s) shall have authority, power and discretion to manage and control the business, affairs and properties of the Company, to make decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, provided, that all such authority, power and discretion shall be exercised solely for the benefit of the Company in the performance of its business as set out in section 3.01.

6.3    <u>Non-Exclusivity of Manager(s)</u>. The Class A Managing Member(s) shall devote sufficient time to the management of the Company's business as is reasonably required to achieve the business purposes of the Company set out in this Operating Agreement. Subject to the immediately preceding sentence, The Class A Managing Member(s) shall not be required to manage the Company as their sole and exclusive function and may have other business interests and engage in other activities in addition to those relating to the Company. Neither the Company nor any other Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of the Class A Managing Member(s) or in the income or proceeds derived therefrom. The Class A Managing Member(s) have the right to engage in any other business of any nature or type whatsoever, including, without limitation, provided that no such project shall be based upon or use any of the intellectual property.

6.4    <u>Powers of the Class A Managing Member(s)</u>. Without limiting the generality or restrictions of Section 6.02, and subject to express rights granted to the other Members under this Operating Agreement, the Class A Managing Member(s) shall have power and authority to cause the Company:

(a) To borrow money for the Company from banks, other lending institutions and/or individuals, Members, or affiliates of the Class A Managing Member(s) or Members on such terms as the Class A Managing Member(s) deem appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Class A Managing Member(s), or to the extent permitted under the California Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Class A Managing Member(s);

(b) To purchase liability and other insurance in customary forms and amounts to protect the Company's property and business;

(c) To hold and own any Company real and/or personal properties solely in the name of the Company;

(d) To invest any Company funds in interest bearing checking or other accounts account(s) in federally insured banking institutions;

(e) To guaranty the obligations of entities in which the Company is a shareholder, member or partner, and other entities which in the opinion of the Class A Managing Member(s) will be in the interest of the Company or its Members, provided a Majority-in-Interest of the Class B Non-Managing Members, have approved such guaranty.

11

(f)    To execute on behalf of the Company all instruments and documents, including, without limitation, contracts; agreements; checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; leases, partnership agreements, guarantees, operating agreements of other limited liability companies; and any other instruments or documents necessary in the opinion of the Class A Managing Member(s), to the business of the Company;

(g)    To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

(h)    To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Class A Managing Member(s) may approve, including but not limited to any and all agreements relating to exploitation of the Service; and

(i)    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized to do so by this Operating Agreement or by the Class A Managing Member(s), no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable monetarily for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Class A Managing Member(s) to act as an agent of the Company in accordance with the previous sentence.

6.5    <u>Standard of Care</u>. The Class A Managing Member(s) shall not be liable, responsible or accountable in damages or otherwise to the Company or to the other Members for any act performed by them, respectively, in good faith and without willful misconduct, gross negligence, or breach of fiduciary duty.

6.6    <u>Indemnification</u>. To the extent not inconsistent with applicable law, the Company agrees to indemnify and hold harmless the Class A Managing Member(s), and their respective agents and representatives, from and against all damages, costs, expenses, losses, claims, demands, liabilities and/or obligations, including, without limitation, reasonable fees and disbursements of counsel, arising from, relating to, or in any way sustained or incurred by any action or in action on the part of the Class A Managing Member(s) or any such Person, except to the extent attributable to breach of the standard of care hereinabove set forth. Any such indemnification shall be from and limited to the assets of the Company, provided, that in the event of any claim against any Class A Managing Member, the Class A Managing Member shall give notice thereof to the other Members, the other Members shall have the right, through counsel, to select counsel and defend the claim, further provided, that if the claim is found to have arisen due to a breach of the standard of care set forth in section 6.05, then the Class A Managing Members shall indemnify the other Members for the costs of such defense.

## ARTICLE VII

## <u>MEETINGS</u>

7.01    <u>Notice Of Meetings</u>. The Class A Managing Member(s) may at any time call a meeting or a vote of the Members in order to obtain any approval or consent of the Members hereunder or under the California Act, and shall, for such purpose, call for such meeting or vote, and give written notice thereof, within ten (10) days following receipt of written request therefor of

Members holding more than a Majority-in-Interest of the Percentage Interests. The Class A Managing Member(s) shall mail written notice of any such meeting or vote to all Members of record as of the date of mailing and to the most recent addresses shown on the records of the Company, and such notice shall include the purpose or requested purpose of such meeting or vote. Any such meeting or vote shall be held not less than fifteen (15) nor more than sixty (60) days following mailing of the notice. All expenses of the meeting or vote and of notice thereof shall be borne by the Company except the costs of attending the meeting incurred by a Member shall be borne by the Member.

## ARTICLE VIII

## RIGHTS AND OBLIGATIONS OF MEMBERS

8.1     <u>Limitation of Liability</u>.  The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debt, obligation and liability of the Company and, except for violations of the standard of care under section 6.06, not of any of the Members. Each Member's liability shall be limited as set forth in this Operating Agreement, the California Act and other applicable law.

8.2     <u>No Priority and Return of Capital</u>. Except as provided for above in Article V, no Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Profits, Net Losses or Company distributions; provided that this Section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company within the limitations of this Operating Agreement and, as applicable, the Articles of Organization.

## ARTICLE IX

## TRANSFER OR ASSIGNMENT OF COMPANY INTEREST

9.1     <u>Limitations on Pledges, Hypothecations and Encumbrances</u>. No Member shall pledge, hypothecate or encumber, directly or indirectly, all or any part of its interest in the Company, or resign or withdraw from the Company, voluntarily or involuntarily, except as provided in this Operating Agreement or with the prior written approval of the Class A  Managing Member(s).

9.2     <u>Transfer by Operation of Law</u>. Upon the death, bankruptcy, insolvency, liquidation  or dissolution of a Member, its interest in the Company shall descend to and vest in its legal representatives or other successors.

9.3     <u>Transfer of Class A Managing Member's Interest</u>. The Class A Managing Member(s) may not sell, transfer or assign its interest in the Company, or any part thereof, without the prior written consent of a majority of all the Members (as determined by percentage interest), which consent may be withheld in any Member's absolute discretion, or if such conveyance would be in violation of the provisions of Section 9.06 hereof. An assignee of the Class A Managing Member(s) without such majority consent shall not be admitted to the Company as a  substituted Class A Managing Member(s). No Person to whom any part of such interest may  be purported to have been sold or assigned shall be allocated any interest in the capital, and in  the profit and losses of the Company, unless such sale or assignment complies with this  Operating Agreement.

9.4     <u>Transfer of Class B Non-Managing Member's Interest.</u>

13

(a)    Subject to the provisions of Section 9.6 hereof, a Class B Non-Managing Member, may sell, transfer, or assign its interest in the Company, or any part hereof, only with the prior written consent of the Class A Managing Member(s), such consent not to be unreasonably withheld in circumstances where the proposed transferee has a demonstrated financial capability to perform, provided, that a Member may sell, transfer, or assign its interest in the Company to an entity wholly owned by the Member  or to an entity wholly owned by the Member's majority direct or indirect owner without restriction.

(b)    Except as set forth under Sections 9.2 and 9.3, the Class A Managing Member(s) shall have the power, in Class A Managing Member(s)' sole discretion, to admit, as substituted Members, those Persons or entities who acquire an interest in the Company, or any part thereof, of a Member.

(c)    The admission of an assignee as a substituted Member shall be conditioned upon such Person's written acceptance and adoption of all the terms and provisions of this Operating Agreement. The Class A Managing Member(s) shall require such Person to pay any filing fees and reasonable counsel fees incurred in connection with such party becoming a substituted Member hereunder.

