UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

HIDDEN EMPIRE HOLDINGS, LLC,  )
et al.,                       )
                              )
          Plaintiffs,         )
                              )
               vs.            )   2:22-CV-6515-MWF
                              )
DARRICK ANGELONE, et al.,     )
                              )
          Defendants.         )
_____

REPORTER'S TRANSCRIPT OF HEARING

Los Angeles, California

Tuesday, April 9, 2024

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

APPEARANCES OF COUNSEL:


For the Plaintiffs:


                SANDERS ROBERTS LLP
                By:  Lawrence Hinkle, Attorney at Law
                     Stephanie Jones Nojima, Attorney at Law
                1055 West 7th Street, Suite 3200
                Los Angeles, California 90017




For the Defendants:

                KRAMER DEBOER & KEANE
                By:  Sandra Calin, Attorney at Law
                21860 Burbank Boulevard, Suite 370
                Woodland Hills, California 91367

                LAW OFFICES OF JT FOX APC
                By:  JT Fox, Attorney at Law
                556 South Fair Oaks Avenue, Suite 444
                Pasadena, California 91105

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

THE CLERK:  Calling item number one, case number CV-22-6515-MWF Hidden Empire Holdings, LLC, et al. vs. Darrick Angelone, et al.

Counsel state your appearance for the record, beginning with counsel for plaintiffs.

MR. HINKLE:  Good morning, Your Honor.  Lawrence Hinkle appearing on behalf of the plaintiffs.

MS. NOJIMA:  Good morning, Your Honor.  Stephanie Jones Nojima appearing on behalf of the plaintiffs.

MR. FOX:  JT Fox on behalf of the defendants.

MS. CALIN:  Good morning.  Sandra Calin appearing on behalf of the defendants.

THE COURT:  Good morning, counsel.  Good morning to the witnesses who are on the Zoom call, since experts are allowed to hear each other's testimony, and good morning, Mr. Angelone.

As I previously set out, the purpose of this is to allow each side to cross-examine the other's expert, and so factual findings can be made in regard to the requested motion.  Both witnesses submitted testimony under oath, the two declarations of Ms. Burke and the report by Mr. Watts, which was then affirmed under penalty of perjury.

As I mentioned, in order to save time, those declarations under oath will be deemed the direct testimony of the witnesses.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

Each side will have a half hour to cross-examine the other -- the opposing witness, and then there will be 15 minutes for rebuttal.

We'll start with the plaintiffs' expert here.

Ms. Sanchez, would you please swear in Ms. Burke?

THE CLERK:  Yes, Your Honor.  Ms. Burke, please raise your right hand.

THEREUPON:

ERIN BURKE,

Called in these proceedings, and after having been first duly sworn, testifies as follows:

THE CLERK:  Please state your name for the record.

THE WITNESS:  Erin Burke.

THE CLERK:  Thank you.

THE COURT:  All right.  Counsel for Mr. Angelone may proceed.

MS. CALIN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. CALIN:

Q. Ms. Burke, when were you first retained in this case?

A. Approximately October 2022.

Q. You were not obtained prior to October 2022?

A. No.  That is an approximate date.

Q. Okay.  And what was your -- what was the purpose of your retention?  What were you told you were retained to do?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

A. Yes, ma'am.  I was told there would be a transfer of assets from Mr. Angelone to the Taylors, and I was there to help facilitate the transfer of assets as listed in an injunction order.

Q. Now, we have your qualifications.  And do you have any kind of certifications from Google?

A. No, ma'am.

Q. What is your experience working with Google Workspace?

A. So in my current position at FTI Consulting, about approximately half the market share uses Google Workspace, and approximately half uses Microsoft.

And so in my business of consulting with security measures and hardening, as well as aiding in investigations, on the order of about half of those matters would involve consistent detailed use of Google Workspace.

Q. But you have not worked within Google as a cloud architect, have you?

A. I have not.

Q. Now, the primary focus for us here today is the allegation that Mr. Angelone deleted the Google Workspace for Hidden Empire Holdings.  Is that your understanding?