9.5    <u>Rights of Transferees</u>. Any Person who acquires, in any manner whatsoever, any interest in the Company from a Member shall not thereby become a Member, provided that such Person shall acquire the interest of his predecessor-in-interest in Company profits, losses, Gross Receipts, distributions and capital immediately prior to said transfer. Irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Operating Agreement, such Person shall be deemed by the acceptance of the benefit of the acquisition of such interest to have agreed to be subject to and bound by all the obligations of this Operating Agreement that any predecessor in interest of such Person was subject to or bound by. Such Person shall have only rights which are set forth in this Operating Agreement, and, without limiting the generality of the foregoing, he shall not have any right to have the value of his interest ascertained or to receive the value of such interest or, in lieu thereof, profits attributable to any right in the Company, except as herein set forth.

9.6    <u>Restrictions on Transfer</u>.  No sale or exchange of an interest in the Company may be made by a Member:

(a)    if the interest sought to be sold or exchanged, when added to the total of all other interests sold or exchanged within the period of twelve (12) consecutive months prior thereto, results in the termination of the Company under Section 708 of the Code, as amended, unless all of the Members shall consent in writing to such sale or exchange;

(b)    if counsel for the Company shall not have determined that the intended disposition is permissible under this Operating Agreement and does not violate any federal or state securities laws, or the rules and regulations thereunder; or

(c)    to a Person who is a minor or a bankrupt, to a Person who has been declared an incompetent or to a Person or organization prohibited by law from holding such interest.

9.7    <u>Amendment of Certificate</u>. Upon the bankruptcy, insolvency, liquidation or dissolution of a Member, or the admission of a substituted Member hereunder, the Class A Managing Member(s) shall forthwith cause an amendment to the Certificate of Formation and any other necessary papers to be filed, recorded, and published wherever necessary or appropriate showing the appropriate changes in the Members of the Company.

## ARTICLE X

## **AMENDMENTS**

10.1 <u>Power to Amend.</u> Amendments to this Operating Agreement to reflect the addition or substitution of a Member shall be made at the time and in the manner referred to in this Article X. Except as otherwise herein provided, all other amendments to this Agreement shall require the written consent of all Members.

10.2 <u>Proposed Amendments by Class A Managing Member(s).</u> From time to time the Class A Managing Member(s) may propose amendments to this Operating Agreement to (i) add to the duties or obligations of the Class A Managing Member(s) or surrender any right or power granted to the Class A Managing Member(s) herein; and (ii) cure any ambiguity or correct or supplement any provisions hereof which may be inconsistent with any other provision hereof or correct any printing, stenographic or clerical errors or omissions.

10.3 <u>Execution of Amendments.</u> Upon the adoption of any amendment to this Operating Agreement by the Members, the amendment shall be executed by all of the Members, and shall be recorded in the proper records of the State of California and of each jurisdiction in which recordation is necessary for the Company to conduct business or to preserve the limited liability of the Members.

10.4 <u>Amendments on Admission or Withdrawal of Members.</u> If this Operating Agreement shall be amended to reflect the admission or substitution of a Member in accordance with this Operating Agreement, the amendment to this Operating Agreement shall be adopted, executed and sworn to by all Members, the party to be substituted or added and the assigning Member. Any such amendment may be executed by the Class A Managing Member(s), on behalf of the remaining Members, the substituted or added Members, and the assigning Member pursuant to the power of attorney granted in this Operating Agreement.

10.5 <u>Amendment of Certificate.</u> In the event this Agreement shall be amended pursuant to this Article X, the Class A Managing Member(s) shall amend the Certificate to reflect such change if they deem such amendment to be necessary.

## ARTICLE XI

## **DISSOLUTION AND TERMINATION**

11.1 <u>Dissolution</u>.

(a) The Company shall be dissolved upon the occurrence of any of the following events:

i.  when the period fixed for the duration of the Company shall expire pursuant to Section 2.05 hereof; or

ii.  by the written decision of the Majority-in-Interest of the Members; or

      iii.     the death or physical incapacity of a Class A Managing Member to perform the business of the Company under this Operating Agreement or procure substitute performance thereof acceptable to the Majority-in-Interest of the Members; or

      iv.     Any and all rights arising from or relating to the Service have been exploited or are not subject to exploitation or further exploitation; or

      v.     The entry by a California Court of proper jurisdiction of a decree of dissolution.

(b)    As soon as possible following the occurrence of any of the events specified in this Section effecting the dissolution of the Company, the appropriate representative of the Company shall execute the Articles of Dissolution in such form as shall be prescribed by the State of California shall file the same with the Department of State.

(c)    If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his or her person or his or her property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his or his estate or administering his or his property.

**11.2**    <u>Effect of Filing of Articles of Dissolution</u>. Upon the filing of the Articles of Dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business.

**11.3**    <u>Winding Up, Liquidation and Distribution of Assets.</u>

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Class A Managing Member(s) shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Class A Managing Member(s) shall:

      i.     Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Class A Managing Member(s) may determine to distribute any assets to the Members in kind);

      ii.     Pay or provide for the payment of all of the Company's liabilities and liquidating expenses and obligations. If assets are to be distributed to the Members in kind, Members shall accept the assets subject to their proportionate Membership Interest share of the Company's losses;

      iii.     Pay pro rata any loans or advances that may have been made by any of the Members to the Company;

      iv.     Allocate any profit or loss resulting from such sales to the Members' Capital Accounts;

v.    Establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company;

vi.    Distribute the remaining assets in the following order:

(A) If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted pursuant to the provisions of Section 5.03 of this Operating Agreement to reflect such deemed sale.

(B) The positive balance (if any) of each Member's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Class A Managing Member(s), with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1 (b)(2)(ii)(b)(2) of the Treasury Regulations.

(C) Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(D) A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of the liabilities to creditors so as to enable the Class A Managing Member(s) to minimize the normal losses attendant upon a liquidation. Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(E) The Class A Managing Member(s) shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

## ARTICLE XII

## **INTENTIONALLY OMITTED**

17

# ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1    Notices. Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if in writing and delivered personally or by reputable courier to the Member or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's address, as appropriate, which is set forth in this Operating Agreement, or such other address as shall hereafter be designated by notice to the Class A Managing Member(s). Except as otherwise provided herein, any such notice shall be deemed to be given three business days after the date on which the same was deposited in the United States mail, addressed and sent as aforesaid, or upon delivery if delivered personally or by reputable courier.

13.2    Power of Attorney. Each Member hereby constitutes and appoints the Class A Managing Member(s), its true and lawful attorney(s), in its name, place and stead, to make, execute, consent to, swear to, acknowledge, record and file:

(a)    Any and all amendments to the Articles of Organization, and any instrument which may be required to be filed by the Company or the Members under the laws of the State of California and any amendments or modification of such instruments, provided that this power of attorney shall not be construed to authorize any such amendments without the unanimous consent of the Members; and

(b)    All certificates and other instruments which may be required to effect the dissolution and termination of the Company pursuant to the provisions hereof; provided, however, that the Class A Managing Member(s) shall not take any action as attorney(s)-in-act for any Member which could in any way increase the liability of such Member beyond his liability expressly set forth herein or which could in any way materially adversely affect any of the rights of such Member hereunder.

(c)    It is expressly understood and intended by the Members that the grant of each of the foregoing powers of attorney is coupled with an interest and shall be irrevocable.

13.3    Application of California Law. This Operating Agreement and the application or interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of California, and specifically the California Act.

13.4    Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interests and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, or rules or regulations of a governmental authority with jurisdiction over the Company.

13.5    Construction. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

13.6    Headings; Schedules. The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope,

extent or intent of this Operating Agreement or any provision hereof. The Schedules attached to this Operating Agreement are incorporated herein and made expressly a part hereof as though set out in the body hereof.