A. That is my understanding.

Q. Okay.  And it is your opinion that Mr. Angelone did so, correct?

A. That's correct.

Q. And what do you base that on?

A. I base it primarily on Google's words.  On multiple occasions, Google said that the account was deleted by the prior administrator, and Mr. Angelone was the only administrator for the workspace account.

        Moreover, the second reason why I form that opinion is there are logs that I saw with an IP address that is associated with Mr. Angelone that appeared in approximately one minute or so of the stated deletion time in additional Google logs.

Q. A couple of questions regarding your statement just now.

        Have you seen any log which shows that Mr. Angelone actually logged into the Google Workspace in the period between October 6th and October 10th of 2022?

A. I have.

Q. What have you seen that showed that?

A. I saw in the Google security audit logs that Mr. Angelone's IP logged in on October 10th, I believe it was 19:32 time.

Q. That was the IP address, correct?

A. That was an IP address, yes.

Q. Okay.  That doesn't mean that it was Mr. Angelone himself who logged in, does it?

A. No, it does not.

Q. Okay.  You've reviewed the documents that were produced

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

by Google pursuant to subpoena, correct?

A. I did.

Q. And the documents show various times when different people logged into the Google Workspace, correct?

A. Correct.

Q. Okay.  Do you see any login by Mr. Angelone into the Google Workspace between October 7th and October 10, 2022?

A. In the Google user logins, no, I did not.

Q. Okay.  Is there any way to tell who deleted the Google Workspace?

A. I would refer, as I did in my declaration as I've just mentioned a moment ago, to Google itself.  Google stated that it was the prior administrator that deleted the account.

Q. If there is no evidence of Mr. Angelone logging into the Google Workspace, how could he have deleted the account?

A. Sure.  So one is that there is a fairly rapid sequence of events between two Google Workspace accounts which rely on the same underlying domain.  And the deletion times, from what I think we have all agreed to refer to as the first or the old Google Workspace, were only about a minute apart from logs that I saw in the new Google Workspace account.

So it is possible that given a rapid changeover of accounts, that logging could be queued, delayed, lost.  I don't know, and I'm not going to speculate on that.  That would be a question for Google.

Q. Okay. So you are referring to the document that shows a number of logins into the Google Workspace, correct?

A. I would refer to those as the user logs, if I understand your question correctly.

Q. Okay. Yes.

Give me one minute to call that up. That is what's been identified as Exhibit 19 in the document that is Number 111 in the docket. Is that correct? I would like to share my screen and show you this document.

THE COURT: That might be, yeah, preferable. Thank you.

Q. Okay. Is this the document you are referring to?

A. This is not what I am referring to when I say "the user logs".

Q. Okay.

A. Go ahead.

Q. Do you have the user logs available that you are referring to?

A. I have reviewed the user logs as part of the Google production.

Q. Do you have them available?

A. In front of me? No, I have nothing in front of me.

Q. And you can't produce them? You can't share your screen and show the Google logs?

A. I -- I don't have any of the documents for the case

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

available immediately.

Q. All right.

A. I could make them available.  I just would need to --

Q. All right.  So is this one of the documents that shows who accessed the Google Workspace?

A. Yes.  This is -- this is a document that shows access to a Google Workspace.  Access is a reasonably fair word to use, sure.  It's more account activity.

Q. All right.  And is this one of the documents you are relying on to -- for your testimony that Mr. Angelone accessed the Google Workspace?

A. Yes.

Q. Okay.  What in this document shows that Mr. Angelone accessed the Google Workspace?

A. So this document shows that there was an event logged in Google systems, and the IP address causing that event to be logged began with, I believe it was 2600.  It's an IP version 6 address.

That IP address was subpoenaed by counsel.  And the records produced by the ISP associated Mr. Angelone with that as a subscriber, or his mother as a subscriber, I believe.

Q. Does this actually show that Mr. Angelone actually accessed the workspace, or attempted to?

A. Mr. Angelone?  No, it would just be the IP that was associated with him that did.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

Q. And so you can't say that Mr. Angelone is the one who accessed this workspace, correct?

A. No, I cannot say that.

Q. Okay.

MS. CALIN: All right.  I'm sorry, I need to figure out how to get this document back up.