13.7    <u>Waivers</u>. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

13.8    <u>Rights and Remedies Cumulative</u>. The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

13.9    <u>No Equitable Relief</u>. Notwithstanding anything to the contrary in contained herein, in the event of a breach of this Operating Agreement, each Member's remedies shall be limited solely to an action at law for monetary damages actually suffered, if any. In no event shall any Member(s) be entitled to (a) seek to or obtain injunctive or other equitable relief in connection herewith (or any rights therein, thereto, or in connection therewith) or (b) restrain or otherwise interfere with the development, exhibition,  promotion, advertising, any rights therein  or thereto. Each Member irrevocably waives any right to equitable or injunctive relief.

13.10    <u>Severability</u>. If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

13.11    <u>Heirs, Successors and Assigns</u>. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

13.12    <u>Creditors</u>. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

13.13    <u>Entire Agreement</u>. This Operating Agreement sets forth the entire agreement between the parties and supersedes all prior agreements and understandings between the parties.

13.14    <u>Expenses</u>. Each of the parties hereto shall bear such party's own expenses in connection with this Agreement and the transactions contemplated hereby.

13.15    <u>Disputes</u>.  With respect to any disputes arising out of or relating to this Operating Agreement between or among any of the Members, any such disputes, questions, controversies or claims between them shall be submitted to binding arbitration. EACH MEMBER WAIVES ITS RIGHT TO A COURT OR JURY TRIAL. This agreement to arbitrate applies to, but is not limited to, all disputes regarding the construction or application of this Operating Agreement, all claims arising under federal, state, or local statutory or common law, including: claims of breach of promise(s), breach of contract or breach of the covenant of good faith and fair dealing, tort claims, and any other claims of illegality or breach of any

right which the Member(s) might hold with respect to the other whether under this Operating Agreement or otherwise. The arbitration shall be administered by the American Arbitration Association, in accordance with its rules and procedures. The arbitration shall take place in Los Angeles, CA before a single neutral arbitrator from the panel of AAA. The arbitrator shall be a retired state or federal judge with at least ten (10) years experience. The Rules of Evidence, including the rules relating to hearsay, will apply to the arbitration. The parties shall have the right to take depositions and to conduct all other discovery available in civil actions. The arbitrator shall issue a written decision and award including the essential findings and conclusions on which the award is based. The opinion and award will decide all issues submitted and shall be final and binding to the fullest extent permitted by law and will be enforceable by any court having jurisdiction. To the extent allowed by California law, the arbitrator shall be required to follow all applicable substantive law. The arbitrator shall grant any legally meritorious motion for summary judgment presented by any party. It is understood and agreed that each of the parties shall bear its, his or her own attorneys' fees, expert fees, consulting fees, and other litigation costs (if any) ordinarily associated with legal proceedings taking place in a judicial forum, unless the arbitrator orders otherwise. Except as otherwise limited or prohibited by this Agreement, the arbitrator shall be permitted to award those remedies, including, without limitation, attorney's fees, in law or equity, which are requested by the parties and which the arbitrator determines to be supported by credible and relevant evidence presented. The party who prevails in any arbitration may seek to have the arbitrator's award confirmed as a judgment of the California Court and/or the United States District Court located in California.

13.16    <u>Execution in Counterparts</u>. This Agreement may be executed in counterparts by facsimile, scan (i.e., pdf), or email signatures, each part of which when executed shall be deemed an original for all purposes, and all of which when taken together shall constitute one and the same document, fully binding and with full legal force and effect.

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals as of the date first above written.

**CLASS A MANAGING MEMBER**

*Roxanne Taylor*

**Roxanne Taylor**

**SCHEDULE "A"**
**Class A Managing Members Membership Interests**
**Comprising 50% of Percentage Interests**

| Name and Address | Contribution | Class A Membership Interest | Percentage Interest |
|---|---|---|---|
| _Robert Smith_____ _____ | | 50 % | 20% |
| Deon Taylor | | 16.67% | |
| Roxanne Taylor | | 16.67% | |
| Darrick Angelone | | 16.66% | |

**Class B Non-Managing Members**
**Comprising 50% of Percentage Interests**

| Name and Address | Capital Contribution In US$ or Determined In-Kind Contribution Monetary Value | Class B Membership Interest | Percentage Interest |
|---|---|---|---|
| Robert F. Smith | | | 50% |
| Deon Taylor | | | 16.67% |
| Roxanne Taylor | | | 16.67% |
| Darrick Angelone | | | 16.66% |

# Exhibit B

# HYPER ENGINE

### A LIMITED LIABILITY COMPANY

### OPERATING AGREEMENT

Hidden Empire Film Group (66.67%), Aone Entertainment (33.33%) and any subsequently added members hereinafter referred to as "Members," agree to the following:

## ARTICLE 1. NATURE OF COMPANY

### Company Purpose

1.01. The Members voluntarily associate themselves as General Members for the purpose of engaging in the general practice of marketing.

### Name

1.02. The name of the Company, herein called "firm name," shall be *Hyper Engine, LLC*.

### Term

1.03. The Company shall commence on December 15, 2019 and shall continue until dissolved by mutual agreement of the parties or terminated as provided in this Agreement.

### Location

1.04. The Company offices shall be located at 5410 Wilshire Boulevard, 10th Floor, Los Angeles, California 90036, or any other place or places in Los Angeles County, California, that may be designated by majority vote of the Members.

## ARTICLE 2. FINANCIAL

### Capital

2.01. The initial capital of the Company shall consist of:

(a) Hidden Empire Film Group will be providing initial capital in the form of staff, resources, supplies and other expenses incidental to the Company business.

(b) All the physical assets and the intangible assets, including client lists, accounts receivable and work in progress which are contributed to this Company by those persons.

(c) The term "work in progress" as used in this section means matters, cases, or other activities requiring the rendition of services commenced prior to but not completed at the date of this Agreement by any of the former Companys or practices mentioned in this section, referred to in this Agreement as "existing" firms. Each such matter, case, or activity shall be completed by this Company. The charges for completion shall be billed and collected by this Company, and shall, on receipt, be allocated between the existing firm involved and this Company in a manner determined by majority vote of all Members.

(d) Accounts receivable of the existing firms shall be billed and collected by this Company but at all times shall remain the property of the existing firms and their members. Any payments received on any accounts receivable shall be promptly paid to the existing firm whose property it remains. Any practices, other than normal billing and accounting procedures, required to collect any such accounts receivable shall be undertaken by the existing firm whose property it remains and not by this Company.

(e) "Client lists" as used herein shall mean all client information, billing records, accounts, work in progress related to those accounts, and all after-acquired information, records, accounts and client matters, contributed to the Company by the respective Members. On dissolution of the Company or dissociation of any Member, other than by death, disability, or expulsion, all such client lists shall be distributed in-kind to the Member who contributed such client lists to the Company pursuant to this Agreement.

**Withdrawal of Capital**

2.02. No portion of the Company capital may be withdrawn at any time without the consent of all the Members.

**Interest on Capital**

2.03. No Member shall be entitled to interest on contributions to the capital of the Company.

**Profits and Losses**

2.04. The net Company profits shall initially be used to reimburse Hidden Empire Film Group for its initial capital investment. The net Company profits shall then be divided 66.67% to Hidden Empire Film Group, and 33.33% to Aone Entertainment. The net Company losses shall be divided 66.67% to Hidden Empire Film Group, and 33.33% to Aone Entertainment.

**Profits of Deceased or Terminated Member**

2.05. On the death of a Member or on the withdrawal, retirement, or expulsion of a Member as provided in this Agreement, that Member's distributive share of the future Company profits and losses shall be divided among the remaining Members in accord with their percentage interests as specified in Paragraph 2.04 of this Agreement.

**Expenses**

2.06. All rents, payments for office or professional supplies, professional dues, premiums for insurance, wages, salaries, and other expenses incidental to the Company business shall be paid out of the profits or capital of the Company and shall, for the purpose of this Agreement, be considered ordinary and necessary expenses of the Company business deductible before net profits are determined.