THE COURT:  Let me say, counsel is obviously not required to use all 30 minutes.  I just wanted to give that as an outer limit.

MS. CALIN:  I appreciate that, Your Honor.

Q. Is it possible for Google to delete a workspace?

A. Yes.

Q. Okay.  Your testimony is that between October 7th and October 10th, this workspace was deleted, correct?

A. Yes.

Q. Okay.  And the reason you say Mr. Angelone did that is because his IP address was used to login to the workspace; is that right?

A. Also because Google said that the administrator had deleted the account, and Angelone was the only administrator.

Q. Okay.  When was he made administrator?

A. I believe from Mr. Angelone's statements to me, he was administrator when he signed up for the Workspace account.  I don't know the exact dates.

Q. But isn't it true that in September of 2022, Mr. Angelone

was no longer the administrator, but Roxanne Taylor was?

A. That is not my understanding, no.

Q. You believe that Mr. Angelone was the administrator the entire time between September 7th and October 10th of 2022?

A. No, I don't believe that.

Q. Okay.  Who else was the administrator besides Mr. Angelone during that time period?

A. As I understand it, from Google's records, they had him in a temporary spot.  Roxanne Taylor had filed an internal request, as I understand it, Mr. Angelone had.

Google was in the position, with one person saying one thing, and another person saying another, to attempt to house proper ownership of the account, so they could make the right administrator decision.

And so my understanding was that there was a period where Mr. Angelone was not an administrator, and then ultimately he was reinstated as the administrator.

Q. At some point he ceased to become the administrator, correct?

A. Yes, that's correct.

Q. When was he reinstated as the administrator, though, before he ceased being the administrator?

A. According to the Google documentation I reviewed, he was reinstated at approximately October 7th.

Q. Prior to October 7th, could someone else have deleted the

Google Workspace?

A. Highly -- yeah, highly improbable that somebody else could have, but Google could have.

As I mentioned before, Google is the owner, and if there is abuse of their systems and anything, they certainly have the power to delete as needed.

Q. So you really can't say whether the Google Workspace was deleted by Mr. Angelone as someone from Google, correct?

A. That's correct.

Q. Okay.  Thank you.

MS. CALIN:  That's all I have for now.

THE COURT:  All right.  Thank you.

Redirect?

MS. NOJIMA:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. NOJIMA:

Q. Ms. Burke, have you seen any evidence in everything you have reviewed that anybody other than Mr. Angelone likely deleted the account?

A. No.

Q. Specifically, have you seen any evidence that Google on its own initiative deleted the account?

A. No.

MS. NOJIMA:  Nothing further, Your Honor.

THE COURT:  That was -- a very brief recross, in

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

light of -- in light of a brief redirect?

MS. CALIN:  No, Your Honor.

THE COURT:  Okay.  Thank you.

Then let's hear from Mr. Watts.

Ms. Sanchez, would you please swear in Mr. Watts?

THE CLERK:  Yes, Your Honor.

Mr. Watts, please raise your right hand.

THE COURT:  I'm sorry, Ms. Sanchez, you are muted.

THE CLERK:  Okay.  Mr. Watts, would you unmute, as well?

THE WITNESS:  I'm actually on the same microphone.

THE CLERK:  Oh, I see.

Please raise your right hand.

THEREUPON:

RICK WATTS,

Called in these proceedings, and after having been first duly sworn, testifies as follows:

THE CLERK:  Thank you.

Please state your name for the record.

THE WITNESS:  Rick Watts.

THE CLERK:  Thank you.

THE COURT:  All right.  Counsel for Hidden Empire may proceed.

MR. HINKLE:  Thank you, Your Honor.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

CROSS-EXAMINATION

BY MR. HINKLE:

Q. Good morning, Mr. Watts.

You were retained to provide a rebuttal to the expert reports of Erin Burke and Alex Eisen in this case, correct?

A. Yes, sir.

Q. Now, in conducting your work in this case, you reviewed their reports and the entire documentary record in support of their reports, correct?

A. That's correct.

Q. And based on your review, you agree with Ms. Burke's position that there was no administrator of the Hidden Empire Google Workspace account between September 7th and until after October 7th, which was the date Google reinstated Mr. Angelone's administrator privileges on the account, correct?