**Salaries**

2.07. No Member shall receive a base salary for services rendered to or in the Company business.

**Draws**

2.08. During each calendar year each Member shall be entitled to withdraw from the Company funds in equal monthly installments an amount equal to but not in excess of 100% of his or her distributive share of Company net profits for the preceding year. Each withdrawal by a Member shall be charged against his or her distributive share of the net Company profits for the year in which made. Each Member shall be entitled, at the end of any calendar year, to withdraw the balance of his or her distributive share of the Company net profits for the year after making the capital contribution, if any, required by Paragraph 2.03 of this Agreement; provided, however, the withdrawals made by the Members during the first calendar year of the Company shall not exceed the following amounts each month: $20,000.00.

**Fees**

2.9. The amount charged by each Member for marketing services rendered in connection with the Company business shall be twelve percent (12%). However, each Member may render marketing services for any member of his or her immediate family without charge and may, on approval of the Members having a majority interest in the Company profits and losses, render marketing services without charge or at less than regular charge to any professional, civic, educational, religious, or charitable organization or project.

**Bank Accounts**

2.10. All Company funds shall be deposited in bank accounts designated by majority vote of the Members. The Members shall also designate by majority vote two Members, one of whom shall be the Managing Member, who shall be authorized to sign checks and make withdrawals from such bank accounts. All checks and withdrawals on or from any such bank account shall require the signatures of two authorized Members.

**Books**

2.11. Complete and accurate accounts of all Company transactions shall be kept in proper books, and each Member shall enter in those books a full and accurate

account of all transactions conducted by that Member on behalf of the Company. The books of account and other Company records shall be kept in the Company place of business at all times, and each Member shall have access to, and may inspect and copy, any of them at any time.

## Method of Accounting

2.12. The Company books of account shall be kept on a cash and calendar year basis.

## Accountings

2.13. As soon after December 31 in each year as is reasonably practicable, a complete and accurate accounting shall be made of all Company receipts and disbursements during the preceding calendar year. The net Company profits or losses during that year shall be ascertained and credited or debited, as the case may be, on the Company books, to the respective Members in the proportions specified in Paragraph 2.04 of this Agreement.

## Capital Accounts

2.14. An individual capital account shall be maintained for each Member. Each Member's capital account shall consist of his or her contribution to the initial capital, any additional contributions to the Company capital made by that Member pursuant to this Agreement, and any amounts transferred from his or her income account to Company capital pursuant to this Agreement.

## Income Accounts

2.15. An individual income account shall be maintained for each Member. At the end of each calendar year each Member's share of the Company net profits or losses shall be credited or debited to, and his or her withdrawals during the year deducted from, that income account. Except as provided in Paragraph 2.03 of this Agreement, amounts may be transferred from a Member's income account to the Company only by majority vote of the Members.

## Amounts in Income Accounts

2.16. Any amount credited to a Member's income account on any regular Company accounting provided for in this Agreement shall constitute a liability of the Company to that Member payable without interest on demand.

## ARTICLE 3. RIGHTS AND DUTIES OF MEMBERS

### Vacations and Sick Leave

3.01. Each Member shall devote full time, knowledge, and skill to the Company business. Each Member shall be entitled to vacations, sick leave, and absences from the Company business in the following manner:

(a) Each Member shall be entitled to four (4) weeks' vacation in each calendar year to be taken at such times as may be most convenient to the Company. Any vacation not used in one year may be used in a future year only with the approval and to the extent agreed on by majority vote of the Members.

(b) Each Member shall be entitled to one (1) week sick leave each calendar year without adjustment in earnings because of actual sickness or accident to the Member or any member of the Member's immediate family. Sick leave not used in one year may not be carried over to future years or used for additional vacation.

(c) In addition to sick leave, each Member who becomes pregnant shall be entitled to three (3) months maternity leave during any twelve-month period without adjustment in earnings.

(d) Each Member, in addition to the vacation and sick leave provided for in this Section shall be entitled to be absent from the Company business for thirty (30) days each calendar year for the purpose of attending professional meetings or postgraduate courses.

(e) If any Member's vacation or sick leave exceeds the limits specified in this Section for any year, that Member's distributive share of the net Company profits for the year shall be reduced at the rate of 1.9 percent [1/52] for each week the vacation or sick leave exceeds the limits specified in this Section without the consent of a majority of the remaining Members. The amount by which any

Member's distributive share of Company net profits is reduced pursuant to this provision shall be credited to the other Members according to their percentage interests in those profits as specified in Paragraph 2.04 of this Agreement.

**Management**

3.02. In addition to other matters specified in this Agreement, the following matters shall be determined by majority vote of the Members as defined in Paragraph 3.05 of this Agreement:

(a) Matters relating to general management, professional policy, and the purchase of furniture and equipment costing more than $500.00.

(b) The assignment of professional duties and responsibilities among the Members.

(c) The selection of a Member to serve as Managing Member.

**Statement of Company**

3.03. The Members shall cause to be filed with the California Secretary of State articles of organization and bylaws setting forth the Members' rights with respect to management and control of the Company and any limitations thereon as set forth in this Agreement.

**Managing Member**

3.04. The Managing Member shall be selected at the beginning of each calendar year and shall serve in that capacity for the calendar year or until a successor is selected. The Managing Member shall have the duty and authority to carry out and implement decisions relating to general management and professional policy, to purchase supplies, furniture, and equipment costing less than the amount specified in Section 3.02(a*)*, and to employ, discharge, and supervise the clerical, administrative, and other employees of the Company.

**Votes**

3.05. In any matter requiring a majority vote of the Members, each Member shall have one vote for each one percent of Company net profits distributable to the Member under Paragraph 2.04 of this Agreement during the year in which that vote is taken. "Majority vote of the Members" as used in this Agreement shall mean 51 percent of the votes cast pursuant to this Section.

**Prohibited Acts**

3.06. No Member shall, without the consent of all other Members:

(a) Loan any Company funds;

(b) Tender any marketing services to any person if requested by the Managing Member not to do so;

(c) Incur any obligations in the name of or on the credit of the Company except in the ordinary course of the Company business; or

(d) Become bail, surety, or endorser for any other person.

The Company shall be indemnified for any losses it sustains because of the breach of this paragraph by the Member committing the breach.

**Personal Debts**

3.07. Each Member shall pay and discharge that Member's own separate obligations as they become due, and shall protect the other Members and the Company from all costs, claims, and demands relating to his or her personal obligations.

**Errors and Omissions**

3.08. Each Member shall indemnify the Company for all damages and expenses for which the Company may become liable as a result of any alleged act of errors and omissions on the part of that Member to the extent that the damages and expenses are not paid or reimbursed under a policy of insurance carried by the Company.

**Assignment of Interest**

3.09. No Member shall sell, assign, mortgage, hypothecate, or encumber any interest in the Company.

## ARTICLE 4. MEMBER DISSOCIATION

**Withdrawal of Member**

4.01. Any Member may withdraw from the Company at the end of any calendar year by giving six (6) months written notice to the other Members. On service of that notice:

(a) The dissociation of the Member from the Company will automatically become effective at the end of the calendar year in which given, unless within thirty (30) days after receiving notice the remaining Members, by written agreement signed by all of them, elect to dissolve the Company and serve written notice of their election on the dissociating Member, in which event his or her notice shall be deemed an expression of the Member's will to dissolve and wind up the Company business.