A. What I agree to is that there was -- Mr. Angelone was not the administrator between September 6th and October 7th. And Google was the administrator of the workspace, which is typical for Google to do in this type of situation.

Q. Now, do you happen to have your report in front of you, Mr. Watts?

A. I can bring that up, if you like.

Q. Sure. And please let me know when you have it in front

of you.

A. Okay. I have my opinion up in front of me.

Q. And please turn to page 13 of your report. And at the top of that page, which is part of paragraph 35, which begins on the preceding page, the last sentence of your report refers to the time period we were just referring to.

Do you see that?

A. I do.

Q. And this, your report, the dates that you indicated that there was no administrator of the account, was September 7th through October 7th; is that right?

A. That's actually what I say in my report there is that the Google support team was the administrator during that timeframe.

Q. Okay. Well, why don't I just read your sentence that I'm referring to, then.

And I quote: "During that time, Mr. Angelone was prevented from any administrative work on the Google Workspace environment from September 7th until after October 7th when Google reinstated Mr. Angelone's admin privileges."

Do you see that?

A. I do.

Q. Do you disagree with the statement in your report?

A. I do not.

Q. Now, according to your report, it is your opinion that there is insufficient evidence that Mr. Angelone deleted Hidden Empire's Google Workspace account, correct?

A. That's correct.

Q. Now, the documentary record that you and Ms. Burke reviewed included records from Google, correct?

A. That's correct.

Q. Now, with regard to your opinion that Mr. Angelone did not delete the account, the only Google records that you refer to in your report itself are the Google audit logs, correct?

A. That's correct.  I also make reference to the support logs that Ms. Burke included in her opinion.

Q. Right.  Audit logs and support logs.  Those are the only Google records you refer to in your report, correct?

A. That's correct.

Q. Now, you did not reference in your report the other Google records relied on by Ms. Burke, correct?

A. I don't recall any other Google records being relied on by Ms. Burke.

Q. Okay.  Well, for example, you did not refer to any of the correspondence Google sent to Roxanne Taylor about the deletion of the account, correct?

A. That is actually included in all of the subpoena response.  So when I say I used the subpoena response

documents, those are all included in the subpoena response from Google.

Q. Yes, we are familiar with that, and I believe we just heard Ms. Burke's testimony with respect to that.

But what I'm referring to is your report that you prepared where you state the information that you relied on for your opinions in this case.

Do you understand that?

A. I do.  I also relied upon the exhibits that Ms. Burke used in her opinion as I went through her opinion.

Q. And in your report, Mr. Watts, when stating what you relied on for your opinion, you do not refer in your report itself to any of the correspondence and communications from Google to Ms. Taylor, correct?

A. Directly.  That's correct.

Q. Please look at Exhibit 53.  Do you have that in front of you, Mr. Watts?

A. I can bring that up, if you wish.

Q. Sure.

MR. HINKLE:  And, Your Honor, if you would like for us to share the screen?

THE COURT:  I would.

MR. HINKLE:  You would not?

THE COURT:  I would like you to share it on the screen.

MR. HINKLE:  Okay.  We will.

Q. And when you have it up, please turn to page 53.27.

A. And this is which exhibit one more time, please?

Q. 53.

A. I have them by the name that plaintiff expert put them in, rather than the number that is listed on the document.

Q. We'll share the screen.

A. Okay.

MS. NOJIMA:  I'm going to pull up the document.

I'm sorry, Your Honor.  I'm unable to pull it up.

MR. HINKLE:  Okay.  Well, we'll have a different approach in the meantime.

Q. So in the Google records that we are referring to, there are notes, what is referred to as Google notes, which is communications between Google and Ms. Taylor, correct?

A. Yes.

Q. And you reviewed those records in preparation of your opinions in this case, correct?

A. I did.

Q. I'll represent that at Exhibit 53, which is page 27 of -- 53.27, there are some of the Google Workspace support notes that were made available to you that you were -- as you were developing your opinion in this case.

Do you recall that?