(b) If the remaining Members do not elect to dissolve the Company, the Company books shall be closed at the end of the calendar year in the usual manner. The withdrawing Member shall then be paid the balance shown in his or her capital and income accounts, increased by his or her share of Company net profits or decreased by his or her share of Company net losses during the year, and decreased further by his or her drawings against anticipated profits during the year. The net amount payable to the withdrawing Member shall not include any share in uncollected charges received by the Company subsequent to the effective date of withdrawal and shall be payable without interest in twelve (12) equal consecutive monthly installments commencing one (1) month  after the effective date of dissociation.

(c) A Member may withdraw from the Company without the written advance notice required under this Paragraph, but such a withdrawal shall be considered a wrongful dissociation under Corp. Code § 16602(b)(1) and the Member will be liable for any damages caused by the wrongful dissociation under Corp. Code § 16602(c) .

**Expulsion of a Member**

HYPER ENGINE
A LIMITED LIABILITY COMPANY

4.02. Any Member may be expelled from the Company.

(a) Expulsion shall become effective on the adoption by majority vote of the remaining Members, at a meeting held after five days written notice has been given to the expelled Member, of a written resolution finding that the Member has:

> (1) Engaged in personal misconduct or a willful breach of this Agreement of such a serious nature as to render the Member's continued presence in the Company personally or professionally obnoxious or detrimental to the other Members or the Company;

> (2) Been expelled, suspended, or otherwise disciplined by the final action of any professional organization or duly constituted authority;

> (3) Resigned from any professional organization under threat of disciplinary action;

> (4) Been convicted by final action of any court of any offense punishable as a felony or involving moral turpitude; or

> (5) Made an assignment for the benefit of creditors or been declared a bankrupt.

(b) The expelled Member shall be entitled to receive from the remaining Members, as soon as practical after the effective date of the dissociation, the book value of the expelled Member's Company interest as determined by a complete inventory and accounting of the Company affairs as of the close of business on the effective date of the dissociation, less any value attributable to the goodwill of the Company business and less any damages, if the expulsion was caused by willful breach of this Agreement, sustained by the remaining Members or the Company because of the breach.

**Retirement of Member**

4.03. Any Member may voluntarily retire from the Company at any time after the age of 65 years by giving six (6) months written notice of the intention to retire to

the other Members.

**Disability of Member**

4.04. Any Member who is disabled because of illness, accident, or other cause, and therefore unable to perform six (6) months or longer may be retired from the Company by majority vote of the other Members.

**Payment for Company Interest**

Section 4.05(a). On the dissociation of a Member due to retirement under Paragraph 4.03, or because of disability under Paragraph 4.04, the Company shall pay to the person legally entitled thereto, in full liquidation of that Member's interest in the Company, the following amounts:

(a) An amount each month for thirty-six (36) consecutive months following the retirement or death of the Member that is equal to one-half (½) of the Member's average monthly earnings from the Company in the five (5) years immediately preceding the Member's retirement or death during which the Member was a member of the Company; plus

(b) The Member's distributive share of the Company net profits for its current year to the date of retirement or death, less withdrawals made by the Member against those profits, payable thirty (30) days after the date of retirement or death; plus

(c) An amount equal to the balance in the Member's capital and income accounts on the date of retirement or death, payable without interest in four (4) consecutive equal quarterly installments beginning two (2) months after the date of retirement.

Section 4.05(b). On the dissociation of a Member due to death, the Company shall pay to the person legally entitled thereto, in full liquidation of that Member's interest in the Company, an amount to be set by a unanimous vote of the Members each year. This amount shall be paid from a term life insurance policy.

**Noncompetition Clause**

4.06. Any retired Member who engages in competition with the Company in any way during the period any amounts are payable to him or her under Subparagraph (a) of Paragraph 4.05 of this Agreement shall forfeit all right to any remaining payments due under that Subparagraph. "Competition with the Company" shall mean engaging, directly or indirectly, (including, by way of example only, as a director, principal, Member, venturer, Member, or agent), or having any direct or indirect interest, in any business similar to or competitive with that then being carried on by the Company in the County of Sacramento.

**Retired Member's Right to Examine Books**

4.07. Any person legally entitled to receive any payments pursuant to the provisions of Paragraph 4.05 of this Agreement shall have the right to examine the Company books and records at any time during normal business hours to the extent that the examination is necessary to determine the amount of any payments set forth in Paragraph 4.05 of this Agreement.

**Limitation on Payments to Dissociated Members**

4.08. A dissociated Member, including a deceased Member's estate, shall not have any claim against the Company or the remaining Members, except for payments expressly provided in this Agreement to be paid to them. If the Company is dissolved before the full amount of these payments has been paid, the unpaid balance shall be paid in full before any distribution of Company assets shall be made to the remaining Members.

**Dissolution**

4.09. The Company may be dissolved on the affirmative vote of a majority in numbers of, but in no case less than two, Members. On dissolution of the Company, all Company assets, including any lease for office space occupied by the Company, but excluding any files or records pertaining to the affairs of clients shall be liquidated and the proceeds distributed in the manner specified in California Corporations Code Section 16807 .

**Files**

4.10. On any dissolution of the Company, the Member who has usually rendered marketing services for a particular client shall be entitled to the client's file unless the client requests that a different disposition be made of that file. A Member who withdraws from the Company shall be entitled only to the records or files of those clients for whom he or she regularly performed marketing services as a member of the Company and for whom he or she also rendered marketing services before becoming a member of the Company. The estate of a deceased Member shall not be entitled to any records or files of the Company except records and files relating to personal matters of the deceased Member.

## ARTICLE 5. MISCELLANEOUS

### Additional Members

5.01. The Members may by a unanimous vote, admit additional Members and fix the capital contributions, if any, to be made and the participation percentage in profits and losses of any additional Members. All Members shall relinquish an equal proportion of their own participation percentage in Company profits and losses to any such additional Members. However, before being admitted, each additional Member must first agree in writing to be bound by the provisions of this Agreement.

### Notices

5.02. Any notices permitted or required by law or by this Agreement shall be in writing and shall be deemed duly given when personally delivered to the Member to whom they are addressed or, in lieu of personal delivery, when deposited in the United States mail, first-class postage prepaid, certified, addressed to that Member at the address that appears below that Member's signature at the end of this Agreement.

### Amendments

5.03. No amendment to this Agreement shall be valid unless made in writing and signed by all of the Members.

HYPER ENGINE
A LIMITED LIABILITY COMPANY

PAGE 14 OF 14

Entered into on December 1, 2019 in Los Angeles County, California.

**HIDDEN EMPIRE FILM GROUP**

By: _____

    Deon Taylor, Principal

**AONE ENTERTAINMENT**

By: _____

Its: _____

# Exhibit C

# BANK OF THE WEST

**BNP PARIBAS GROUP**

## BUSINESS DEBIT CARD ENROLLMENT

### (This is not a credit card)

**TELL US ABOUT YOUR COMPANY** (PLEASE PRINT)

Business Name

| H | Y | P | E | R | | E | N | G | I | N | E | | L | L | C | | | | | | | | |

Primary Business or Commercial Checking Account Number  060288396

Phone Number (916) 257-2475          Tax ID Number  82-5286902

Business Address 8060 SHELBORNE DR          City GRANITE BAY   State CA   Zip 95746
(Street Address Only)

Legal Status  ☐ Sole Proprietorship   ☐ Partnership   ☐ Corporation   ☒ LLC   ☐ Other

Type of Business MOVIE PRODUCTION          Executed as an agreement on (date) 9-20-19

*(Note: Authorized Representative are persons authorized to contract for the business. Authorized Representatives are required to sign this Enrollment Form)*

X _____          X _____
Authorized Representative                Authorized Representative

ROXANNE TAYLOR          _____
Authorized Representative (Please print name.)   Authorized Representative (Please print name.)