A. I do.

Q. And in those notes, there are statements from Google about who deleted the account, correct?

A. There are statements in that that indicate that the administrator for the account deleted the workspace.

Q. That's correct.

MR. HINKLE: And for Your Honor's edification, on that page, there is, for example, the following statement from Google to Ms. Taylor: "Please be informed that the deletion of the old account was performed by the existing administrator."

Q. Is that the -- do you recall that statement, Mr. Watts?

A. I do.

Q. Now, you do not refer to any of those notes from Google to Ms. Taylor in your report itself, correct?

A. That's correct.

Q. Now, Mr. Angelone was the administrator of the old account, correct?

A. For a period of time, he was; for a period of time, he was not. And there is a lot of churn between October 5th and October 10th in the fact scenarios. That is why you didn't hear me mention that particular message in my report. The underlying facts from Google don't support that statement.

Q. You were not aware of any administrator of the account, other than Mr. Angelone, correct?

A. That's incorrect. Google was the administrator for the

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

account from September 6th until October 7th.

Q. So other than Mr. Angelone and, as you say Google, you are not aware of any other administrator of the account, correct?

A. Not prior to October 10th. That's correct.

Q. Well, how about after October 10th?

A. Roxanne Taylor was the administrator as of October 10th.

Q. So is it your testimony that Ms. Taylor was the administrator of the old account?

A. No, I'm not -- there was no old account as of October 10th.

Q. That's correct. So the only administrator of the old account is, as you put it, either Mr. Angelone or Google, is that --

A. That's correct.

Q. -- your testimony?

Sorry. Was there an answer?

A. I'm sorry. Yes, that's correct.

Q. Now, in your report, you state that based on the facts presented in Ms. Burke's declaration, there must be an explanation for the deletion, other than Mr. Angelone deleting the account, correct?

A. That's correct.

Q. And in your report, you did not provide an alternative explanation for the deletion of the account in your report,

correct?

A. I did not, no.  And my rationale for that was there were no facts actually showing that Mr. Angelone deleted the account.  There such a dearth of facts in fact provided to the Google response, that coming up with alternative scenarios when we couldn't prove out the base scenario seemed like a little much.

Q. And you do not have any information to disprove that Mr. Angelone did not delete the account, correct?

A. I do not have -- a double negative.  I do not have any proof that he did not delete the account.  Actually, I do, I guess.  I have the absence of facts would be what I would use as the proof.

Q. Now, directing your attention to the nine Icelandic domains.  Do you know what I'm referring to when I say "the nine Icelandic domains"?

A. I do, yes.

MS. CALIN:  I'm going to object to this line of questioning.  That has been resolved.

THE COURT:  I'll give a little latitude here to see if it gets tied in back to the deletion of the account.

MS. CALIN:  Thank you.

Q. Well, you conducted your own independent investigation regarding those domains, correct?

A. That's correct.

Q. Now, based on your investigation, you agree with Ms. Burke that all of those domains had been in the Jacky Jasper name account since 2021, correct?

A. I believe that that reestablished that they had been under that same registrar control.

Q. Right.  And the control was connected to the name Jacky Jasper, correct?

A. That's correct.

Q. Now, your research further indicated that there was no evidence of any transfer of any of those domains between 2021 and the time you prepared your report, correct?

A. I could not see that on the registrar records, that's correct.

Q. Now, in the Namecheap records were a list of all of the domains that were a part of that account, correct?  Do you recall seeing that in the record?

A. I've seen that evidence provided by Namecheap.

Q. Correct.  And included in the list of domains, and I'll refer to you that they were part of Exhibit 58 in this case, on pages 13, 14 and 15, those pages included the Hidden Empire domains, correct?

A. That is what the exhibit showed.  That's correct.

Q. And one of the domains that is in that list is the aventiii.com domain, correct?

A. I recall that, yes.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

Q. And you are aware that after the preliminary injunction was issued by this Court, Mr. Angelone transferred shared control of that Avent VIII domain to Ms. Taylor, correct?

A. I have been made aware of that, yes.

Q. Now, if Mr. Angelone was able to transfer shared control of that domain to Ms. Taylor, that would indicate that he had the ability to control the other domains listed in the same Jacky Jasper account, correct?