Social Security Number _____          Social Security Number _____

Preset Limit   A  B  C  D  E          Preset Limit   A  B  C  D  E
*(Circle one)*                    *(Circle one)*

| PRESET DAILY LIMITS | A | B | C | D | E |
|---|---|---|---|---|---|
| ATM Cash Limit | $100 | $0 | $100 | $500 | $995 |
| POS (Combined Signature and PIN) | $1,200 | $1,200 | $2,000 | $3,000 | $7,000 |
| Number of Transactions | 30 | 30 | 30 | 30 | 30 |
| Limit All Transactions | $1,300 | $1,200 | $2,100 | $3,500 | $7,995 |

**TELL US ABOUT ADDITIONAL AUTHORIZED CARDHOLDERS** (PLEASE PRINT)

| D | A | R | R | I | C | K | | A | N | G | E | L | O | N | E | | | | | | | |

Name of Card User *(please print)*

Social Security Number _____   Preset Limit   A   B   C   D   E   *(circle one)*

| | | | | | | | | | | | | | | | | | | | | | |

Name of Card User *(please print)*

Social Security Number _____   Preset Limit   A   B   C   D   E   *(circle one)*

| | | | | | | | | | | | | | | | | | | | | | |

Name of Card User *(please print)*

Social Security Number _____   Preset Limit   A   B   C   D   E   *(circle one)*

BANK USE ONLY

Employee Name/Number _____          Cost Center # _____

Ordered By _____          Page _____ of _____   (for multiple Authorized Reps)

Original – Branch File
Retention: 7 years from account closure.                    110-03901 (Rev. 08/14)

# Exhibit D

California
*Secretary of State*

Business          UCC

Login

Home

Search

Forms

# Business Search

*The California Business Search provides access to available information for* **corporations**, **limited liability companies** *and* **limited partnerships** *of record with the California Secretary of State, with* **free PDF copies** *of over 17 million imaged business entity documents, including the most recent imaged Statements of Information filed for Corporations and Limited Liability Companies.*

*Currently, information for Limited Liability Partnerships (e.g. law firms, architecture firms, engineering firms, public accountancy firms, and land survey firms), General Partnerships, and other entity types are* **not contained** *in the California Business Search. If you wish to obtain information about LLPs and GPs, submit a Business Entities Order paper form to request copies of filings for these entity types. Note: This search is not intended to serve as a name reservation search. To reserve an entity name, select Forms on the left panel and select Entity Name Reservation ? Corporation, LLC, LP.*

### Basic Search

*A Basic search can be performed using an entity name or entity number, where applicable,* **remove "C"** *from the entity number. Note,* ***a basic search*** *will search* ***only ACTIVE entities*** *(Corporations, Limited Liability Companies, Limited Partnerships, Cooperatives, Name Reservations, Foreign Name Reservations, Unincorporated Common Interest Developments, and Out of State Associations). The basic search performs a contains ?keyword? search. The Advanced search allows for a ?starts with? filter. To search entities that have a status other than active or to refine search criteria, use the* **Advanced** *search feature.*

### Advanced Search

*An Advanced search is required when searching for publicly traded disclosure information or a status other than active.*

*An Advanced search allows for searching by specific entity types (e.g., Nonprofit Mutual Benefit Corporation) or by entity groups (e.g., All Corporations) as well as searching by ? begins with? specific search criteria.*

**Disclaimer:** *Search results are limited to the 500 entities closest matching the entered search criteria. If your desired search result is not found within the 500 entities provided, please refine the search criteria using the Advanced search function for additional results/entities. The California Business Search is updated as documents are approved. The data provided is not a complete or certified record.*

*Although every attempt has been made to ensure that the information contained in the database is accurate, the Secretary of State's office is not responsible for any loss, consequence, or damage resulting directly or indirectly from reliance on the accuracy, reliability, or timeliness of the information that is provided. All such information is provided "as is." To order certified copies or certificates of status, (1) locate an entity using the search; (2)select Request Certificate in the right-hand detail drawer; and (3) complete your request online.*

Skip to main content   State



# Exhibit E

**From:**      deontaylor@me.com
**To:**        Darrick @ AngelOne; Roxanne Supremacy
**Subject:**   Completion of Website.
**Date:**      Tuesday, October 22, 2013 7:23:44 PM

---

Roxanne can you please confirm with D, the final amounts Needed to close
out the online work.. Also discussed with D, a bit about the 2/3 page site
for Suzane.. I'd like to get a price point for this as well, so we can do
all this week.

D, thanks a lot!!!
Sent via BlackBerry by AT&T

# Exhibit F

```
{
  "registration_information": {
    "customer_id": "59255770",
    "domain_name": "hiddenempirefilmgroup.com",
    "declared_country": "US",
    "primary_admin_email": "darrick@hiddenempirefilmgroup.com",
    "secondary_email_address": "darrick.aone@gmail.com",
    "user_cap": 1,
    "user_count": 0,
    "using_services_allowed": false,
    "is_reseller": false,
    "time_created": "2017-10-18 14:58:59 UTC"
  },
  "services": [{
    "name": "AppSheet",
    "status": "On for everyone"
  }, {
    "name": "Blogger",
    "status": "Off for everyone"
  }, {
    "name": "Calendar",
    "status": "Off for everyone"
  }, {
    "name": "Campaign Manager",
    "status": "Off for everyone"
  }, {
    "name": "Chrome Canvas",
    "status": "On for everyone"
  }, {
    "name": "Chrome Management",
    "status": "On for everyone"
  }, {
    "name": "Chrome Remote Desktop",
    "status": "On for everyone"
  }, {
    "name": "Chrome Web Store",
    "status": "Off for everyone"
  }, {
    "name": "Client-side encryption",
    "status": "On for everyone"
  }, {
    "name": "Contacts",
    "status": "Off for everyone"
  }, {
    "name": "Currents",
    "status": "Off for everyone"
  }, {
    "name": "Directory settings",
    "status": "On for everyone"
  }, {
    "name": "Drive and Docs",
    "status": "Off for everyone"
```

```
    }, {
      "name": "Experimental Apps",
      "status": "On for everyone"
    }, {
      "name": "FeedBurner",
      "status": "Off for everyone"
    }, {
      "name": "Fusion Tables - experimental",
      "status": "Off for everyone"
    }, {
      "name": "Gmail",
      "status": "Off for everyone"
    }, {
      "name": "Google Ad Manager",
      "status": "Off for everyone"
    }, {
      "name": "Google Ads",
      "status": "Off for everyone"
    }, {
      "name": "Google AdSense",
      "status": "Off for everyone"
    }, {
      "name": "Google Alerts",
      "status": "Off for everyone"
    }, {
      "name": "Google Analytics",
      "status": "Off for everyone"
    }, {
      "name": "Google Bookmarks",
      "status": "Off for everyone"
    }, {
      "name": "Google Books",
      "status": "Off for everyone"
    }, {
      "name": "Google Chrome Sync",
      "status": "Off for everyone"
    }, {
      "name": "Google Cloud Platform",
      "status": "Off for everyone"
    }, {
      "name": "Google Cloud Print",
      "status": "On for everyone"
    }, {
      "name": "Google Custom Search",
      "status": "Off for everyone"
    }, {
      "name": "Google Data Studio",
      "status": "On for everyone"
    }, {
      "name": "Google Domains",
      "status": "On for everyone"
    }, {
```

```
      "name": "Google Earth",
      "status": "On for everyone"
}, {
      "name": "Google Fi",
      "status": "Off for everyone"
}, {
      "name": "Google Groups",
      "status": "Off for everyone"
}, {
      "name": "Google Hangouts",
      "status": "Off for everyone"
}, {
      "name": "Google Maps",
      "status": "Off for everyone"
}, {
      "name": "Google My Business",
      "status": "On for everyone"
}, {
      "name": "Google My Maps",
      "status": "On for everyone"
}, {
      "name": "Google Pay",
      "status": "On for everyone"
}, {
      "name": "Google Photos",
      "status": "Off for everyone"
}, {
      "name": "Google Play",
      "status": "On for everyone"
}, {
      "name": "Google Play Console",
      "status": "Off for everyone"
}, {
      "name": "Google Public Data",
      "status": "Off for everyone"
}, {
      "name": "Google Search Console",
      "status": "On for everyone"
}, {
      "name": "Google Takeout",
      "status": "Off for everyone"
}, {
      "name": "Google Translator Toolkit",
      "status": "Off for everyone"
}, {
      "name": "Google Trips",
      "status": "On for everyone"
}, {
      "name": "Google Voice",
      "status": "On for everyone"
}, {
      "name": "Groups for Business",
```

```
    "status": "Off for everyone"
}, {
    "name": "Idaas Logo",
    "status": "On for everyone"
}, {
    "name": "Individual storage",
    "status": "Off for everyone"
}, {
    "name": "Location History",
    "status": "Off for everyone"
}, {
    "name": "Managed Google Play",
    "status": "On for everyone"
}, {
    "name": "Material Gallery",
    "status": "Off for everyone"
}, {
    "name": "Merchant Center",
    "status": "Off for everyone"
}, {
    "name": "Partner Dash",
    "status": "Off for everyone"
}, {
    "name": "Play Books Partner Center",
    "status": "Off for everyone"
}, {
    "name": "Read Along",
    "status": "Off for everyone"
}, {
    "name": "Scholar Profiles",
    "status": "Off for everyone"
}, {
    "name": "Search Ads 360",
    "status": "Off for everyone"
}, {
    "name": "Search And Assistant",
    "status": "On for everyone"
}, {
    "name": "Sharing",
    "status": "On for everyone"
}, {
    "name": "Shopping Transactions",
    "status": "On for everyone"
}, {
    "name": "Sites",
    "status": "Off for everyone"
}, {
    "name": "Studio",
    "status": "Off for everyone"
}, {
    "name": "Tour Creator",
    "status": "Off for everyone"
```

```
    }, {
      "name": "Web and App Activity",
      "status": "Off for everyone"
    }, {
      "name": "YouTube",
      "status": "On for everyone"
    }],
    "resold_information": {
      "bill_to_customer_id": "NA (Not a resold customer)"
    }
}
```