A. I don't know that that is accurate.

Q. Do you know it's not accurate?

A. So I know that there is a very big difference between access to a registrar, and having authority to transfer a domain.

Q. Do you know who Sean Merrick is?

A. I do.

Q. And Sean Merrick is a person that used the name Jacky Jasper, correct?

A. That's correct.  It's a pseudonym for Mr. Merrick.

Q. And are you also aware that Mr. Angelone used the pseudonym Jacky Jasper?

A. I am not aware that Mr. Angelone uses that as a pseudonym.  I am aware that he supports websites and digital assets and inventories that are part of the Sean Merrick/Jacky Jasper entertainment medium.

Q. Are you aware of any testimony directly from Mr. Angelone

himself where he stated under oath that Jacky Jasper is a pseudonym that he uses?

MS. CALIN:  Your Honor, I'm going to object again. This is far afield from what we are dealing with here.

THE COURT:  Yeah.  Sustained.

MS. CALIN:  Thank you.

Q. Now, prior to submitting your report, did you review any Twitter documents as part of your work in this case?

A. So I did review the opinions from the plaintiffs' experts, as well as the documents supporting their opinions.

Q. And do you recall, based on your review of those records, records regarding the Twitter handle Hidden Empire FG?

A. I do.

Q. And in those records, it stated that the creation date of the Twitter -- that Twitter handle as being January 12, 2023.

Do you recall that?

A. I do.

Q. And associated with the creation of that handle on January 12, 2023, was an e-mail address Jacky.Jasper@gmail.com.  Do you recall that?

A. I do recall that.

Q. Now --

MR. HINKLE: And that is all I have, Your Honor.

THE COURT:  All right.  Thank you.

Redirect?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

MS. CALIN:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. CALIN:

Q. Mr. Watts, can you describe your experience with the Google Cloud Google Workspace environment?

A. So I have, for the past five years, been a professional certified cloud architect.  And that certification comes from Google.  I have also worked as a practitioner in the Google Workspace environment as a professional.

Q. Thank you.

You heard Ms. Burke's testimony regarding why she believes that Mr. Angelone must have deleted the Google Workspace, correct?

A. I did.

Q. And what is your response to that?

A. So my response to that is, as I stated in my opinion, there is no record of Darrick Angelone accessing the Google Workspace environment after October 6th.

We know that an employee of HEFG logged into the Google Workspace on October 7th, and so without any log from Google that says Darrick Angelone was inside the environment, it would not have been possible for Mr. Angelone to have deleted the workspace after October 7th.

Q. Okay.  Thank you.

Can an administrator leak user logs?  Is that

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

possible?

A. That is not possible.

Q. If Mr. Angelone had logged into the Google Workspace account, there would be some record of him logging in?

A. That's correct.  That would have been in the log and subpoenas produced by Google.

Google has to meet regulatory guidelines, legal requirements in order to maintain health care, financial systems and all of that.

So they make their logs, they are immutable, that is our words.  That means you can't alter them, you can't adjust them, you can't edit them, and you can't delete them.

Q. The fact that there is no user log showing Mr. Angelone logged into the Google Workspace account would mean that he could not have deleted it; is that correct?

MR. HINKLE:  Objection.  Leading.

THE COURT:  I'll allow it.  Overruled.

THE WITNESS:  That is correct.  That is how I arrived at my opinion, based upon some detailed analysis of who was in the Google Workspace during the time period when the expert says it was deleted.

Q. Is anything else that Ms. Burke testified to that you have some issue with?

A. I'm sorry.  Can you repeat that question?

Q. Sure.  Is there anything else in Ms. Burke's testimony

that you would like to address?

A. I have -- I don't think there is anything outside of the opinion that I offered.  There is an entire period of time I honestly believe Ms. Burke is trying to establish Darrick Angelone had access and was trying to do certain things as an administrator in the Google account; when, in fact, he was not the administrator for 30 days within that same time period.

And that is necessary in her opinion to get us to understand and believe that Darrick Angelone deleted the workspace, while we don't have any actual records of that workspace deletion or his logging in as an administrator.