# Exhibit G

| | |
|---|---|
| **From:** | Sean Miller |
| **To:** | Darrick Angelone |
| **Subject:** | Re: Your Google Workspace data transfer was successful for Sean Miller to Deon Taylor Assistant |
| **Date:** | Thursday, August 4, 2022 10:53:06 AM |

Copy.

Sean

On Tue, Aug 2, 2022 at 1:49 PM Darrick Angelone <darrick@hiddenempirefilmgroup.com> wrote: This will need to be set up internally on hefg side and transfer request made there. This is an aone service being discontinued with current outstanding balance.

On Tue, Aug 2, 2022 at 13:46 Sean Miller <sean@hiddenempirefilmgroup.com> wrote: Okay, but why is my data being transferred to the DT Asst?

Like my emails and stuff?

Sean

On Tue, Aug 2, 2022 at 1:44 PM Darrick Angelone <darrick@hiddenempirefilmgroup.com> wrote: Accounts are being closed out and where necessary set up for transfer.

On Tue, Aug 2, 2022 at 13:25 Sean Miller <sean@hiddenempirefilmgroup.com> wrote: What is this?

Sean


**Sean Miller**
Office Manager

***Hidden Empire Film Group***

c | 818.634.4989

o | 323.613.7120

e | sean@hiddenempirefilmgroup.com

w | www.hiddenempirefilmgroup.com

THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. This e-mail message and/or any attachments thereto may be confidential, legally privileged, and/or exempt from disclosure under applicable law. If the reader of this message is not an intended recipient, you are hereby notified that any review, use, disclosure, dissemination, forwarding or copying of this e-mail message and/or attachments or taking of any action in reliance on the contents therein is strictly prohibited. Please notify Hidden Empire Film Group immediately by reply e-mail or telephone, and delete the original message and all attachments from your system. Thank you.


---------- Forwarded message ---------
From: **The Google Workspace Team** <workspace-noreply@google.com>

Date: Tue, Aug 2, 2022 at 12:59 PM
Subject: Your Google Workspace data transfer was successful for Sean Miller to Deon Taylor Assistant
To: <[sean@hiddenempirefilmgroup.com](mailto:sean@hiddenempirefilmgroup.com)>



Hello Admin,

Google Workspace recently processed a request from Darrick Angelone ([darrick@hiddenempirefilmgroup.com](mailto:darrick@hiddenempirefilmgroup.com)) to transfer data for Sean Miller ([sean@hiddenempirefilmgroup.com](mailto:sean@hiddenempirefilmgroup.com)) to Deon Taylor Assistant ([dtaylor_asst@hiddenempirefilmgroup.com](mailto:dtaylor_asst@hiddenempirefilmgroup.com)).

The data transfer was successful.

**Sincerely,**

**The Google Workspace Team**



© 2022 Google LLC [1600 Amphitheatre Parkway, Mountain View, CA 94043](#)

*You're receiving this mandatory email service announcement to update you about important changes to your Google Workspace product or account.*

--
Warm regards,
Darrick R. Angelone

Sent while on the move... Please excuse typo and grammar issues.
--
Warm regards,
Darrick R. Angelone

Sent while on the move... Please excuse typo and grammar issues.

# Exhibit H

**darrick@aone.la**

| | |
|---|---|
| **From:** | darrick@hiddenempirefilmgroup.com |
| **Sent:** | Wednesday, January 17, 2018 8:41 AM |
| **To:** | Roxanne Avent |
| **Subject:** | Re: traffik dev balance invoice attached |

I am speechless!

Sent on the fly....

On Wed, Jan 17, 2018 at 8:33 AM -0800, "Roxanne Avent" <roxanneavent@gmail.com> wrote:

Wow. Now he is trying to protect our brand. How does he go from an invoice to this

Roxanne
916.257.2475

Begin forwarded message:

> **From:** Jeff Clanagan <jclanagan@lionsgate.com>
> **Date:** January 17, 2018 at 8:15:18 AM PST
> **To:** Roxanne Avent <roxanneavent@gmail.com>
> **Cc:** Roxanne <roxanne@hiddenempirefilmgroup.com>, Deon Taylor <Deontaylor@me.com>
> **Subject: Re: traffik dev balance invoice attached**

Roxanne, I spoke to Deon about this we are good.  Darrick is not contracted by my company so I am not in position to consult with him about anything at this point.  We have not had any conversations. The stuff I am talking about is I am trying to keep your brand clean inside Lionsgate.  As you know Lionsgate was recently served with garnishment papers for you and Deon.  Then I get an invoice for social media work rendered before we even had signed agreement.  I did not hire him to do any social media work nor is he in my budget or even set up as a vendor at the company.  I explained to you previously I am willing to figure out a way to use him going forward, I just need to determine where he can best help and support our existing efforts.  I cannot pay for something he did prior to the agreement being signed or work he was not contracted for.




1

**From:** Roxanne Avent <roxanneavent@gmail.com>
**Date:** Wednesday, January 17, 2018 at 8:09 AM
**To:** Jeffery Clanagan <jclanagan@lionsgate.com>
**Cc:** Roxanne <roxanne@hiddenempirefilmgroup.com>, Deon Taylor <Deontaylor@me.com>
**Subject:** Re: traffik dev balance invoice attached

Jeff do what type of stuff??  I have no idea what your taking about. I didn't submit it. You should consult Darrick directly. I'm sure he wouldn't submit an invoice without speaking to you about it coming first and the work he has done.