MS. CALIN:  Thank you.  That is all I have.

THE COURT:  All right.  I'll -- since both sides have some time left, I'll allow a brief amount of rebuttal testimony, if counsel wishes, from Ms. Burke, followed then by some cross, and then likewise with Mr. Watts.

MS. CALIN:  I'm sorry, Your Honor.  You wanted me to question her?

THE COURT:  No.  I wanted to give counsel the chance to elicit her testimony, if they wish, to what Mr. Watts just testified.  Then you can have some brief cross --

MS. CALIN:  Thank you.

THE COURT:  -- of that testimony.  And then likewise, you can elicit testimony from Mr. Watts in response

to what Ms. Burke is -- just about her testimony, if any, and then likewise, then, there can be a final thing of cross from the plaintiff.

MS. NOJIMA:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. NOJIMA:

Q. Ms. Burke, do you disagree with the testimony Mr. Watts just offered?

A. The -- there are a few clarifications that I would note. It is not necessarily the absence of logs, it's what Google produced to us.

So I can't say that there were no admin logs that showed the deletion, because Google did not produce those.

The second clarification that I would note relates to Mr. Watts's response to the prior administrator when he referred to that as potentially Google.

In the Google correspondence, it said by the existing administrator.  And at the time of saying that, the existing administrator was Mr. Angelone.  And that was the basis for me believing that that's, in particular, the administrator that they were referring to.

Q. And in your review of all of the subpoena returns that you referenced in your report and other documents, have you seen any evidence that Ms. Taylor was ever promoted to administrator privileges for the, what you referred to in

your report as the older, historical HEFG account?

A. No. I think Mr. Watts and I both agree to that, too, that she was never the administrator.

MS. NOJIMA: Nothing further. Thank you.

THE COURT: Any further cross-examination?

MS. CALIN: Yes, Your Honor. Just a couple of questions.

FURTHER CROSS-EXAMINATION

BY MS. CALIN:

Q. Are you saying, Ms. Burke, that Google failed to produce all of their documents?

A. That's my understanding, that counsel asked for the administrative logs, and Google did not produce them.

I have sent many subpoenas to Google over the course of my career, and it is not unusual for it to be the case for a provider to not respond completely to all requested records.

Q. But they did produce all the login records for the account, correct?

A. They produced user logins, that's correct.

Q. Okay. And if an administrator were to log in, wouldn't there be a record of the administrator logging in?

A. There should be, yes.

MS. CALIN: Thank you. Nothing further.

THE COURT: All right. Then likewise, if you wish

to elicit further testimony from Mr. Watts.

MS. CALIN:  Thank you.

REDIRECT EXAMINATION

BY MS. CALIN:

Q. Mr. Watts, you heard Ms. Burke's testimony now.  Are there any facts whatsoever that you have found that would indicate that Mr. Angelone, in fact, logged into this account in order to delete it?

A. I have -- I do not.  I base my opinion in large measure on the user logs.

User logs capture, as we -- as Ms. Burke stated in her opinion, an administrator is simply a user with elevated privileges.  Mr. Angelone did not have those privileges from September 6th until October 7th.

And the last time that Mr. Angelone logged into the workspace was on October 6th as a normal user without any administrative privileges.

In order for Mr. Angelone to have exercised the administrative privileges to delete the workspace, he would had to have logged in as the administrator.  There is no record of Mr. Angelone logging in as the administrator, which would have had to have happened after he was given those privileges back after October 7th.

MS. CALIN:  Thank you.  Nothing further, Your Honor.

THE COURT:  And any further cross-examination,

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

Mr. Hinkle?

MR. HINKLE:  No, Your Honor.

THE COURT:  All right.  Thank you.

The witnesses may now log off.  Thank you for appearing.

We have some time here.  Let me hear some further argument in support of the plaintiffs' motion, starting with the plaintiff, and then we'll hear from the defense.

MR. HINKLE:  Thank you, Your Honor.

I believe that we have met our burden of proof with respect to both the violation of the preliminary injunction, as well as spoliation of evidence.

The evidence that we have submitted only points in one direction as to the -- that would be the Hidden Empire account was deleted, and that all things point to Darrick Angelone.  There was a history of Darrick Angelone accessing and disrupting Hidden Empire's access to the account.