Roxanne
916.257.2475

On Jan 16, 2018, at 5:01 PM, Jeff Clanagan <jclanagan@lionsgate.com> wrote:

Roxanne Lionsgate can't pay this.  The work was done prior to signing of the agreement.  Additionally you can't just submit an invoice with no back up. I spoke to Deon about this already.  Lastly this is not in my budget.  We cannot do this type of stuff.

**Jeffery Clanagan**
President



2700 Colorado Ave. Suite 200 | Santa Monica, CA 90404
**corporate office (424) 214-4231** | production office: (818) 227-6400

website | vCard | map | email

---

**From:** Roxanne Avent <roxanneavent@gmail.com>
**Date:** Tuesday, January 16, 2018 at 4:59 PM
**To:** Jeff Clanagan <jclanagan@lionsgate.com>
**Cc:** Roxanne <roxanne@hiddenempirefilmgroup.com>, Deon Taylor <Deontaylor@me.com>
**Subject:** Re: traffik dev balance invoice attached

Hey Jeff

Approved

Roxanne
916.257.2475

On Jan 16, 2018, at 4:53 PM, Jeff Clanagan <jclanagan@lionsgate.com> wrote:

See attachment.

**Jeffery Clanagan**
President

2700 Colorado Ave. Suite 200  |  Santa Monica, CA 90404
**corporate office (424) 214-4231** | production office: (818) 227-6400

**website** | **vCard** | **map** | **email**

---

**From:** Darrick Angelone <darrickangelone@aoneent.com>
**Date:** Tuesday, January 16, 2018 at 2:10 PM
**To:** Jeff Clanagan <jclanagan@lionsgate.com>, Jeff Clanagan <jeff@codeblack.com>
**Subject:** traffik dev balance invoice attached

Jeff,

Please find attached the balance invoice for the initial Traffik dev. Prompt payment is required.


**Darrick Angelone**
darrickangelone@aoneent.com
tel: +1 323 205 6506
mob: +1 323 989 2221
aoneunlimited.com

# Exhibit I

| | |
|---|---|
| **From:** | deon taylor |
| **To:** | Mastroberte, Glen G |
| **Cc:** | darrick@aone.la; Quincy Newell; roxanne@hiddenempirefilmgroup.com; omar@hiddenempirefilmgroup.com; dtlaw5@gmail.com |
| **Subject:** | Re: Fear Game Partnership |
| **Date:** | Thursday, May 26, 2022 10:57:48 AM |

Glen —

Coming up for air — we are knee deep in this project — wanted to see if you and Darell connected regarding the game — just wanted to follow up .

Thanks !

Sent from my iPhone

DEON TAYLOR
HIDDEN EMPIRE FILM GROUP
GOD WORKS ..
Passion beats Talent -


On May 24, 2022, at 11:29 AM, Mastroberte, Glen G <Glen.Mastroberte@skadden.com> wrote:


Darrell,

Please call me to discuss as soon as possible.

Darrick, in the meantime, please cease all exploitation, promotion, publicity, etc. of any game, NFT, collectables, etc. (whether for marketing purposes or otherwise) based on or incorporating any IP from the film "Fear", including the name thereof and the name and likeness of any characters therein.

Best,
**Glen G. Mastroberte**
Partner
**Entertainment Group**
**Skadden**, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue | Los Angeles | California | 90071-3144
T: +1.213.687.5699 | F: +1.213.621.5699
glen.mastroberte@skadden.com


**From:** darrick@aone.la <darrick@aone.la>
**Sent:** Tuesday, May 24, 2022 11:18 AM
**To:** 'Quincy Newell' <quincy@hiddenempirefilmgroup.com>; 'deon taylor'
<deon@hiddenempirefilmgroup.com>; Mastroberte, Glen G (LAC) <Glen.Mastroberte@skadden.com>
**Cc:** roxanne@hiddenempirefilmgroup.com; omar@hiddenempirefilmgroup.com; dtlaw5@gmail.com
**Subject:** [Ext] RE: Fear Game Partnership

For context and to be more precise, the element can be found on page 30 of the marketing strategy I've previously circulated and also have attached to this email. Thank you.

Warm regards,

**Darrick Angelone**
AOne Creative LLC.
o: 323.205.6506 | m: 310.869.2354
aone.la

**From:** Quincy Newell <quincy@hiddenempirefilmgroup.com>
**Sent:** Tuesday, May 24, 2022 10:59 AM
**To:** deon taylor <deon@hiddenempirefilmgroup.com>; Glen Mastroberte <glen.mastroberte@skadden.com>
**Cc:** Darrick Angelone <darrick@aone.la>; roxanne@hiddenempirefilmgroup.com; omar@hiddenempirefilmgroup.com; dtlaw5@gmail.com
**Subject:** Re: Fear Game Partnership

Good morning all,

Looping in Glen Mastroberte who will handle discussions around your proposed digital/mobile game and the use of Hidden Empire's proprietary IP "FEAR" as the basis for the game.

Glen, will call you to give you background.

Best regards,

Quincy

QUINCY C. NEWELL | **HIDDEN EMPIRE FILM GROUP** | COO | cell: 818.455.6398 | email: quincy@hiddenempirefilmgroup.com | hiddenempirefilmgroup.com

> On May 7, 2022, at 7:55 AM, deon taylor <deon@hiddenempirefilmgroup.com> wrote:
>
> Got it !!! Thanks
>
> Sent from my iPhone
>
> DEON TAYLOR
> HIDDEN EMPIRE FILM GROUP
> GOD WORKS ..
> Passion beats Talent -

> On May 6, 2022, at 9:17 PM, Darrick Angelone <darrick@aone.la> wrote:
>
> Deon,
>
> Per our conversation Thursday morning, please find attached a detailed breakdown of the business surrounding the Fear game.
>
> In addition to the game which is more of a marketing vehicle, we've added the classic approach of nfts as collectables. Where the potential upside for the game is limited, the collectable addition as just a revenue generator could generate $16million for the film and cast.
>
> Please let me know when is a good time next week that I can walk you, Roxanne and Omar through it and answer all your questions so that Darrell and Quincy can dive into formalizing a partnership, on this.
>
> Thank you.

Fear Mobile Game Demo:
https://www.dropbox.com/s/nsx2mhatl6e3pjz/demo%20showcase.mp4?dl=0

------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

==============================================================================

## CERTIFICATE OF SERVICE

I am employed in Los Angeles County, California.  I am over the age of 18 and not a party to this action; my business address is 27001 Agoura Road, Suite 350, Calabasas, CA 91301.  My email address is ynelson@kdeklaw.com.

I certify that on August 4, 2025, I served: **DECLARATION OF DEFENDANT DARRICK ANGELONE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** on the following parties or counsel of record as follows:

| | |
|---|---|
| Felton T. Newell, Esq.<br>Newell Law Group PC<br>1801 Century Park East, 24th Floor<br>Phone (310) 556-9663<br>E-mail:  felton@newellpc.com;<br>christine@newellpc.com | *Counsel for Plaintiffs* |
| Justin Kian, Esq.<br>J.T. Fox, Esq.<br>LAW OFFICES OF JT FOX, APC<br>556 S. Fair Oaks Avenue, Suite 444<br>Pasadena, California 91105<br>Telephone: (888) 750-5530 - Fax: (888) 750-5530<br>Email:  jt@jtfoxlaw.com;<br>justin@jtfoxlaw.com | *Co-Counsel for Defendants* |

By ECF/CM: I electronically filed an accurate copy using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System.

I declare under penalty of perjury under the laws of the Unites States of America and the State of California that the foregoing is true and correct.  Executed at Calabasas, California on August 4, 2025.


/s/ *Yolanda Nelson*
Yolanda Nelson

KRAMER, DeBOER & KEANE
A LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
27001 AGOURA ROAD, SUITE 350
CALABASAS, CA 91301
TELEPHONE (818) 657-0255