It is Mr. Angelone who prevented, hijacked the account and prevented Hidden Empire from accessing their own -- their Google Workspace accounts.

It is Mr. Angelone who was the admitted sole administrator of the account, and there is no dispute in this case that it is only the administrator of the account that can delete the account.

It is Mr. Angelone who is the only person who had

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

access as administrator of the account once the privileges were reinstated to him on or about October 7, 2022.

THE COURT:  In your view, had the deletion of the historical account already taken place, i.e., when the restoration occurred on October 7th to which account were the rights restored?

MR. HINKLE:  Yes, Your Honor.  The rights were restored to what we are referring to as the old account, the account with all of the historical e-mails.  That is the account, as clearly stated in the Google notes, to Ms. Taylor.  That is the account that was deleted.  That is the account with the historical e-mails.  And it is at that point, Your Honor, that Mr. Angelone deleted the account when the rights were reinstated.

Just for clarification, Your Honor, the only other account we are talking about is the account that we are referring to as the new account that Ms. Roxanne Taylor signed up for, or that was made accessible to Ms. Taylor after the original account was deleted by Mr. Angelone.

The notion, Your Honor, as Mr. Watts, that Google on its own decided to delete the account on its own, is directly contrary to all of the evidence in this case.  There is no evidence whatsoever that Google decided to delete the account.

In fact, there is a plethora of evidence where

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

Google is attempting to restore the account.  They make numerous statements about who specifically deleted the account.  And the only person that they point to is Mr. Angelone.

And so based on the evidence, and not just the Google records, Your Honor, but the IP addresses, also point to Darrick Angelone, and only Darrick Angelone.

You know, this is a case in which there is no question that Mr. Angelone does not have an issue with not telling the truth, with misrepresenting the facts.  And that is why a lot of the things that we talked about, Your Honor, were to expose to the Court all, you know, Mr. Angelone's true character here.

All of the things that he did to Hidden Empire, and all the things he did in violation of the preliminary injunction, and also to thwart Hidden Empire's ability to prosecute its case and defend against its claims, primarily his deletion of the e-mail account, there is no question in our mind that Mr. Angelone is the only person that could have, and the only person who did delete the account.

THE COURT:  Thank you.

Ms. Calin?

MS. CALIN:  Thank you, Your Honor.

So in order to meet plaintiffs' burden of proof, they have to show facts that prove their case.  All they have

is suppositions and innuendos.

According to even Ms. Burke, there is absolutely no record of Mr. Angelone actually logging into the Google Workspace account that would be required for him to delete the account.

You know, and I believe Your Honor asked last time, how did it get deleted? We don't know. What we do know is there is absolutely no record of Mr. Angelone logging in on the date that the Google account supposedly was deleted.

There may be a record of somebody with an IP address attempting to log in, but there is no record of the actual login into the account on the date that the account was deleted.

As Mr. Watts testified to, Google has to maintain the user logs. And they have produced all the documents they have showing who logged into the account when. And again, there is absolutely no record of Mr. Angelone logging into the account.

You know, Mr. Hinkle wants to paint this picture of Mr. Angelone not being truthful, and bringing in other unrelated issues at this point. Yes, the plaintiffs have a case against Mr. Angelone, but -- or they are trying to prove a case against Mr. Angelone, but Mr. Angelone himself has a case against the plaintiffs.

And I think that the allegations that the

plaintiffs' making against Mr. Angelone, and he can make as easily against the plaintiffs with respect to their conduct, but the issue we are dealing with today is whether he violated the preliminary injunction, and that requires clear and convincing facts that he did so.

And I believe that the evidence is clear that there are no facts showing that he, in fact, logged into the account in order to delete the account.

THE COURT:  Thank you.

The plaintiffs' motion is taken under submission.

Thank you, counsel.

MS. CALIN:  Thank you, Your Honor.

MR. HINKLE:  Thank you, Your Honor.

*****     *****     *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

---------------------------

Amy C. Diaz, RPR, CRR              December 31, 2025

S/  Amy Diaz

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER